**No. 24-10372**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Fair Fight, Inc.,

*Plaintiff-Appellant*

v.

True the Vote, Inc., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
No. 2:20-cv-00302-SCJ

## OPENING BRIEF OF APPELLANT FAIR FIGHT, INC.

Allegra J. Lawrence-Hardy
Leslie J. Bryan
Michelle McClafferty
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350

Uzoma N. Nkwonta
Jacob D. Shelly
Christina Ford
Tina Meng Morrison
Marcos Mocine-McQueen
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490

*Attorneys for Appellant Fair Fight, Inc.*

**No. 24-10372**
**Fair Fight, Inc. v. True the Vote, Inc.,** *et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Appellant Fair Fight, Inc. certifies that the following is a full and complete list of all persons, associations, firms, partnerships, or corporations having an interest in the outcome of this case and/or appeal:

- Bao, Judy, *Attorney for Intervenor*

- Berson, Scott, *Plaintiff*

- Berwick, Benjamin L., *Attorney for Amicus*

- Bopp Jr., James, *Former Attorney for Defendants-Appellees*

- Branch, Aria Christine, *Attorney for Plaintiff-Appellant*

- Bryan, Leslie J., *Attorney for Plaintiff-Appellant*

- Cogen, Maia J., *Attorney for Plaintiff-Appellant*

- Cooper, James, *Defendant*

- David F. Guldenschuh, P.C., *Former Attorney for Defendants-Appellees*

- Davis, Mark, *Defendant*

- Department of Justice, *Attorney for Intervenor*

- Devaney, John M., *Former Attorney for Plaintiff-Appellant*

- Elias Law Group LLP, *Attorney for Plaintiff-Appellant*

C-1

- Elias, Marc E., *Attorney for Plaintiff-Appellant*

- Engelbrecht, Catherine, *Defendant-Appellee*

- Evans, James Cullen, *Attorney for Defendants-Appellees*

- Fair Fight, Inc., *Plaintiff-Appellant*

- Ford, Christina Ashley, *Attorney for Plaintiff-Appellant*

- Gallant, Jeffrey P., *Former Attorney for Defendants-Appellees*

- Greenberg Traurig LLP, *Attorney for Defendants-Appellees*

- Gregory Wynne Arney PLLC, *Attorney for Defendants-Appellees*

- Guldenschuh, David F., *Former Attorney for Defendants-Appellees*

- Heredia, Jocelyn, *Plaintiff*

- Hughes, Aileen Bell, *Attorney for Intervenor*

- Johnson, Ron, *Defendant*

- Jones, Steve C., *U.S. District Court Judge*

- Kistler, Cameron, *Attorney for Amicus*

- Kramer, Courtney, *Former Attorney for Defendants-Appellees*

- Kramer Law LLC, *Former Attorney for Defendants-Appellees*

- Krevolin & Horst LLC, *Attorney for Amicus*

- Larsen, Joseph R., *Attorney for Defendants-Appellees*

- Lawrence & Bundy, LLC, *Attorney for Plaintiff-Appellant*

- Lawrence, Allegra J., *Attorney for Plaintiff-Appellant*

- Lindenbaum, Dara, *Former Attorney for Plaintiff-Appellant*

- McClafferty, Michelle, *Attorney for Plaintiff-Appellant*

- Mellett, Timothy, *Attorney for Intervenor*

- Milbank, Courtney Turner, *Former Attorney for Defendants-Appellees*

- Mitchell, Molly Elizabeth, *Former Attorney for Plaintiff-Appellant*

- Mobley, Ansley Mikayla, *Attorney for Defendants-Appellees*

- Mocine-McQueen, Marcos, *Attorney for Plaintiff-Appellant*

- Morrison, Tina Meng, *Attorney for Plaintiff-Appellant*

- Nkwonta, Uzoma, *Attorney for Plaintiff-Appellant*

- Paikowsky, Dana, *Attorney for Intervenor*

- Paredes, Eric John Galvez, *Attorney for Amicus*

- Perkins Coie LLP, *Former Attorney for Plaintiff-Appellant*

- Powell, Cameron, *Attorney for Defendants-Appellees*

- Protect Democracy Project, *Attorney for Amicus*

- Ramirez, Joel J., *Former Attorney for Plaintiff-Appellant*

- Rodgers, Torryn Taylor, *Former Attorney for Plaintiff-Appellant*

- Sandler Reiff Lamb Rosenstein & Birkenstock, P.C., *Former Attorney for Plaintiff-Appellant*

- Shelly, Jacob D., *Attorney for Plaintiff-Appellant*

- Siebert, Melena, *Former Attorney for Defendants-Appellees*

- Smith III, Ray Stallings, *Former Attorney for Defendants-Appellees*

- Smith & Liss, LLC, *Former Attorney for Defendants-Appellees*

- Somerville, Derek, *Defendant*

- Sparks, Adam, *Attorney for Amicus*

- The Bopp Law Firm, PC, *Former Attorney for Defendants-Appellees*

- Tobin, Thomas, *Former Attorney for Plaintiff-Appellant*

- True the Vote, Inc., *Defendant-Appellee*

- Williams, Mark, *Defendant*

- Wynne, Michael John, *Attorney for Defendants-Appellees*

- Yun, Jennifer J., *Attorney for Intervenor*

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. Section 11(b) of the Voting Rights Act, at issue in this case, protects voters from intimidation, threats, or coercion. The outcome of this appeal, which presents weighty legal questions, will be consequential for Appellant and for all voters in this Circuit.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES ................................................... iv

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ......................................3

STATEMENT OF THE ISSUES......................................................3

STATEMENT OF THE CASE.................................................4

    I.    Statutory Background .................................................4

    II.    Factual Background ...................................................7

        A. Shortly before filings its mass challenges, TTV attempted to
overturn the 2020 presidential election results despite having no
evidence of voter fraud. ...........................................7

        B. After failing to overturn the 2020 election results, TTV filed
mass voter challenges despite warnings that its challenge effort
was legally and factually erroneous......................................8

        C. Expert analysis confirmed that TTV's challenge lists were wholly
unreliable..............................................................11

        D. Defendants' challenges were likely to and did intimidate or
coerce Georgia voters. .........................................12

    III.    Procedural History....................................................17

    IV.    Standard of Review .................................................19

SUMMARY OF THE ARGUMENT ...................................20

ARGUMENT ...........................................................................22

I.   The district court misapplied Section 11(b) in adjudicating whether TTV's conduct resulted in voter intimidation or coercion. ........................22

  A. Georgia law cannot insulate TTV's conduct under Section 11(b). .......23

  B. The district court applied the incorrect causation standard in determining whether TTV violated Section 11(b). ...............................26

  C. Voters experienced coercion and intimidation within the meaning of Section 11(b). ......................................................................................30

     1.   Section 11(b) proscribes actions that put voters in fear for the act of voting. ..........................................................................31

     2.   The district court credited testimony and made factual findings that plainly established a Section 11(b) violation. ...................................................................................32

II.  TTV attempted to intimidate, threaten, and coerce voters in violation of Section 11(b). ........................................................................................39

  A. The district court misconstrued the legal elements of attempt. ............39

  B. The record confirms that TTV attempted to intimidate, threaten, or coerce voters. ..................................................................................44

     1.   TTV acted with specific intent to intimidate, threaten, or coerce voters. ...............................................................................44

     2.   TTV took substantial steps to intimidate, threaten, or coerce voters. ..................................................................................52

CONCLUSION ........................................................................................................54

CERTIFICATE OF COMPLIANCE ......................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. State*,
  163 S.E.2d 323 (Ga. Ct. App. 1968)....................................................41

*Bellitto v. Snipes*,
  935 F.3d 1192 (11th Cir. 2019) ..........................................................19

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ..........................................................25

*Caban-Wheeler v. Elsea*,
  71 F.3d 837 (11th Cir. 1996) ..............................................................19

*Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election
  Integrity Plan*,
  653 F. Supp. 3d 861 (D. Colo. 2023)...........................................26, 32

*Compulife Software Inc. v. Newman*,
  959 F.3d 1288 (11th Cir. 2020) ..........................................................19

*\*Cox v. Adm'r U.S. Steel & Carnegie*,
  17 F.3d 1386 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347
  (11th Cir. 1994)............................................................................27, 28

*Hafer v. Melo*,
  502 U.S. 21 (1991)..............................................................................24

*Hill v. Cundiff*,
  797 F.3d 948 (11th Cir. 2015) ......................................................28, 30

*Husted v. A. Philip Randolph Inst.*,
  584 U.S. 756 (2018)......................................................................27, 28

*League of United Latin Am. Citizens - Richmond Region Council 4614
  v. Pub. Int. Legal Found.*,
  No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018)........6, 26, 32

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
66 F.4th 905 (11th Cir. 2023) ...............................................................19

*Malley v. Briggs*,
475 U.S. 335 (1986)...............................................................................29

*Milwaukee & Saint Paul Ry. Co. v. Kellogg*,
94 U.S. 469 (1876)..................................................................................27

*Mont. Democratic Party v. Eaton*,
581 F. Supp. 2d 1077 (D. Mont. 2008)..................................................51

*Nat'l Coal. on Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021) .................................................5, 6

*Nat'l Coal. on Black Civic Participation v. Wohl*,
661 F. Supp. 3d 78 (S.D.N.Y. 2023) .............................6, 26, 31, 32

*People v. Delvalle*,
26 Cal. App. 4th 869 (1994) ...................................................................40

*People v. Trepanier*,
84 A.D.2d 374 (N.Y. App. Div. 4th Dep't 1982)....................................40

*Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*,
944 F.3d 886 (11th Cir. 2019) ................................................................29

*Rogers v. S. Star Logistics, Inc.*,
661 F. App'x 667 (11th Cir. 2016) ..........................................................37

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012).................................................................................5

*United States v. Balfany*,
965 F.2d 575 (8th Cir. 1992) ..................................................................37

*United States v. Ballinger*,
395 F.3d 1218 (11th Cir. 2005) .............................................22, 41, 53

*United States v. Bd. of Comm'rs of Sheffield*,
435 U.S. 110 (1978)..................................................................................6

*United States v. Beaty*,
   288 F.2d 653 (6th Cir. 1961) ...........................................................25, 31

*\*United States v. Bruce*,
   353 F.2d 474 (5th Cir. 1965) .........................................................24, 25, 26, 31

*United States v. Elliott*,
   No. 1:19-cr-00278-LMM-JSA-4, 2022 WL 20613209 (N.D. Ga.
   Oct. 4, 2022) .........................................................................................52

*United States v. Martin*,
   803 F.3d 581 (11th Cir. 2015) .......................................................28, 30

*\*United States v. McLeod*,
   385 F.2d 734 (5th Cir. 1967) .........................................................24, 31, 38, 51

*\*United States v. Murrell*,
   368 F.3d 1283 (11th Cir. 2004) .....................................................21, 39, 42, 44

*United States v. Parikh*,
   858 F.2d 688 (11th Cir. 1988) .......................................................37

*United States v. Rodriguez*,
   279 F.3d 947 (11th Cir. 2002) .......................................................28

*United States v. Taylor*,
   596 U.S. 845 (2022) .......................................................................53

*United States v. Wood*,
   295 F.2d 772 (5th Cir. 1961) .........................................................31

*Whatley v. City of Vidalia*,
   399 F.2d 521 (5th Cir. 1968) .........................................................25

*Willingham v. County of Albany*,
   593 F. Supp. 2d 446 (N.D.N.Y. 2006)...........................................6

**Statutes**

28 U.S.C. § 1291 ...............................................................................3

28 U.S.C. § 1331 ...............................................................................3

52 U.S.C. § 10101(b) ........................................................................5, 25

*52 U.S.C. § 10307(b) ................................................1, 4, 5, 24, 39, 43

52 U.S.C. § 20507(d) ...............................................................49

O.C.G.A. § 21-2-217....................................................................9, 49

O.C.G.A. § 21-2-230.................................................................10

**Other Authorities**

*Hr'gs on H.R. 6400 Before H. Subcomm. No. 5 on the Judiciary,
89th Cong. 11 (1965) .........................................................5, 6, 20, 51

## INTRODUCTION

In December 2020, True the Vote and its president Catherine Engelbrecht (collectively "TTV") launched a massive campaign to challenge the voting rights of over 360,000 Georgia voters in the weeks before the state's Senate runoff election—based on nothing more than a suspicion that these voters had forwarded their mail. The consequences of that effort were predictably devastating. Because it is common for voters to temporarily forward their mail for school, work, military service, or any number of reasons unrelated to voting eligibility, TTV's gargantuan challenge net ensnared qualified voters across Georgia. Several challenged voters testified to the distress that followed: a Black veteran in his 70s was "mentally destroyed" by the attack on his hard-won right to vote; a recent university graduate, freshly home from school, was "intimidate[d]"; a civilian military employee stationed overseas was "scared" and "overwhelmed"; a young woman who spent hours at her polling place trying to overcome TTV's voter challenge was so distressed that she has stopped voting altogether.

These events tell a story of large-scale voter intimidation, which, along with voting-related threats and coercion, is expressly prohibited by Section 11(b) of the Voting Rights Act ("VRA"). 52 U.S.C. § 10307(b).[1] By its plain text, Section 11(b)

---

[1] Like the district court, Appellants occasionally refer to "intimidation" as shorthand for all the activities proscribed by § 11(b). Doc. 335 at 113 n.57.

1

prohibits anyone from intimidating, threatening, or coercing another person for voting or attempting to vote, and it separately proscribes any "attempt" to commit those acts, imposing liability even if Defendants' scheme ultimately fails. The district court's findings paint a vivid portrait of TTV's campaign of intimidation and coercion, which TTV hoped would swing the Senate runoff elections. At every step of TTV's effort—from haphazardly assembling its challenge list based on unreliable criteria, to steamrolling over warnings from the Secretary of State's office and TTV's own volunteers about its challenges, to goading counties to act on its challenges and issuing thinly-veiled threats when they did not—TTV systematically opted for exaggeration rather than exactitude, puffery rather than precision, and voter intimidation rather than election integrity.

Although the district court found virtually all of these facts in Plaintiffs' favor, its legal analysis wandered far afield of Section 11(b)'s statutory framework. The court faulted Plaintiffs for failing to prove that TTV was the *sole cause* of voters' intimidation, when the law imposes no such requirement; it found dispositive that Georgia law authorizes voter challenges, even though *federal law* is supreme and it is common for otherwise legitimate acts to create legal liability when those actions cause intimidation; and the court failed to map its factual findings onto the legal elements of an "attempt" to violate Section 11(b), repeatedly faulting Plaintiffs for failing to prove a completed offense—which is not required for attempt liability.

2

This cascade of legal errors resulted from the district court's failure to identify the correct legal standards for Section 11(b) liability, which led the district court to enter judgment for TTV. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. The district court entered its final order on January 2, 2024. Doc. 335.[2] Fair Fight timely filed a notice of appeal on February 1, 2024. Doc. 340. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in concluding that Defendants could not be liable under Section 11(b) for the foreseeable consequences of their actions where they enlisted third parties to take steps that intimidated and coerced voters.

2.    Whether the district court erred in concluding Defendants' mass voter challenges did not result in coercion or intimidation within the meaning of Section 11(b) where the district court otherwise credited voters' testimony of feeling overwhelmed, wrongfully accused, stressed, nervous, discouraged, confused, anguished, scared, and intimidated by the challenges.

---

[2] "Doc." refers to the district court' docket. Trial transcripts cite the underlying docket number where that transcript can be found, using the ECF page number as the page cite. "PX" refers to Plaintiffs' Exhibit, each of which cited herein can be found in Appellants' forthcoming Appendix.

3.      Whether the district court erred in concluding that Defendants' conduct did not attempt to coerce or intimidate within the meaning of Section 11(b) without applying the legal elements of attempt liability to the relevant facts.

4.      Whether the district court erred in concluding that the challenge against Plaintiff Heredia was reasonable where the court's conclusion rests on a clearly erroneous factual finding that contradicts undisputed evidence.

5.      Whether the district court erred in excluding, on hearsay grounds, testimony elicited directly by TTV's counsel, where such testimony established TTV's connection to the voter challenges filed in Muscogee County that targeted several of Plaintiffs' witnesses.

6.      Whether the district court erred in excluding, on hearsay grounds, evidence of a statement threatening to release the names of challenged voters, issued through a social media account that the district court found was affiliated with Engelbrecht.

## STATEMENT OF THE CASE

### I.      Statutory Background

This case arises under Section 11(b) of the VRA, which provides that, "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). The law sweeps broadly to address both

subtle and overt acts that evaded Congress's historical attempts to eradicate unlawful intimidation in the voting process. The statute's operative words—"intimidate," "threaten," and "coerce"—are instructive. To "intimidate" is to "make timid or fearful," to "threaten" is to "cause to feel insecure or anxious," and to "coerce" is to "compel to an act or choice."[3] Consistent with these definitions, "conduct that puts an individual in fear of harassment and interference with their right to vote" is unlawful under Section 11(b). *Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl I*"), 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) (cleaned up).

Although Congress incorporated similar terms in an earlier voter intimidation law enacted under the Civil Rights Act (CRA) of 1957, courts interpreted that provision to require proof of subjective purpose to intimidate—a perceived weaknesses that Congress sought to correct through the VRA.[4] *See Hr'gs on H.R. 6400 Before H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 11 (1965) (Statement

---

[3] *Intimidate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/intimidate; *Threaten*, Merriam-Webster, https://www.merriam-webster.com/dictionary/threaten; *Coerce*, Merriam-Webster, https://www.merriam-webster.com/dictionary/coerce (all last accessed May 13, 2024). Because these terms are not defined in the statute, courts apply their commonly understood meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

[4] Section 131(b) of the Civil Rights Act provides that "[n]o person . . . shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose of interfering with the right of such other person to vote* . . . ." 52 U.S.C. § 10101(b) (emphasis added). But Congress eliminated the "purpose" requirement in Section 11(b). *Id.* § 10307(b).

by Att'y Gen. Katzenbach) ("*6400 Hearings*"). Section 11(b) thus "represents a deliberate and . . . constructive departure from the language and construction" of its predecessor. *Id*. Specifically, Section 11(b) plaintiffs need not prove that defendants specifically *intended* to intimidate, threaten, or coerce any voter to establish liability. *Id*. Instead, "defendants [will] be deemed to intend the natural consequences of their acts." *Id*.; *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 131 (1978) (noting that Attorney General Katzenbach's "contemporaneous administrative construction of the [VRA] is persuasive evidence of the [statute's] original understanding, especially in light of the extensive role the AG played in drafting the statute and explaining its operation to Congress").

Consistent with this history and the plain text of Section 11(b), courts have held the same: plaintiffs need not prove a defendant's purpose to intimidate or coerce to establish a Section 11(b) violation. *See, e.g.*, *Willingham v. County of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl II*"), 661 F. Supp. 3d 78, 116 (S.D.N.Y. 2023); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.* ("*LULAC*"), No. 1:18-CV-00423, 2018 WL 3848404, at *3-4 (E.D. Va. Aug. 13, 2018). Similarly, litigants need not show "proof that racial discrimination motivated the intimidation, threats, or coercion." *Willingham*, 593 F. Supp. 2d at 462; *Wohl I*, 512 F. Supp. 3d at 509.

6

## II.    Factual Background

TTV is a Texas-based organization that describes itself as a force for election integrity but has long been accused of filing frivolous voter challenges that result in intimidation. PX 16 at 2; 20-22; PX 17. In advance of Georgia's 2021 Senate runoff election, TTV deployed these tactics once again, with devastating consequences for Georgia's voters.

### A.    Shortly before filings its mass challenges, TTV attempted to overturn the 2020 presidential election results despite having no evidence of voter fraud.

In early November 2020, TTV's founder, Catherine Engelbrecht, learned that a financier was interested in paying TTV millions to help overturn the results of the 2020 presidential election. PX 90 at 1; PX 1. TTV accepted $2.5 million and launched a program called "Validate the Vote" aimed at "nullify[ing]" and overturning election results in seven key states, including Georgia, relying primarily on allegations of illegal voting and fraud. PX 1; PX 28.

As part of Validate the Vote, TTV planned to solicit "whistleblower testimonies" to expose election fraud, aggregate and analyze data to identify election subversion, "[b]uild public momentum" around these findings, and file lawsuits to overturn election results in key battleground states. PX 1; Doc. 335 at 24; PX 28. Validate the Vote centered on accusations of voter fraud, and within days of the program's conception, TTV filed federal lawsuits across the country alleging states'

presidential election results should be overturned because of illegal votes, Doc. 335 at 25 n.16, despite lacking *any* evidence of illegal voting, Doc. 313 at 42. In one of these lawsuits, filed in Georgia, TTV named as defendants the eight counties with the largest Black active voter populations in Georgia, rather than the counties in which the plaintiffs alleged fraud had occurred. PX 27; Doc. 316 at 38-39 (court taking judicial notice of these facts). Unsurprisingly, none of the lawsuits succeeded, and Engelbrecht subsequently conceded that she had no way to determine where or whether illegal votes were being counted and could not recall any evidence of voter fraud that TTV had received before making these allegations. PX 99 at 271:6-13; Doc. 313 at 85.

### B. After failing to overturn the 2020 election results, TTV filed mass voter challenges despite warnings that its challenge effort was legally and factually erroneous.

Having failed to make good on its promise to overturn the presidential election, TTV immediately trained its sights on Georgia, where runoff elections for two U.S. Senate seats on January 5, 2021 would determine control of the U.S. Senate. Doc. 310 at 48. TTV swiftly rebranded its efforts: "Validate the Vote" became "Validate the Vote Georgia." PX 99 at 68:16-69:7; PX 10 at 17. TTV asked citizens to keep all "Eyes on Georgia," and encouraged the public to report fraud through TTV's telephone hotline or online at GAValidatetheVote.org. PX 37.

But the centerpiece of this program was TTV's "landmark coordinated challenge," which TTV announced would challenge the eligibility of 364,541 voters who had filed a mail-forwarding request with the U.S. Postal Service's National Change of Address ("NCOA") database. PX 42 at 2. Before launching its challenges, TTV met with representatives from Georgia's Secretary of State's Office, including the Secretary's then-General Counsel Ryan Germany, whom the district court found particularly credible in recounting his meeting with TTV. Doc. 335 at 28 n.19, 65, 68-69. Germany explained to TTV that because "the challenge process in Georgia really is an individualized inquiry," challengers must submit individualized evidence demonstrating that each particular voter being challenged was no longer eligible to vote in the state. Doc. 321 at 56-57. Germany warned TTV that submitting a spreadsheet of voters who purportedly filed NCOA requests with the postal service, as TTV planned to do, was legally insufficient to support a challenge because many voters who file NCOA requests remain fully eligible voters, including students, active military members, or voters who relocated temporarily for a host of reasons. Doc. 335 at 67; Doc. 321 48-50; 59-60; *see also* O.C.G.A. § 21-2-217 (allowing Georgia voters residing out-of-state to retain their Georgia voting eligibility under numerous circumstances). Germany explained that federal and state law do not permit the use of NCOA lists alone to remove voters from voter rolls given the serious risk that eligible voters will be swept up in such an effort. Doc. 335 at 65-

66; *see also id.* at 79-80 (crediting Dr. Kenneth Mayer's expert testimony about the limitations of using NCOA to identify individuals who are no longer residents of Georgia).

Despite being told of the serious misgivings from Georgia's top election officials, TTV proceeded with its mass challenges. And because only Georgia voters may lodge challenges against voters in their home counties, *see* O.C.G.A. § 21-2-230, TTV recruited volunteers who would sign their name to pre-packaged challenges in each county. Doc. 335 at 28. The volunteers were not shown TTV's challenge lists before submission. Doc. 323 at 98-99. Instead, TTV submitted the challenges directly to the county boards of elections under each volunteer's signature, from TTV's own email address: gaelectorchallenge@truethevote.org. Doc. 335 at 92-93; PX 10 at 19-20. In some cases, individuals were not even aware TTV had filed challenges under their name. *See, e.g.*, PX 101 at 73:15-21; 74:10-13; PX 94 at 56:17-21; 57:5-9; 62:21-63:3.

The one volunteer who demanded TTV's challenge list for his county to investigate it himself quickly discovered it was unreliable. Doc. 335 at 70-71, 91. Taliaferro County challenger Joseph Martin, whom the district court found highly credible, *id.* at 72-73, contemporaneously summarized his findings in an email to TTV, asking it to hold any challenges in his name: "Not sure where the out of state residence information came from," Martin wrote, "but it appears incorrect." PX 43

10

at 1. Martin also expressed "[c]oncerns with the quality of [TTV's] information," including "problem[s] with data accuracy and relevance." *Id.*; PX 80 at 1-2. Rather than reassess the accuracy of its lists, TTV redoubled its efforts to find a new volunteer challenger to re-file the *same erroneous challenges* in Taliaferro County. Doc. 335 at 57.

###    C.    Expert analysis confirmed that TTV's challenge lists were wholly unreliable.

Joseph Martin's instinct—along with Mr. Germany's warnings—about the lack of reliability of TTV's challenges was correct. The evidence at trial demonstrated that "TTV's list utterly lacked reliability" and "verge[d] on recklessness." Doc. 335 at 90. The district court credited the testimony of Plaintiffs' expert Dr. Mayer, who found the challenge lists wholly unreliable. *Id.* at 76. As the district court concluded, Dr. Mayer's "opinion rings without rebuttal: [TTV's] list was shoddy and rife with errors." *Id.* at 91.

These errors included entries where: (1) the challenged individual's registration address and alleged *new* address were identical; (2) the challenged individuals were *both* students and in the military, residing at institutions like the U.S. Military Academy at West Point or the Air Force Academy; (3) the challenged voter's name did not match between the voter file and challenge file; and (4) the challenged individuals were not even registered to vote in Georgia (meaning that TTV had even challenged individuals who were not on Georgia's voter list to begin

with). Doc. 335 at 77; Doc. 311 at 76, 78; PX 91 at 2. TTV also challenged over 35,000 individuals residing on or adjacent to a college or university campus, as well as over 20,000 individuals residing on or adjacent to one of 189 military installations—both red flags that should have triggered a closer look. PX 91 at 2; PX 15 at 30. Other errors were even more flagrant: for example, TTV challenged over 6,000 voters who were already registered at the address TTV claimed they had moved to, and over 15,000 voters TTV claimed had moved but without identifying the street address to which they had allegedly moved. Doc. 311 at 75, 79; PX 91 at 2; PX 15 at 26-29. All told, Dr. Mayer identified tens of thousands of obvious errors that were apparent based on immediate inspection, Doc. 311 at 44, and the district court concluded that this evidence should be afforded "great weight." Doc. 335 at 76.

> **D.** **Defendants' challenges were likely to and did intimidate or coerce Georgia voters.**

Consistent with the warnings from the Secretary's Office, most counties were not receptive to TTV's challenges. TTV nonetheless pressured counties to investigate the challenged voters, even offering the counties free legal support if they encountered legal trouble. Doc. 323 at 34; PX 92 at 38. When those efforts faltered, TTV itself considered suing counties to force them to act on the challenges. Doc. 335 at 128.

Amidst TTV's campaign to persuade counties, a Twitter account named "Crusade for Freedom," which the district court found was affiliated with Engelbrecht, tweeted: "We just prospectively challenged the eligibility of 360,000 voters in GA. Largest single election challenge in Georgia and American history. #eyesonGA #validatethevoteGA." PX 45;[5] Doc. 335 at 98-99. The account then followed with a threat: "If the Georgia counties refuse to handle the challenges of 366,00 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC. #validatethevoteGA #eyesonGA." PX 45.

Although Defendants never delivered on that specific threat, challenged voters were—predictably—informed by county officials that their eligibility was being questioned, which—again, predictably—caused those voters fear, anxiety, and apprehension. Plaintiff Jocelyn Heredia, a young, Hispanic Banks County resident challenged by TTV, was one such voter. Doc. 335 at 14. Heredia learned she had been challenged when she arrived to vote in person for the 2021 Senate runoff election. *Id.* at 15-16. Upon hearing her right to vote had been challenged, Heredia feared she had done something wrong and thought she was being accused of committing a crime. *Id.* at 17. It took Heredia several hours at her polling location to finally reestablish her eligibility. *Id.* at 16.

---

[5] The district court excluded Plaintiffs' Exhibit 45 as hearsay, Doc 335 at 99-100, which was erroneous for the reasons explained *infra* at Argument II(A).

Upset by what she had just endured, Heredia went home, where she learned Banks County had published her name on its website as a challenged voter. *Id.* at 17; PX 49. This news left her "scared" and wondering if she was "going to get in trouble" because she tried to vote as a challenged voter. Doc. 335 at 17-18 (citing Doc. 312 at 21, 52). Regrettably, Heredia's experience in the 2021 runoff election altered her relationship with voting. Although voting is "very important" to her, *id.* at 15, and despite voting consistently in elections from 2016 to 2020, Heredia has not voted since the 2021 runoff election because she fears she will be challenged again and does not want to repeat that distressing experience. Doc. 312 at 21. The district court found that Heredia testified credibly about her experience. Doc. 335 at 18.

Other challenged voters, including Gamaliel Turner, Scott Berson, and Stephanie Stinetorf, all lawful Georgia voters registered in Muscogee County, *Id.* at 14, 62, 65, similarly felt fearful and intimidated by the challenges. At the time, Turner, a Black 70-year-old military veteran, had lived in Muscogee County for over two decades before temporarily locating to California for his work as a federal government contractor. *Id.* at 59. When Turner called Muscogee's election office to check on his ballot in advance of the Senate runoff, Turner was informed he had been challenged. *Id.* at 60. Upon hearing this, Turner felt "anguish" and "confusion,"

resurfacing "PTSD from having to revisit the '60s" struggle for voting rights. *Id*. at 60-61.

Berson, a recent graduate of Auburn University and an active, registered voter, had just returned to Muscogee County when he learned he had been challenged. Doc. 335 at 10-11. Berson described feeling "intimidate[ed] . . . to be told that somebody had accused me of doing something wrong," and distressed that now he had to "prove himself" to be able to vote. *Id.* at 11; Doc. 310 at 98. Although Berson overcame the challenge, it took him several hours to prove his residency and have his ballot counted. Doc. 335 at 12.

Stinetorf, a registered voter in Muscogee County, was working in Germany as a civilian employee of the U.S. Department of Defense when she discovered she had been challenged. *Id.* at 62-63. Stinetorf found the experience very "stressful" and she felt "overwhelm[ed]" and "a little scared" about the consequences of being challenged. *Id.* at 63 (citing Doc. 321 at 13, 18). Although Stinetorf was eventually able to resolve the challenge, it made her worried she was doing something wrong by trying to vote from abroad. *Id.* Overall, the experience gave Stinetorf "quite a lot of concern going forward" about her ability to successfully vote absentee from overseas in future elections. Doc. 321 at 18.

Shortly after TTV announced its challenges, Fair Fight, Inc., a pro-democracy organization headquartered in Georgia, began hearing from challenged voters that

they "felt this activity was threatening." *Id.* at 8. At trial, Fair Fight's Executive Director explained how the organization deployed staff and volunteers to monitor TTV's activities and provide support to county boards of elections that were receiving TTV's mass challenges. *Id.* at 9. Consequently, Fair Fight was not able to engage in its ordinary voter outreach, voter empowerment, and election research work in the lead-up to the Senate runoff election as it originally intended. *Id.* And since 2020, Fair Fight has formalized its response to TTV through "Democracy Watch," a program intended to monitor for further TTV challenges in light of TTV's announced "IV3 program," a web tool designed to facilitate mass challenges in future elections. *Id.*

*        *        *

The district court found all of Plaintiffs' witnesses credible and credited their testimony. Doc. 335 at 10 (Stewart-Reid), 14 (Berson), 18 (Heredia), 62 (Turner), 65 (Stinetorf), 69 (Germany), 73 (Martin), 84-85 (Dr. Mayer and Dr. Orville Burton). The court further acknowledged that voter challenges in Georgia have a sordid history of being used to exclude eligible voters from participating in elections. *Id.* at 86-87. As Dr. Burton explained, Georgia's first voter challenge statute was adopted in the early 1900s as a mechanism to prevent Black voters from exercising political power and quickly became an effective tool of voter intimidation and disenfranchisement. *Id.* at 85-86; PX 16 at 7-11. Even unsuccessful challenges had

a great atmospheric effect, as challenged voters understood they were accused of violating the law, leading to fears about participating in elections. Doc. 335 at 87; *see also* Doc. 312 at 94 (Dr. Burton testifying to the likelihood that challenged voters will worry they will "be[] subject to a criminal investigation, even though [they] have done nothing wrong").

## III.   Procedural History

Shortly after TTV announced its "landmark" voter challenges to over 360,000 Georgia voters, Plaintiffs sued Defendants for violating Section 11(b) and sought an emergency TRO to restrain them from filing further challenges. *See* Doc. 1; Doc. 11; PX 42.[6] Although the district court denied the TRO given the under-developed factual record at that stage, the court expressed "grave concerns regarding Defendants' coordinated, broad-strokes challenge" to hundreds of thousands of Georgia voters "on the eve of an unprecedented two-seat Senate runoff." Doc. 29 at 11.

The case proceeded to discovery, during which Defendants deposed only one individual, Plaintiff Heredia, and offered no experts. Before trial, the district court largely denied cross-motions for summary judgment based on contested factual

---

[6] The operative complaint names Fair Fight, Heredia, Berson, and Jane Doe as Plaintiffs, and True the Vote, Engelbrecht, Somerville, Davis, Williams, Johnson, and Cooper as Defendants. Doc. 73. In this appeal, Fair Fight is the Appellant and True the Vote and Engelbrecht are Appellees.

issues but recognized that Plaintiffs could prove their claim if they "submitted evidence that voters felt or could have felt intimidated by being, or possibly being, challenged by Defendants via their county challengers." Doc. 222 at 21.

At trial, the district court heard testimony from a total of twelve witnesses, including all named Plaintiffs—except for Jane Doe who proceeded anonymously, *see* Doc. 29 at 18—Plaintiffs' experts Drs. Mayer and Burton, and the Secretary of State's former general counsel, Ryan Germany, who attended the December 2020 meeting between representatives of the Secretary's Office and TTV. Defendants called four witnesses in total—Defendants Somerville, Davis, Williams, and Engelbrecht—and admitted only two exhibits. Defendants notably did not call Gregg Phillips, who generated TTV's list of voters to be challenged. And although Defendants had previously argued that Section 11(b) would violate the First Amendment if applied to prohibit their conduct, *see* Doc. 82 ¶¶ 86, 91, at trial Defendants explicitly abandoned any affirmative defense based on the First Amendment. *See* Doc. 316 at 130-31.

On January 2, 2024, the district court entered judgment in favor of Defendants. Doc. 335. Despite crediting the testimony of Plaintiffs' witnesses, the court held that TTV's conduct did not violate Section 11(b) because it was permitted under state law, and a county official's decision to act on TTV's challenges broke the causal chain such that any resulting intimidation could not be attributed to TTV.

*Id.* at 129, 138, 144-145. The court also briefly considered whether Plaintiffs had shown TTV *attempted* to intimidate or coerce voters, but similarly excused TTV from liability after concluding that any such attempt had been unsuccessful. *Id.* at 137.

Fair Fight now appeals the court's judgment in favor of TTV and Engelbrecht.

## IV.    Standard of Review

Following a bench trial, this Court reviews conclusions of law and the application of the law to the facts *de novo. See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 921 (11th Cir. 2023).

This Court reviews factual findings for clear error, *id.*, with "[f]indings based on the credibility of witnesses demand[ing] even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Caban-Wheeler v. Elsea*, 71 F.3d 837, 843 (11th Cir. 1996) (quotation omitted) (cleaned up). This Court affords similar deference to the trial judge's assessment of the credibility of expert testimony. *Bellitto v. Snipes*, 935 F.3d 1192, 1209 (11th Cir. 2019).

For mixed questions of law and fact, the standard of review depends on "whether answering it entails primarily legal or factual work." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020).

## SUMMARY OF THE ARGUMENT

I.    The district court committed legal error in excusing TTV from liability under Section 11(b) for actions that resulted in voter intimidation or coercion. First, the district court assumed incorrectly that TTV's actions must be unlawful under state law in order to violate Section 11(b). But the plain text of Section 11(b) imposes no such requirement, and case law confirms that compliance with state law is no defense to a voter intimidation claim under federal law.

Next, the district court required Plaintiffs to show that TTV was the *sole* cause of voters' fear or intimidation, a standard that appears nowhere in the statutory text. Contextual clues from the statute's drafters, however, point to the correct causation standard: Defendants should be liable for "the natural consequences of their acts"— the definition of proximate cause. *See 6400 Hearings* at 11. And under the correct causation standard, TTV is liable under Section 11(b) because the foreseeable, natural consequence of its actions—accusing hundreds of thousands of Georgia voters of unlawfully voting on the eve of the election when national attention was trained on Georgia—was to intimidate and coerce voters.

Finally, the district court failed to appreciate the import of its factual findings. Although the court found Plaintiffs' witnesses universally credible, it failed to identify the elements of their testimony that established a straightforward Section 11(b) violation—specifically, that voters feared the legal consequences of voting

20

after learning they had been challenged. Such an outcome is exactly what Section 11(b) was intended to prevent, and what courts have held is sufficient to establish a Section 11(b) violation.

II.    The district court also erred by failing to apply the correct legal standard—or any standard at all—to adjudicate TTV's *attempt* to intimidate voters. Defendants are liable for attempt where they (1) have the intent to engage in the proscribed conduct, and (2) take "a substantial step toward commission of the offense." *United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004). By failing to apply this framework, the district court's analysis was irrevocably compromised. With no law to apply, the court had no way to identify the relevant facts—and ended up ignoring whole swaths of its own dispositive findings.

Rather than separately analyze each distinct theory of TTV's potential liability, the district court grouped "[e]vidence of intimidation or attempted intimidation" into one joint, condensed subheading. Doc. 335 at 130. This juxtaposition makes it difficult to parse which evidence the court deemed relevant to which theory of liability; ultimately, the court appears to have conflated actual, successful intimidation with *attempted* intimidation. To establish attempt, the court seemed to believe, Plaintiffs were required to prove that TTV purposefully aimed its conduct at voter intimidation and *succeeded* in those efforts. *See id.* at 130-34 (concluding TTV was not liable for attempt because, in the court's view, any attempt

21

failed). That is emphatically not the law. *See United States v. Ballinger*, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (en banc).

And the district court's conclusions cannot even be reconciled with its own findings, which offer a sweeping, unrebutted narrative of TTV's intent to challenge eligible voters, intimidating them and—with the enforcement it was counting on from county officials—outright coercing them from participating in the runoff elections. The court was persuaded by the testimony of each of Plaintiffs' key witnesses on TTV's intent, who explained that TTV willfully ignored blaring sirens that its voter challenges were ensnaring eligible voters and pressed forward with its scheme. And there is no dispute that TTV's actions surpassed mere preparation and constituted a substantial step toward its end goal. TTV did not just draw up challenge lists, it directly served those lists on counties across the state and pressed those counties to act on them, even after the challenges had been discredited. Because the district court failed to apply the legal elements of attempt, its opinion entirely neglected to synthesize its own key findings consistent with the relevant law and rendered an incomplete analysis of TTV's liability.

## ARGUMENT

### I.    The district court misapplied Section 11(b) in adjudicating whether TTV's conduct resulted in voter intimidation or coercion.

The district court's opinion, while condemning TTV's conduct, improperly excused TTV from liability based on a standardless application of Section 11(b),

which led it to commit three critical, legal errors. First, the district court excused TTV's conduct under Section 11(b) based on its determination that TTV's actions complied with Georgia law, a fundamentally different inquiry from whether TTV's conduct violates federal voter intimidation laws. Second, the district court excused TTV from liability after concluding TTV was not the *sole cause* of voters' fear, a requirement found nowhere in Section 11(b) or case law. Quite to the contrary, the text and history of Section 11(b) make clear that it imposes liability for actions that have the "natural consequences" of intimidating or coercing voters. Third, the district court failed to recognize a Section 11(b) violation based on the testimony of Plaintiffs' voters and expert witnesses, all of whom the district court found credible, who testified that the challenges made them fear the consequences of voting—the very intimidation and coercion that Section 11(b) is intended to prevent.

## A.    Georgia law cannot insulate TTV's conduct under Section 11(b).

Although the district court condemned TTV's "actions in facilitating a mass number of seemingly frivolous challenges" to Georgia voters, it nonetheless excused TTV's conduct because it "could not say that [TTV's] actions were contrary to Georgia law." Doc. 335 at 123 n.60; *see also id.* at 122 (district court remarking that "Plaintiffs' most evident problem in their Section 11(b) claim is Georgia law itself."). That ruling, which implies that acts do not violate Section 11(b) unless they first violate state law, was legal error: Section 11(b) itself contains no such

23

requirement, and case law confirms that an act's legality under state law has no bearing on whether it violates federal voter intimidation provisions.

The plain language of Section 11(b) states: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). This language, of course, contains no requirement that one's conduct must violate state law to come within Section 11(b)'s ambit. To the contrary, the statute proscribes even conduct committed "under the color of law" if it otherwise results in intimidation, threats, or coercion, which all but confirms the opposite of the district court's conclusion—that one may violate the statute even if they act with the cloak of state (or even federal) authority in doing so. *See, e.g.*, *Hafer v. Melo*, 502 U.S. 21, 28 (1991) (confirming acts made "under color of state law" include acts made within the authority of state law).

Moreover, at the time of Section 11(b)'s adoption, case law made clear that "[a]cts otherwise entirely within the law may violate [federal voter intimidation laws] if they have the proscribed effect" of intimidating voters. *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (interpreting the CRA's voter intimidation provision);[7] *see also United States v. Bruce*, 353 F.2d 474, 476-77 (5th

---

[7] *McLeod* also required proof of "purpose" because it was interpreting the prohibition against voter intimidation in the CRA, which explicitly includes an intent

Cir. 1965) (explaining, in a case arising under the CRA's voter intimidation provision, it is "no excuse or defense" to one's conduct that challenged behavior is "perfectly legal" otherwise).[8] As *Bruce* explained, "[a]lthough the defendants here may have had an almost unrestricted right to invoke the Alabama trespass law to keep all persons from entering upon their property . . . they could not legally invoke the right of excluding [the plaintiff] . . . for the purpose of interfering with his right . . . to register and vote." 353 F.2d at 477; *see also United States v. Beaty*, 288 F.2d 653, 654 (6th Cir. 1961) (holding eviction that might otherwise be lawful could violate the CRA).

To be sure, these cases applied the CRA's (rather than VRA's) voter intimidation provision, but because Congress "broadened the [CRA's prohibition against voter intimidation] in 1965 by adopting [Section 11(b)]," *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968), there is no basis to conclude that Congress intended the VRA to immunize conduct that technically complies with state law, and the district court gave no reason to hold otherwise.

---

element. *See* 52 U.S.C. § 10101(b). That element was consciously removed from § 11(b). *See 6400 Hearings*.

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Consistent with this case law, courts examining Section 11(b) claims have held that otherwise legal conduct can be illegal under the VRA if it results in voter intimidation or coercion. *See, e.g.*, *Wohl II*, 661 F. Supp. 3d at 113-14 (holding defendants' robocalls violated Section 11(b)); *LULAC*, 2018 WL 3848404, at *1-4 (holding statements in magazine publication were sufficient to state claim under Section 11(b)); *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 870 (D. Colo. 2023) (holding door-knocking activities sufficient to state claim under Section 11(b)). Of course, making robocalls, publishing magazines, and knocking doors are generally permitted by state law, but that is "no excuse or defense" to avoid liability from federal voter intimidation laws if the result is voter intimidation. *Bruce*, 353 F.2d at 476-77.

For all of these reasons, even if Georgia law did not prohibit TTV's frivolous challenges (which Plaintiffs reject), that would not immunize their conduct under Section 11(b), and the district court legally erred in concluding otherwise.

## B. The district court applied the incorrect causation standard in determining whether TTV violated Section 11(b).

Undisputed evidence at trial established that TTV urged election officials to confront challenged voters and require them to prove their eligibility. When county officials responded as TTV intended, the district court held that the counties' actions broke the causal chain and absolved TTV of any liability for voter intimidation. *See* Doc. 335 at 125-26. In so holding, the court implicitly adopted a theory of causation

26

that is foreign to Section 11(b)'s framework and irreconcilable with settled precedents.

Section 11(b) itself does not contain any specific causation requirement, but that does not end the inquiry. "When a statutory provision includes an undefined causation requirement, we look to context to decide" what the statute demands. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 769 (2018). Because the VRA's drafters intended for individuals to be liable under Section 11(b) for "the natural consequences of their acts," *see supra* Background I, that statute is best read to require only *proximate* cause. *See, e.g.*, *Milwaukee & Saint Paul Ry. Co. v. Kellogg*, 94 U.S. 469, 469-70 (1876) (explaining the "proximate cause of an injury" is one that "was the natural and probable consequence" of the defendant's actions; one that "ought to have been foreseen in the light of the attending circumstances"). "[P]roximate cause is not . . . the same thing as a sole cause." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994). "Instead, a factor is a proximate cause if it is a substantial factor in the sequence of responsible causation." *Id.* (quotation omitted).

The district court—instead of looking to this history and context, as precedent demands—simply assumed that Section 11(b) imposed a sole cause requirement, citing no authority and conducting no analysis that would support this proposition, beyond recognizing that Section 11(b) must contain *some* causation element, *see*

Doc. 335 at 126 n.65. But there are "several types of causation," *Husted*, 584 U.S. at 769, and the district court made no attempt to explain how it arrived at a sole causation requirement where the text and context of Section 11(b) do not support one.[9]

Under the appropriate proximate cause standard, county boards of elections that did precisely what TTV demanded cannot sever the causal chain between TTV's actions and the resulting intimidation because those counties' actions were wholly foreseeable. As this Court has repeatedly explained, intervening acts of third parties "break the chain of causation only where they are *unforeseeable*." *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (citation omitted) (emphasis added); *United States v. Rodriguez*, 279 F.3d 947, 952 (11th Cir. 2002) (holding it is a "basic principle" that "foreseeable . . . acts of a third party do not sever the chain of causation"); *Hill v. Cundiff*, 797 F.3d 948, 984 (11th Cir. 2015) (holding, "where the act of an intervening agent is reasonably foreseeable, a defendant may be held liable" for the harm caused).

At trial, there was no dispute that the counties' decisions to notify challenged voters and request proof of eligibility were entirely foreseeable to TTV. Indeed, that

---

[9] Precisely because TTV need not have been the *sole* cause of Heredia's fear for TTV to be proximately liable under § 11(b), *see Cox*, 17 F.3d at 1399, the district court also erred in concluding TTV could not be liable because part of Heredia's fear stemmed from being "a minority voter in a majority-white county." Doc. 335 at 134.

was the entire goal of the challenge program: to persuade counties to require challenged voters to produce evidence before they could vote, something the counties could not otherwise ask these voters to do without a challenge in hand. *See* PX 95 at 158:1-159:5; Doc. 313 at 95-97. To add to the pressure to accept their challenges, TTV told the counties that they were mandated by law to conduct challenge hearings, Doc. 323 at 74-75, publicly shamed those counties that refused, *see* PX 84, offered the counties legal support if they were willing to accept the challenge, Doc. 323 at 34; PX 92 at 38, and even made plans to sue counties if they refused to acquiesce, *see* Doc. 323 at 34, 37; PX 92 at 11-25. Under these circumstances, the county boards of elections were not independent actors whose actions in processing TTV's challenges were so unforeseeable to TTV as to break the chain of causation. *See Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*, 944 F.3d 886, 892 (11th Cir. 2019) (holding an intervening cause will not excuse liability "if its probable or natural consequences could reasonably have been anticipated") (cleaned up).

Because the counties' actions do not sever the causal link to voter intimidation, the district court's reliance on TTV's lack of "control over" the county officials, Doc. 335 at 128, was also legal error. Even when an intervening actor has unfettered discretion, foreseeability remains the touchstone of causation. *See*, *e.g.*, *Malley v. Briggs*, 475 U.S. 335, 345 & 344 n.7 (1986) (holding a judge's "decision

29

to issue [an unlawful] warrant" does not "break[] the casual chain" of liability for an arresting officer because the officer is "responsible for the natural consequences of his action"); *Cundiff*, 797 F.3d at 984 (holding jury could find teacher proximately caused assault of student left alone with a known sexual predator because that assault was reasonably foreseeable); *Martin*, 803 F.3d at 594 (holding chain of causation was not broken where defendant submitted fraudulent loan applications and third-party lenders chose to approve them).

Here, the "intermediaries" who informed voters of the challenges and demanded proof of eligibility did exactly what TTV asked them to do, resulting in voter intimidation. *See infra* Argument I(C). TTV's conduct was plainly a proximate cause of those consequences. *See, e.g.*, *Martin*, 803 F.3d at 594; *Cundiff*, 797 F.3d at 984. This Court should reverse the contrary opinion of the district court and hold that Section 11(b) defendants are liable for the natural consequences of their actions.

## C. Voters experienced coercion and intimidation within the meaning of Section 11(b).

The district court's errors discussed above also permeated its analysis of the remaining Section 11(b) elements. Having determined that both Georgia law and third-party "intermediaries" immunized TTV's conduct, the court's evaluation of whether TTV's actions resulted in voter intimidation or coercion was cursory at best, and despite crediting voters' testimony that being challenged put them in fear for the

act of voting, the court failed to recognize the legal import of its own factual findings: that TTV violated Section 11(b).

### 1. Section 11(b) proscribes actions that put voters in fear for the act of voting.

Conduct that causes individuals to fear harassment or negative legal consequences for voting may constitute voter intimidation under Section 11(b). *Wohl II*, 661 F. Supp. 3d at 114. This fear need not involve physical violence; as the CRA cases hold, fear of legal or economic consequences, or other more subtle forms of pressure, all suffice to state a claim of voter intimidation. *See, e.g.*, *McLeod*, 385 F.2d at 740-41 (fear of prosecution resulted in voter intimidation); *United States v. Wood*, 295 F.2d 772, 784 (5th Cir. 1961) (fear of prosecution and abuse of state criminal process stated claim for voter intimidation); *Bruce*, 353 F.2d at 476-77 (fear of exclusion from property stated claim for voter intimidation); *Beaty*, 288 F.2d at 654 (fear of eviction resulted in voter intimidation).

In *Wohl II*, for example, two defendants arranged for robocalls to thousands of voters in advance of the 2020 election. *See Wohl II*, 661 F. Supp. 3d at 92. The calls falsely claimed that voting by mail would expose voters' personal information to the CDC, police departments, and credit card companies. *Id*. The record showed the plaintiffs were "frightened, enraged, and distressed upon receiving the call," with some "reliving their past traumas or feeling especially targeted." *Id.* at 115. Even though none of the recipients were ultimately deterred from voting, *see id.* at 116-

17, the court held that the defendants violated Section 11(b) by putting voters in fear of "negative criminal and legal consequences" and "economic consequences" if they voted, *id.* at 113-14, fears that were a "natural consequence" of the robocall. *Id.* at 116.

Other courts have similarly recognized that putting a voter in fear of negative consequences for voting can violate Section 11(b). *See LULAC*, 2018 WL 3848404, at *1-4 (holding plaintiff stated claim under Section 11(b) where defendants alleged that certain voters were voting illegally, subjecting them to public scrutiny); *Colorado*, 653 F. Supp. 3d at 870 (holding plaintiff stated claim under Section 11(b) where defendants canvassed homes and asked questions about the plaintiffs' voting history and citizenship status).

### 2.  The district court credited testimony and made factual findings that plainly established a Section 11(b) violation.

The district court's factual findings demonstrated that intimidation was the natural consequence of TTV's mass challenges, which put Plaintiffs and other Georgia voters in fear simply for voting.

Take the testimony of Jocelyn Heredia, a young, Hispanic voter who the district court found testified credibly about her experience as a challenged voter. *See* Doc. 335 at 18. As she explained, being challenged made her fear she had done something wrong. Doc. 312 at 17 ("It made me feel, like, I was, you know, am I committing a crime? Because, like, why am I being challenged? Like, are you

questioning that I'm a citizen?"). Learning that her name had been published online as a challenged voter was similarly harrowing. *See* Doc. 335 at 18; Doc. 312 at 17-18; PX 49. As Heredia described, "[W]hen I saw my name on the list I felt kind of like scared, like, why is my name on a list on, like, a public website. . . . Like, my eligibility to vote is being questioned. And, yeah, I was, you know, kind of like scared, too, because I was, like, am I going to get in trouble because I voted while my vote was challenged?" Doc. 312 at 21. Heredia testified the entire experience was so upsetting that she has not voted since the 2021 runoff election because of the fear of being challenged again, despite being a regular voter prior to this challenge. *See supra* Background II(D). Heredia's fear and apprehension, moreover, was an objectively likely consequence of TTV's actions given the atmosphere at a time when allegations of voter fraud were running rampant and "all eyes" were on Georgia. *See supra* Background II(B).

The district court nevertheless excused TTV's challenge of Heredia for two erroneous reasons. First, the court held that "increas[ing] the difficulty [of voting] alone does not constitute voter intimidation," Doc. 335 at 135. But that was neither the basis of Plaintiffs' Section 11(b) claim nor the thrust of Heredia's testimony. It was Heredia's *fear that she was going to get in trouble for voting while challenged*, *see supra* Background II(D), not the administrative inconvenience the challenge caused her, that establishes Section 11(b) liability. The district court, although

33

repeatedly crediting Heredia's account of her experience and finding her credible, Doc. 335 at 18, failed to acknowledge this testimony in reaching its conclusion.

Second, the district court clearly erred in finding TTV's challenge of Heredia was "reasonable." *Id.* at 134. In the district court's estimation, "there was a reasonable question about Heredia's proper residency for voting purposes" because "Heredia had lived and worked in Atlanta for three years at the time of the Senate runoff election and all public information indicated her residency around Atlanta." *Id.* But this plainly misstates the record. Heredia could not have, and did not, "live[] and work[] in Atlanta for three years at the time of the Senate runoff election [in December 2020]." Doc. 335 at 134.[10] To the contrary, Heredia testified she lived at home in Banks County, Georgia, while she was a student at the University of Georgia, through 2019. Doc. 312 at 8-9. It was not until February 2020 that Heredia obtained a one-year lease for an apartment in the Atlanta area after an Atlanta-based company offered her a one-year contract position. *See id.* at 10-11. In light of the pandemic one month later, however, Heredia functionally abandoned that apartment after her job went remote, and she testified that at the time TTV filed its challenge in December 2020, she maintained her permanent residence in Banks County, where

---

[10] At the time of *trial*, *in November 2023*, Heredia had leased an apartment and worked in Atlanta for approximately three years. Doc. 312 at 10-11. But, of course, the relevant marker in determining the reasonableness of the challenge was Heredia's residence at the time she was challenged—in December 2020.

she was challenged, and her driver's license, car insurance, and voter registration all remained in Banks County. *Id.* at 11-13; Doc. 335 at 14-15. All Defendants knew about Heredia at the time they challenged her was that she had filed a postal change of address in February 2020, PX 15 at 1, which, as Germany had warned them, was an insufficient basis to find probable cause for a challenge without further individualized evidence. *See supra* at Background II(B).

Similar to Heredia, Muscogee County voters Berson, Stinetorf, and Turner testified that being challenged on the eve of the state's closely watched Senate runoff election was a harrowing experience. Turner, a Black veteran in his 70s, testified that learning he had been challenged caused him extreme anguish and "mentally destroyed" him for a period, leading him to recall his struggles attempting to vote during the civil rights era, *see* Doc. 335 at 60-61; Doc. 320 at 34-35, *supra* Background II(D). Stinetorf testified that being challenged was a "very stressful" experience that made her feel "overwhelmed" and worried she had done something wrong by trying to vote from her overseas station. Doc. 335 at 63. And Berson testified that "it was intimidating . . . to be told that somebody had accused me of doing something wrong," *id.* at 11, just as Heredia did, *see supra* at Background II(D).[11]

---

[11] Although the district court noted "Berson had not previously used the term 'intimidating' to describe his experience in discovery" and therefore gave that

Although Heredia was the only testifying voter whom the district court found was sufficiently connected to TTV, this conclusion was legal error, too. At trial, the district court improperly excluded testimony from Turner in direct response to a question posed by TTV's counsel that the Muscogee County challenger, Alton Russell, explicitly told Turner that he worked with TTV to submit challenges.[12]

---

testimony less weight, Doc. 335 at 12 n.8, Defendants declined to depose Berson, and their interrogatories asked Berson about the administrative burdens he faced in proving his residency, Doc. 310 at 126, a much narrower question than whether Berson was intimidated by the challenge. Trial was consequently Berson's first opportunity to describe how being challenged made him feel.

[12] On cross examination, TTV's counsel and Turner had the following exchange.

> **Q.** Do you know who made that alleged challenge against you?
> **A.** Yes.
> **Q.** And who -- who did it?
> **A.** A gentleman whose name is Austin [sic]. I don't remember his last name.
> …
> **Q.** Did the gentleman named Austin ever speak to you in any form?
> **A.** Yes, he has.
> **Q.** In what form did he speak to you?
> **A.** Person to person.
> **Q.** If I told you that Mr. Austin is not affiliated in any way with any of the defendants in this case, would you have any reason to disagree with that?
> **A.** Yes.
> **Q.** How?
> **A.** He said he was.
> **Q.** When did he tell you he was?
> **A.** When I spoke to him.
> **Q.** And when was that?
> **A.** In Columbus, Georgia.

Although the court acknowledged that TTV's counsel "invited this line of questioning," Doc. 320 at 70, it nonetheless excluded it as hearsay, which was legal error. *See, e.g.*, *Rogers v. S. Star Logistics, Inc.*, 661 F. App'x 667, 674 (11th Cir. 2016) (upholding the admission of a response that constituted hearsay where "defense counsel pushed Plaintiff on this point during cross-examination" and thus "invited the response through his questioning of Plaintiff"); *United States v. Parikh*, 858 F.2d 688, 695 (11th Cir. 1988) (upholding admission of out-of-court statements by a government witness, when responding to an inquiry by defense counsel, on ground that defense counsel "invited" the testimony); *United States v. Balfany*, 965 F.2d 575, 582-83 (8th Cir. 1992) (finding a party waives its objection to inadmissible hearsay, even when such testimony is prejudicial, when the testimony is elicited by the party's questioning of the witness on cross examination).

Even if the district court did not err in rejecting this testimony as sufficient to establish that Russell acted as TTV's challenger in Muscogee County, the testimony

---

**Q.** And what did he say?
**A.** He essentially talked to the challenge holistically. He talked to how he came to challenge me based on the NCOA. And that was the gist of the conversation.

Doc. 320 at 69-70; *see also* Doc. 311 at 29-30, 34-35 (on redirect, Turner clarifying that "Austin" was "Alton Russell," whom Turner met while filming a documentary about the challenge process, during which Turner learned about Russell's relationship with TTV).

from the Muscogee County voters who were challenged on NCOA grounds in the same election—all of whom the district court found credible—lends further support to Heredia's account of her experience.

The consistent reports of fear and apprehension among challenged voters, moreover, should come as no surprise. As Plaintiffs' expert Dr. Burton testified, voter challenges have been previously deployed to dissuade Georgians from exercising their right to vote, even if the challenges were not upheld. Doc. 335 at 87. Although TTV's campaign came later in time than the historical challenges Dr. Burton studied, the voters' reactions to being challenged in the present case make perfect sense given the atmosphere in November and December 2020, when frivolous accusations of voter fraud were rampant. *See supra* Background II(A)-(B). As Berson described, the period after the 2020 general election was "extremely fraught," recounting that "the country was on the verge of flying off the handle." Doc. 310 at 95. Precisely because context is so important to determining whether voter intimidation was a natural consequence of a defendant's actions, TTV's challenges "cannot be viewed in isolation" apart from this atmosphere. *McLeod*, 385 F.2d at 740. Instead, "[t]hey must be considered against the background of contemporaneous events in [Georgia] and the general climate prevailing there at the time." *Id.*

In this atmosphere, much of which TTV had inflamed with its frivolous accusations of voter fraud and its call to keep all "eyes on Georgia," *supra* Background II(B), intimidation was a natural consequence of TTV's actions. And under any reasonable interpretation of Section 11(b), TTV is liable for voter intimidation.

## II.    TTV attempted to intimidate, threaten, and coerce voters in violation of Section 11(b).

Apart from the prohibition on intimidating, threatening or coercing any individual for voting, Section 11(b) also outlaws *attempts* to commit these same acts. 52 U.S.C. § 10307(b). While the district court applied the incorrect standard in determining actual intimidation, it failed to adopt any standard at all in concluding that TTV was not liable for attempt. The settled framework for determining attempt asks whether the defendant: (1) had "the specific intent to engage in" the proscribed conduct, and (2) took "a substantial step toward commission of the offense." *Murrell*, 368 F.3d at 1286. The district court's failure to apply this standard is an independent legal error that warrants reversal.

### A.    The district court misconstrued the legal elements of attempt.

Although the district court held TTV was not liable for attempting to intimidate or coerce voters, the court never identified the elements it deemed relevant to attempt. *See* Doc. 335 at 113-16. It buried in a parenthetical Plaintiffs' "suggest[ion]" to adopt the specific-intent-plus-substantial-step test routinely

applied in criminal cases, where attempt offenses are more common, *id.* at 136-37, but never addressed whether it would apply that standard, a different standard, or any standard at all in determining liability.

Throughout its opinion, the court consistently confused *attempted* intimidation with *actual* intimidation, erroneously double-faulting Plaintiffs for their perceived failure to prove a completed offense. For example, the district court began by emphasizing that the "intermediary of the county Boards of Elections in the Section 230 process" means that "Defendants' Section 230 challenges could not have reasonably attempted" to affect any voter. *Id.* at 130-31. But merely because the county boards might have *thwarted* TTV's attempt does not mean that their existence prevented TTV from *forming* an attempt. Just as a would-be bank robber may require a teller's cooperation to complete his offense, the person who dons a ski mask and demands bags of cash is still guilty of attempt even if he is turned away emptyhanded. *Cf. People v. Delvalle*, 26 Cal. App. 4th 869, 876 (1994) ("Neither refusal of the victim to comply with the accused nor the ultimate impossibility of completion of the offense prevents the commission of an attempt."); *People v. Trepanier*, 84 A.D.2d 374, 378 (N.Y. App. Div. 4th Dep't 1982) ("[L]iability for attempt has been imposed upon persons who solicited another to commit a crime and took a step towards its completion despite the fact that the contemplated crime had no possibility of success because the person solicited did not intend to carry out the

40

scheme."); *Bell v. State*, 163 S.E.2d 323, 324 (Ga. Ct. App. 1968) (holding that foiling of a defendant "by any parties or intervening circumstances from committing the final act or acts constituting the crime does not negate the existence of an attempt").

The district court next found that evidence of attempt was "lacking" because, in the court's view, "Plaintiffs' evidence largely fails to connect Defendants' actions to the voters in this case," or to attribute the intimidation voters experienced entirely to TTV. Doc. 335 at 131-32, 133 n.70, 134. But this gets the analysis backwards. Congress's prohibition of attempts proscribes "substantial preparatory steps dangerously close to completing the offense, *even when they ultimately miss their mark*." *Ballinger*, 395 F.3d at 1238 n.8. The district court's fixation on whether any trial witnesses were actually (or solely) intimidated by TTV ignores that TTV may be liable for attempted intimidation even if its actions were unsuccessful—whether because TTV failed to recruit a volunteer to sign its challenges in some counties, or because TTV failed to persuade boards of elections to act on its challenges in other counties, or because challenged voters were intimidated by factors in addition to TTV's challenges. By demanding from Plaintiffs proof that TTV directly and effectively intimidated voters, the district court's "interpretation largely reads the attempt offense out of the statute." *Id.*

41

The district court's failure to articulate a legal test for attempt rendered it unable to apply law to facts without committing reversible error. For example, the court emphasized the "reasonable[ness]" of TTV's challenge to Heredia's voting rights, based on its (clearly erroneous) finding that Heredia had lived and worked in Atlanta for three years prior to the runoff election. *See* Doc. 335 at 134; *see also supra* Argument I(C)(2). But the existence of an attempt turns on defendants' specific intent—that is, their subjective knowledge. *See Murrell*, 368 F.3d at 1286. All that TTV knew about Heredia when it challenged her was that she forwarded her mail. *See supra* Argument I(C)(2). TTV's agents were aware that a voter's mail management does not affect voting eligibility, PX 102 at 126-27, and so their exclusive reliance on this mail-forwarding request was *not* a reasonable basis for challenging Heredia.[13]

Likewise, the absence of any guiding principles for the attempt analysis ultimately led the district court astray in excluding probative, admissible evidence. The court refused to consider evidence of public tweets from Crusade for Freedom, which the district court connected to Engelbrecht, Doc. 335 at 98-99, that pledged "to release the entire list" of challenged voters if counties rejected the challenges.

---

[13] Indeed, even subjective knowledge that Heredia had, in fact, located in Atlanta could not have supplied a reasonable basis to challenger her voting rights because— as TTV knew—it is common for voters to relocate out-of-county without forfeiting their lawful registration. *See* PX 102 at 125:12-127:19.

PX 45. As the court reasoned, "[t]here is no evidence that these posts were intended to reach any voter to be an attempted intimidation under Section 11(b)." Doc. 335 at 98-100. "Thus," the court continued, "if they are not admitted for their truth value (i.e., that Crusade for Freedom in fact intended to release the challenged voters' names if the counties did not pursue the challenges), then the Court cannot find they are relevant for any effect on the listener." *Id.* at 100. This short passage layers legal error on top of legal error.

First, the tweets need not be offered for their "truth value" to be relevant; even if Defendants did not subjectively intend to publish any names, the threat itself is actionable under Section 11(b). *See* 52 U.S.C. § 10307(b). Nor, contrary to the district court's explanation, is the number of people who "saw or read these posts" relevant to attempt, precisely because—again—attempt liability does not require proof of actual intimidation. Doc. 335 at 100. What is clear is that TTV *intended* to reach Georgia voters, as evidenced by these public tweets, amplified with Georgia hashtags. The tweets threatened to release the challenge lists "[i]f the Georgia counties refuse to handle the challenges"—indicating the publication of names was intended as a corrective to a scenario where voters were not otherwise affected by the challenges. And the tweets anticipated that publishing the names would enable "America [to] do the QC"—suggesting that the entire country would investigate the personal circumstances of targeted voters, *see* PX 45, the exact fear Heredia had

43

when she learned her name had been published as a challenged voter online, *see supra* Background II(D). Yet the district court excluded the evidence altogether, despite recognizing that "releasing the names of Georgia voters challenged under Section 230 has enormous implications for potential voter intimidation." Doc. 335 at 100 n.52. Defendants' public threat to release the names of challenged voters cannot, at the same time, have "enormous implications for" voter intimidation and be irrelevant to Section 11(b) claims.

**B.    The record confirms that TTV attempted to intimidate, threaten, or coerce voters.**

Had the district court applied the proper two-step test for attempt offenses (requiring specific intent, a substantial step, and nothing more, *see Murrell*, 368 F.3d at 1286), it would have recognized—based on its own findings and undisputed evidence—that TTV attempted to intimidate, threaten, or coerce voters in violation of Section 11(b).

**1.    TTV acted with specific intent to intimidate, threaten, or coerce voters.**

The district court admitted extensive evidence of TTV's specific intent to intimidate, threaten, or coerce voters, and it even emphasized that the witnesses presenting this key testimony were extremely credible, while witnesses presenting contrary testimony lacked candor. The court simply lacked the legal lens to see this evidence for what it was—proof of TTV's unlawful attempt.

44

Two versions of TTV's intent were presented at trial. Engelbrecht described her organization's mass challenges as a meticulous and wholesome effort to clean the voter rolls, while Plaintiffs countered that TTV's voter challenge program was systematically inconsistent with that stated intent—and instead attempted to deter voters from casting ballots. To corroborate TTV's version, Defendants offered the testimony of a single witness: Engelbrecht herself. But, as the court quickly recognized, Engelbrecht was not a reliable narrator. She "was impeached a number of times at trial," and the court could not "ignore that many of Engelbrecht's skillful answers were obviously self-serving—and to the detriment of her overall candor." Doc. 335 at 34. The testimony of Phillips, TTV's agent and chief collaborator for the challenges, was limited to deposition designations because of a witness sequestration violation, but even his brief appearance to answer for the sequestration issues was sufficient for the court to assess his demeanor and find "him, on the whole, to be an unreliable witness lacking credibility." *Id.* at 26 n.18.

Plaintiffs, in contrast, marshalled evidence of TTV's culpability that the court recognized as powerful and persuasive. Short of an open-court confession by Engelbrecht (precluded by her self-serving lack of candor), Plaintiffs established from virtually every possible angle—with evidence from before, during, and after the challenges were filed—TTV's willfulness in creating a bloated challenge file that was guaranteed to sweep in and intimidate eligible voters. Because the district

45

court rejected any innocent explanation for this behavior, it should have followed its own logic to find that TTV acted, not to engage in genuine election integrity efforts, but with the specific intent to intimidate, threaten, or coerce voters.

*Pre-conduct evidence of intent.* TTV was told before filing any challenges that its approach would sweep in eligible voters—and yet it willfully proceeded anyway. Ryan Germany—then general counsel for the Secretary's Office—warned TTV that its mass NCOA-based voter challenges lacked probable cause to establish any voter's ineligibility. *Id.* at 68-69; *see also supra* Background II(B). The district court twice highlighted that it found Germany's testimony "particularly credible," noting that Germany was "a non-party without any personal interest in this matter" who "provided thorough, balanced answers." *Id.* at 65, 69.

The record was replete with other evidence that TTV had a history of falsely alleging voter fraud without evidence. Just weeks before filing its challenges, for example, TTV filed a flurry of lawsuits alleging voter fraud sufficient to overturn the presidential election, only to admit (much later under oath) that it had no such evidence at all. *See id.* at 25, Doc. 313 at 42. And, as the court found, Phillips, who generated the challenge lists on TTV's behalf, "made public allegations about non-citizen voting in the 2016 election that were unfounded and unsupported by proper data and methods." Doc. 335 at 91 n.49. The court even recognized that this evidence "offers additional support for the historically *misplaced intentions*" of "TTV and its

46

associates." *Id.* (emphasis added). TTV knew that in contracting with Phillips it was selecting someone who would drive publicity with exaggerated and altogether false claims of ineligible voting, just as TTV knew that high-ranking officials in the Secretary's office had warned that mass NCOA-based voter challenges were improper. Nevertheless, it persisted.

***Mid-conduct evidence of intent.*** Once TTV's challenge scheme was in motion, TTV received confirmation from its *own volunteer*—Joe Martin in Taliaferro County—that TTV's approach was sweeping in demonstrably eligible voters. *See supra* Background II(B); Doc. 335 at 70-71; *see also* PX 80 at 1-2 (Martin emailing TTV, "My experience with the True the Vote data base has not been good," and expressing "[c]oncerns with the quality of your information," including that he believed there were "problem[s] with data accuracy and relevance"). The district court found Martin "to be a highly credibly witness" whose testimony was "particularly reliable because while his partisanship affiliation . . . was more aligned with True the Vote's interest, Martin still engaged in a deliberate investigation and testified with candor." Doc. 335 at 72-73.

Notably, Defendants were not remorseful about the mistakes that Martin identified; nor did they seek to reassess their data. Instead, they redoubled their efforts and attempted to find a new volunteer challenger to re-file the *same erroneous challenge list*. *Id.* at 57. TTV's willful continuation of challenges that it knew to be

47

inaccurate reflected a specific intent to challenge eligible voters in a manner calibrated to result in coercion and intimidation.

Defendants' own actions and testimony confirm they hoped the counties would act on their challenges and compel challenged voters to prove their eligibility. For example, TTV's agents attended public hearings to urge county boards of elections to accept their challenges, and TTV offered counties legal assistance if they would take more aggressive action. *See* Doc. 335 at 128; *supra* Argument I(B). TTV even discussed *suing* one county "for not acting on the challenges." Doc. 335 at 128. The district court situated these findings as evidence that TTV did not maintain "control over" county boards, *id.*, an observation entirely irrelevant to attempt. TTV believed "that the counties could (and ultimately would) handle the Section 230 challenges," *id.* at 29, and the counties that failed to do so directly impeded TTV's intent to coerce and intimidate.

**Post-conduct evidence of intent.** A post-hoc review of TTV's mass challenges further confirms that TTV executed its scheme with bad intentions. Dr. Mayer, an expert in political science, quantitative analysis, election administration, and voter behavior, provided a comprehensive assessment of TTV's NCOA-based challenge file. *Id.* at 75-76. His conclusion, adopted by the district court, was that the challenge file "was filled with errors, many of which were 'obvious' to even an untrained eye upon 'immediate inspection.'" *Id.* at 77 (quoting testimony).

48

The NCOA list, Dr. Mayer explained, does not reveal where an individual subjectively intends to establish their permanent residence, *see* Doc. 311 at 69, which is the relevant inquiry for voting eligibility, *see* O.C.G.A. § 21-2-217(a) (providing 15 intent-based rules for determining an individual's residency for purposes of voting eligibility, and codifying several examples where an individual may be away from their registration address without forfeiting their voting eligibility). In fact, the National Voter Registration Act *prohibits* states from using an NCOA record alone to determine a voter has changed their residency for purposes of voting eligibility—rather, states may use NCOA data only as one step in a multi-year process to confirm a voter's eligibility. *See* 52 U.S.C. § 20507(d).

Having launched its effort from the false premises that NCOA data determined residency, TTV proceeded to execute its process of linking Georgia's voter file to the NCOA database disastrously. Dr. Mayer identified *tens of thousands* of obvious "mistakes" in TTV's challenge file, such as where the challenged voter shared a name and address with multiple different individuals in the voter file; where TTV challenged individuals without any information about where (or if) the challenged voter had moved; where TTV listed a different name for the registration number it was challenging than the name linked to that registration number in Georgia's voter file; where TTV alleged challenged voters "moved" despite listing the same address for the voter's registration address and new address; and where

TTV challenged individuals who were almost certainly away from their registration address only temporarily for military service or schooling. *See* Doc. 335 at 77-80; PX 15. Dr. Mayer's "overall conclusion based on these errors was that '[TTV's] challenge file is just rife with errors,' and 'it just took his breath away how sloppy it was.'" *Id.* at 80 (quoting testimony) (district court's alteration adopted).

Having received this extensive testimony of TTV's willful disregard for the accuracy of its challenge list, the district court found that it was entitled to "great weight." *Id.* at 76. The court recognized that Dr. Mayer "testified clearly, reliably, and objectively"; the court found "no reason to doubt that he used sound methodology in reaching his conclusions"; and the court "credit[ed] his expert report and testimony." *Id.* Further, the court recognized that "Defendants did not submit any expert rebuttal to Mayer's report and testimony," and TTV's attempt "to rebut his conclusions with the testimony of Engelbrecht herself" was entirely unsuccessful—both because "Engelbrecht's testimony [did] not carry the same weight of expertise as Mayer's," and also because Dr. Mayer directly addressed and debunked Ms. Engelbrecht's attempted defense of TTV's process. *Id.* at 83.

\* \* \*

The legal question generated by these extensive findings is what, exactly, TTV intended to accomplish in challenging more than 250,000 Georgia voters just weeks before a high-stakes election without a sound basis. The district court never

answered that question, nor did it acknowledge that Section 11(b) defendants should "be deemed to intend the natural consequences of their acts." *6400 Hearings* at 11. But decisions from other courts supply helpful guidance. Foreseeing precisely the crisis that TTV perpetrated here, one federal court explained:

> One can imagine the mischief an immature political operative could inject into an election cycle were he to use [state challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy. **Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged.**

*Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008), as amended (Oct. 10, 2008) (emphasis added). The former Fifth Circuit, in turn, recognized that "[t]he only reasonable conclusion to be drawn from" a series of baseless accusations pressed against voters—in that case, through bogus arrests and prosecutions—"is that the purpose of [the defendants' conduct] was to hamper" voting activity in violation of the prohibition against voter intimidation and coercion. *McLeod*, 385 F.2d at 742. Here, the only reasonable interpretation to be drawn from TTV's baseless challenges was that it intended to intimidate voters from casting a ballot in Georgia's high-stakes runoff election.

The district court also erroneously excluded or ignored additional evidence of TTV's specific intent. *See, e.g.*, *supra* Argument I(B) (wrongfully ignoring that the natural consequence of TTV's challenges was, in fact, to intimidate voters) ; *supra*

Argument II(A) (wrongfully excluding evidence of threatening tweets); PX 17 at 3 (pre-challenge letter to Engelbrecht from a congressman relaying: "When you cry wolf [with unfounded claims of voter fraud], and there's no wolf, you undermine your credibility, and you have unjustly inconvenienced a legally registered voter, and that can border on voter intimidation."); *supra* Background II(A)-(B) (Validate the Vote and Eyes on Georgia campaigns to alter election outcomes). But the district court's failure to synthesize all of the evidence that it *did* credit, and all of the facts that it *did* find, into any discussion of TTV's attempt to do what Section 11(b) prohibits underscores the prejudicial legal error infecting the court's analysis. The court found Germany, Martin, and Dr. Mayer to be highly credible witnesses who offered critical testimony—yet, somehow, it deemed Plaintiffs' side of the scale to be altogether barren on the matter of TTV's attempt. This contradiction reveals a fundamental error, and that error about discrete legal elements requires reversal.

## 2. TTV took substantial steps to intimidate, threaten, or coerce voters.

A "substantial step," for purposes of attempt offenses, "is an important action leading up to committing of an offense—not just an inconsequential act. It must be more than simply preparing. It must be an act that would normally result in committing the offense." *United States v. Elliott*, Crim. No. 1:19-cr-00278-LMM-JSA-4, 2022 WL 20613209, at *3 (N.D. Ga. Oct. 4, 2022) (quoting 11th Cir. Pattern Jury Instructions, S11 (Attempt)).

It is true, as the district court observed, that "the prohibited action under Section 11(b) is attempted voter intimidation[,] not attempted voter challenges." Doc. 335 at 137 (emphasis omitted). Again, however, the court confused the elements. The substantial step need not itself be a prohibited action, nor must it be the ultimate offense—which would eviscerate Section 11(b)'s distinct prohibition against attempts. *See Ballinger*, 395 F.3d at 1238 n.8. As the Supreme Court recently recognized, for example, there is "little question" that an individual would be guilty of attempted robbery if he researched a business's layout, purchased a disguise, plotted his escape route, recruited a getaway driver, and drafted a note demanding money, even if the police were notified and arrested the person before he ever delivered the note or issued his demand. *United States v. Taylor*, 596 U.S. 845, 851-52 (2022). This is so even though the "prohibited action" is attempted robbery—not attempted casing of a building, or attempted purchase of a disguise, or so on. The substantial steps, each lawful in isolation, collectively exceed simple preparation and would normally result in the commission of the ultimate offense.

Similarly here, TTV's actions went well beyond preparation. TTV did not merely peruse Georgia addresses on the NCOA registry; it amassed challenge lists targeting hundreds of thousands of voters. Doc. 335 at 26. It did not merely brainstorm potential volunteers for its effort; it deployed agents to recruit volunteers across the state and transmitted the challenges directly to county election offices. *Id.*

at 53, 56, 74. It did not merely draft a statement announcing its "landmark coordinated challenges"; it published a press release to the widest audience it could reach. PX 42. The district court's conclusion that these acts themselves did not result in voter intimidation misapplies the legal standard for *attempt*.

The district court resolved virtually all of the factual disputes about TTV's intent in Plaintiffs' favor, and virtually all of the facts pertaining to steps that TTV took to execute its scheme were undisputed. Plaintiffs carried their burden to prove that TTV attempted to intimidate voters in violation of Section 11(b), and judgment should have been entered in their favor.

## CONCLUSION

Because TTV is liable under Section 11(b) both for actual coercion and intimidation of voters and for its attempt to do so, this Court should reverse the judgment below.

Respectfully submitted,

Allegra J. Lawrence-Hardy
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Michelle McClafferty
Georgia Bar No. 161970
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com

*/s/ Uzoma Nkwonta*
Uzoma N. Nkwonta
Jacob D. Shelly
Christina Ford
Tina Meng Morrison
Marcos Mocine-McQueen
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
cford@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law

**No. 24-10372**
**Fair Fight, Inc. v. True the Vote, Inc.,** *et al.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Eleventh Circuit Rule 32-4, this brief contains 12,988 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in font size 14, Times New Roman.

*/s/ Uzoma Nkwonta*
Uzoma Nkwonta
*Attorney for Appellant Fair Fight, Inc.*