No. 24-10372

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

FAIR FIGHT, INC.,

Plaintiff-Appellant

v.

CATHERINE ENGELBRECHT, et al.,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING
PLAINTIFF-APPELLANT AND URGING REVERSAL
ON THE ISSUE ADDRESSED HEREIN

———————————

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA 30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

BONNIE I. ROBIN-VERGEER
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 598-0243

*Fair Fight, Inc. v. Engelbrecht*, No. 24-10372

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the

United States certifies that, in addition to those identified in the certificates filed by

plaintiffs-appellants and defendants-appellees, the following persons may have an

interest in the outcome of this case:

Bokat-Lindell, Noah B., U.S. Department of Justice, Civil Rights Division,

counsel for the United States;

Buchanan, Ryan K., United States Attorney, Northern District of Georgia,

counsel for the United States;

Clarke, Kristen, U.S. Department of Justice, Civil Rights Division, counsel

for the United States;

Robin-Vergeer, Bonnie I., U.S. Department of Justice, Civil Rights Division,

counsel for the United States.

The United States certifies that no publicly traded company or corporation

has an interest in the outcome of this appeal.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  May 20, 2024

C-1 of 1

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

INTEREST OF THE UNITED STATES .................................................... 1

STATEMENT OF THE ISSUE .................................................................. 1

STATEMENT OF THE CASE .................................................................... 2

SUMMARY OF ARGUMENT ................................................................... 5

ARGUMENT

    The district court erred to the extent it determined that the county
    Boards of Elections' role in investigating voter challenges necessarily
    prevented a finding that defendants violated Section 11(b). ......................... 7

    A.    Filing knowingly or recklessly false voter challenges can
        violate Section 11(b) ............................................................... 7

    B.    Defendants can violate Section 11(b) even when the success
        of their scheme relies on the actions of independent
        intermediaries. ..................................................................... 13

        1.    Section 11(b) does not contain a standalone
            causation requirement. ............................................. 14

        2.    The district court's analysis was incorrect even if
            causation principles applied. ..................................... 19

    C.    To the extent the district court applied a per se causation bar,
        this Court should reject its reasoning. ................................... 21

CONCLUSION ........................................................................................ 28

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

**CASES:**                                                                    **PAGE**

*Arizona All. for Retired Ams. v. Clean Elections USA*,
    No. 2:22-cv-1823, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022)........... 16, 27

*\*Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017)............................. 19-20

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ...........................10

*\*City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019),
    *cert. granted, judgment vacated as moot*, 140 S. Ct. 1259 (2020).......... 19-20

*Counterman v. Colorado*, 600 U.S. 66 (2023) .......................................................11

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
    673 F.3d 192 (3d Cir. 2012) ............................................................................16

*Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022).......................................................18

*Geraci v. Union Square Condo. Ass'n*, 891 F.3d 274 (7th Cir. 2018) ...................10

*Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000)..................................................23

*\*League of United Latin Am. Citizens Richmond Region Council 4614 v.
    Public Int. Legal Found.*, No. 1:18-CV-00423,
    2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............................... 9, 11-12, 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................. 17, 19

*Montana Democratic Party v. Eaton*,
    581 F. Supp. 2d 1077 (D. Mont. 2008) ........................................................13

*\*National Coal. on Black Civic Participation v. Wohl*,
    661 F. Supp. 3d 78 (S.D.N.Y. 2023) ................................8-11, 16, 21, 23-24

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ..................................................................13

**CASES (continued):**                                                    **PAGE**

*Roberts v. Williams*, 456 F.2d 819 (5th Cir. 1971)......................................21

\*_United States v. Ballinger_, 395 F.3d 1218 (11th Cir. 2005) (en banc).................26

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961)............................... 8-9

*United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965) ............................ 10, 24

*United States v. Hansen*, 599 U.S. 762 (2023) .........................................11

\*_United States v. McLeod_, 385 F.2d 734 (5th Cir. 1967)...................9-10, 24, 26-27

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007)...............................26

*United States v. Taylor*, 596 U.S. 845 (2022)..........................................25

\*_United States v. Wood_, 295 F.2d 772 (5th Cir. 1961)................................... 16, 27

*Warshauer v. Solis*, 577 F.3d 1330 (11th Cir. 2009).................................8

\*_Whatley v. City of Vidalia_, 399 F.2d 521 (5th Cir. 1968).............................. 16, 27

**STATUTES:**

Voting Rights Act of 1965
     52 U.S.C. 10301(a) .........................................................15
     52 U.S.C. 10307(b)........................................... 1-2, 6, 8-9, 11-12, 15, 20, 24
     52 U.S.C. 10307(e)(1) and (3)............................................15
     52 U.S.C. 10308(d)............................................................1
     52 U.S.C. 10310(c)(1) ........................................................2
     Pub. L. No. 89-110, § 12(a), 79 Stat. 443 (1965).........................25

52 U.S.C. 10101
     52 U.S.C. 10101(a)(2)(B) .................................................15
     52 U.S.C. 10101(b)....................................................9, 11

Ga. Code Ann. § 21-2-230 (2019) .............................................2

**RULE:** PAGE

Fed. R. App. P. 29(a) ..................................................................1

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 439, 89th Cong., 1st Sess. (1965) ............................................. 11-12

*Voting Rights Act of 1965:  Hearing Before the H. Comm. on the Judiciary*, 89th Cong., 1st Sess. (1965) ................................................................. 11, 21

**MISCELLANEOUS:**

*Black's Law Dictionary* (11th ed. 2019)...................................................24

*\*Webster's Third New International Dictionary* (1966) ............................... 8, 12-13

## INTEREST OF THE UNITED STATES

This appeal concerns the interpretation of Section 11(b) of the Voting Rights Act of 1965 (VRA), 52 U.S.C. 10307(b), one of a series of federal laws passed to prevent voter intimidation.  The Attorney General enforces Section 11(b).  *See* 52 U.S.C. 10308(d).  The United States therefore has a significant interest in the statute's interpretation.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).[1]

## STATEMENT OF THE ISSUE

Whether the district court erred in rejecting plaintiffs' claim under Section 11(b) that defendants intimidated, threatened, or coerced, or attempted to intimidate, threaten, or coerce, voters by filing mass numbers of voter challenges, on the ground that a state law requiring Georgia's county Boards of Elections to determine whether probable cause exists to sustain a challenge "breaks the chain of causation" and thus necessarily immunizes defendants from liability.[2]

---

[1]  The United States intervened below to defend the constitutionality of Section 11(b), but defendants disclaimed any constitutional defense after trial and the United States did not appeal the district court's decision.  The United States therefore files this brief as an amicus curiae.

[2]  The United States takes no position on any other issue.

## STATEMENT OF THE CASE

1.  Section 11(b) provides:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [certain provisions of the Voting Rights Act].

52 U.S.C. 10307(b).  "At the time Congress passed Section 11(b)," the word "'intimidate' mean[t] to 'make timid or fearful,' or to 'inspire or affect with fear,' especially 'to compel to action or inaction (as by threats).'"  Doc. 335, at 113 (alteration in original; citation omitted).[3]  "To 'threaten' mean[t] to 'utter threats against' or 'promise punishment, reprisal, or other distress.'"  *Ibid.* (alteration in original; citation omitted).  "And to 'coerce' mean[t] to 'restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).'"  *Ibid.* (alteration in original; citation omitted).  The VRA defines the term "vote" broadly to encompass "all action necessary to make a vote effective."  52 U.S.C. 10310(c)(1).

2.  Utilizing Georgia's voter-challenge law, Ga. Code Ann. § 21-2-230 (2019), defendant True the Vote solicited Georgia voters to lodge challenges to any

---

[3] "Doc. __, at __" refers to the docket entry and page number of documents filed in the district court, No. 2:20-cv-302 (N.D. Ga.).

voter in their counties who appeared on a list of over 360,000 purportedly ineligible voters.  Doc. 335, at 4, 43-44.  In December 2020, plaintiffs Fair Fight, Inc. and several voters (collectively, "Fair Fight") sued True the Vote, its founder Catherine Engelbrecht, and a number of other individuals (collectively and interchangeably, "True the Vote"), alleging that the campaign violated Section 11(b) of the VRA.  *Id.* at 2, 6; *see* Doc. 73 (First Am. Compl.).  In its summary judgment brief, True the Vote raised several constitutional defenses to applying Section 11(b) to its voter challenges.  Doc. 155-1, at 24-31.  The United States intervened in the case to defend Section 11(b)'s constitutionality, and in the course of that defense also made arguments about the statute's meaning.  *See* Doc. 187 (notice of intervention); Doc. 198-1 (amended intervenor brief).

The district court largely denied summary judgment.  *See* Doc. 222.  In its ruling, the court addressed the legal standards governing Section 11(b) claims.  It "determine[d] that there must be some connection between Defendants' conduct and the intimidation that is reasonably felt or could be reasonably felt by a voter." *Id.* at 25.  The court described that connection as a "causation requirement" and stated that the required showing need not be "onerous."  *Ibid.*  As the court explained, "Defendants' actions need only be connected to the voters feeling (or potentially feeling) intimidated."  *Ibid.*; *see also id.* at 24 (recognizing that "Section 11(b) generally attributes to Defendants the *natural consequences* of their

actions"). The court also stated that plaintiffs need only prove that defendants' actions could have intimidated, threatened, or coerced a reasonable person, rather than that those actions in fact *did* intimidate, threaten, or coerce a specific person. *Id.* at 14, 16-17 & n.10.

3. The district court held an eight-day bench trial, in which the United States participated to defend Section 11(b)'s constitutionality. Doc. 335, at 2 n.2, 3. At the close of trial, defendants affirmatively disclaimed their constitutional defenses. *See* Doc. 316, at 131 ("No, we are not challenging the constitutionality of Section 11(b). Something, in fact, we're very proud of and we honor. We're not challenging it in any respect."). The court ultimately ruled for defendants. *See* Doc. 335, at 2, 144-145.

The district court agreed with plaintiffs that defendants' voter challenges were not well founded. It determined that True the Vote's "list" of potentially ineligible voters "utterly lacked reliability. Indeed, it verges on recklessness." Doc. 335, at 90. The court found that plaintiffs' expert's "opinion rings without rebuttal: the list was shoddy and rife with errors." *Id.* at 91. The court emphasized that a "visual inspection of the list by a layperson" would show "that [True the Vote] did not engage in a quality process to create the list, nor did they have proper review or controls in place. The sheer size of the list spurred concerns even by [True the Vote's] co-Defendants, who thought the mass list verged on

being a systemic challenge." *Ibid.* The court criticized True the Vote's "actions in facilitating a mass number of seemingly frivolous challenges." *Id.* at 123 & n.60.

Even though defendants lodged voter challenges based on a list that "utterly lacked reliability" (Doc. 335, at 90), the district court reasoned that the existence of an "intermediary between the challenger and the eligibility inquiry—the county Boards of Elections—creates a significant causation issue for Plaintiffs' case" (*id.* at 126). Emphasizing that "the ultimate decision to pursue an inquiry into a voter's eligibility to vote rests in the county Board of Elections," not the challengers (*id.* at 124), and that plaintiffs did not show that defendants exercised or attempted to exercise direct control over the Boards' actions (*id.* at 128), the court concluded that defendants necessarily did not violate Section 11(b) because the Boards' role "breaks the chain of causation." *Id.* at 126. Accordingly, the court held, plaintiffs could not prove that defendants' voter challenges "alone had a direct effect on any voter." *Id.* at 125.

Fair Fight appealed the judgments in favor of True the Vote and Engelbrecht. Doc. 340.

## SUMMARY OF ARGUMENT

1. Section 11(b) of the VRA sweeps broadly: "No person" may "intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote," or "for urging or aiding any person to vote or

attempt to vote." 52 U.S.C. 10307(b). The statute specifies no requirement that defendants' conduct actually cause any particular voter to be intimidated, threatened, or coerced, and the district court erred in imposing a causation requirement. The question posed by the statute's text is whether defendants engaged or attempted to engage in conduct that a reasonable person would find intimidating, threatening, or coercive.

Filing knowingly or recklessly false voter challenges foreseeably may intimidate, threaten, or coerce a reasonable voter in certain circumstances and thus may violate Section 11(b). This is so even when a third party, such as the county Boards of Elections, must determine whether to act on the challenges. Without correction, the district court's per se liability cutoff could hamper enforcement of Section 11(b) anytime a person attempts to intimidate voters by abusing governmental processes.

2. Even if considered under the rubric of proximate causation, the district court erred in determining that defendants' acts necessarily are too remote from the intimidation, threatening, or coercion of a reasonable voter to warrant Section 11(b) relief. Neither traditional proximate causation principles nor textual and administrative considerations suggest that an intervening act cuts off causation when that act is a foreseeable result of the defendant's conduct. To the extent the

court applied a per se rule that the county Boards' intermediary role necessarily cut off the causal chain, it erred.

The district court instead should have considered whether it is a natural consequence of a mass, indiscriminate flurry of voter challenges numbering in the hundreds of thousands that at least some of those challenges will result in communications to voters that reasonably would intimidate or threaten them or coerce them out of voting. Applying that standard, the court might well have determined that defendants' voter challenges would have intimidated, threatened, or coerced a reasonable voter. The court's contrary analysis is in particular tension with Section 11(b)'s prohibition on attempted voter intimidation.

## ARGUMENT

**The district court erred to the extent it determined that the county Boards of Elections' role in investigating voter challenges necessarily prevented a finding that defendants violated Section 11(b).**

### A.    Filing knowingly or recklessly false voter challenges can violate Section 11(b).

The statutory language, legislative history, and relevant case law all demonstrate that Section 11(b) prohibits any conduct—including filing knowingly or recklessly false voter challenges—that attempts to or does intimidate, threaten, or coerce a reasonable voter. The interpretive principles that lead to this conclusion, each of which the district court acknowledged, provide necessary

background for analyzing Section 11(b)'s application to the voter-challenge context.

1.  "The starting point in statutory interpretation is the language of the statute itself." *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (citation omitted).  Section 11(b) provides in relevant part that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote."  52 U.S.C. 10307(b).  Several conclusions flow from Section 11(b)'s text.

First, intimidation, threats, and coercion are categories of conduct defined largely by their impact rather than by the specific means of their execution.  *See Webster's Third New International Dictionary* 1183 (1966) (defining "intimidate" as to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)"); *id.* at 2381 (defining "threaten" as to "utter threats against" or "promise punishment, reprisal, or other distress"); *id.* at 438 (defining "coerce" as to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)").

Hence, Section 11(b) sweeps broadly to cover all conduct that constitutes voter intimidation, threats, or coercion, regardless of whether the conduct is "violent or physical."  *National Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 110, 113 (S.D.N.Y. 2023); *see, e.g.*, *United States v. Beaty*, 288 F.2d

653, 656 (6th Cir. 1961) ("[T]hreats, intimidation or coercion may take on many forms.") (discussing Section 131(b) of the Civil Rights Act of 1957);[4] *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Public Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (*LULAC-Richmond*) (stating that Section 11(b) has a "deliberately unqualified reach").  Forbidden conduct may include acts "inspiring fear of legal consequences, economic harm, dissemination of personal information, and surveillance." *Wohl*, 661 F. Supp. 3d at 113.  Challenged "acts cannot be viewed in isolation," but must be considered as a whole and "against the background of contemporaneous events." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (discussing Section 131(b)).

Second, Section 11(b) does not require proof that defendant's actions actually caused any voter to refrain from casting a ballot or to vote contrary to their preferences.  Conduct can be intimidating, threatening, or coercive even if the victim resists the pressure, and Section 11(b) specifically prohibits any "*attempt* to intimidate, threaten, or coerce," not just efforts that succeed in changing a voter's behavior.  52 U.S.C. 10307(b) (emphasis added); *see, e.g.*, *Wohl*, 661 F. Supp. 3d

---

[4] Section 131(b) of the Civil Rights Act of 1957, a still-extant predecessor to Section 11(b), makes it illegal to "intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote."  52 U.S.C. 10101(b).

at 110, 115-116; *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965)
(discussing Section 131(b)).

Third, and relatedly, a Section 11(b) violation does not depend on the
subjective reactions of the targeted voters; rather, the statute reaches all "messages
that a reasonable recipient, familiar with the context of the communication, would
view as a threat of injury to deter individuals from exercising their right to vote."
*Wohl*, 661 F. Supp. 3d at 113; *see McLeod*, 385 F.2d at 740-741 (holding that a
county's decision to arrest and prosecute Black voters attempting to register "had a
coercive effect" in violation of Section 131(b) because of the severe "chilling
effect" such activity naturally "would have . . . on a voter registration drive," even
if those coercive acts failed to actually intimidate voters); *see also, e.g.*, *Geraci v.
Union Square Condo. Ass'n*, 891 F.3d 274, 277 (7th Cir. 2018) (applying
reasonable person standard in interpreting Fair Housing Act's anti-intimidation
provision). Such an objective standard "avoids the uncertainties and unfair
discrepancies that can plague a judicial effort to determine a plaintiff's unusual
subjective feelings." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-
69 (2006) (holding that Title VII's retaliation provision employs an objective
standard). Of course, evidence that identified voters subjectively felt intimidated,
threatened, or coerced, though not required, remains relevant under this objective
standard.

- 10 -

Fourth, Section 11(b)'s principal prohibition covers anyone whose conduct would "intimidate, threaten, or coerce" a reasonable person, without requiring proof of a defendant's subjective or specific intent to intimidate, threaten, or coerce.  52 U.S.C. 10307(b); *see, e.g.*, *Wohl*, 661 F. Supp. 3d at 116; *LULAC-Richmond*, 2018 WL 3848404, at *4.[5]  On this point, Section 11(b) contrasts with Section 131(b), which prohibits similar conduct undertaken "*for the purpose of interfering with*" the right to vote.  52 U.S.C. 10101(b) (emphasis added); *see* H.R. Rep. No. 439, 89th Cong., 1st Sess. 30 (1965) (House Report) (noting that "no subjective purpose or intent need be shown" under Section 11(b), unlike Section 131(b), "which requires proof of a 'purpose' to interfere with the right to vote").  Instead of requiring proof of such purpose, Section 11(b) "deem[s]" defendants to "intend the natural consequences of their acts."  *Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong., 1st Sess. 16 (1965) (VRA Hearing) (statement of Nicholas Katzenbach, Att'y Gen. of the United

---

[5]  When the intimidation, threat, or coercion consists of speech, the First Amendment may require an additional showing.  *Cf.* Doc. 335, at 141 n.76 (declining to decide whether First Amendment would protect defendants' voter challenges because of the court's no-violation finding).  But the First Amendment does not protect knowingly or recklessly filing false voter challenges.  *See* Doc. 198-1, at 24-32 (rebutting First Amendment defenses); *United States v. Hansen*, 599 U.S. 762, 783 (2023) (reaffirming speech-in-furtherance-of-illegal-conduct exception); *cf. Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (holding that recklessness suffices to sustain prosecutions under true threats exception).

States).  However, proof of intent remains probative evidence of likely intimidation or coercion under Section 11(b) and, at the very least, is relevant to an attempt claim.[6]

Between its summary judgment decision and its post-trial opinion, the district court largely adopted each of these legal standards.  *See* Doc. 222, at 14, 16-17, 23-24, 48-49; Doc. 335, at 113-116.

2.  Putting these principles together, Section 11(b) encompasses any activity that, if followed through to completion, would naturally tend to "make" a reasonable person "fearful" or "nullify[] [the] individual will or desire" of reasonable eligible voters to vote.  *Webster's Third New International Dictionary* 438, 1183.  The statute provides no limitations or exceptions to this core prohibition.  To be sure, lodging a legitimate voter challenge based on credible evidence is not unlawful.  But filing knowingly or recklessly false voter challenges in circumstances in which a reasonable voter would be intimidated, threatened, or coerced would violate Section 11(b).

Most relevant here, submitting mass voter challenges with the knowledge that some voters are in fact eligible, or with reckless disregard as to their

---

[6]  Section 11(b)'s text likewise includes no racial motivation requirement. *See* 52 U.S.C. 10307(b) (applying to "any person" and containing no mention of race); House Report 30; *LULAC-Richmond*, 2018 WL 3848404, at *4.

- 12 -

eligibility, can constitute intimidation, threats, or coercion under Section 11(b). The natural consequences of filing mass voter challenges in this manner are to cast baseless suspicion on eligible voters, add administrative burdens to those voters' voting experience, dissuade voters from going to the polls, and increase the risk of erroneous disenfranchisement.  *See* Doc. 29, at 15-17 & n.9; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (discussing how "voter confusion" can create a "consequent incentive to remain away from the polls"); *Montana Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008) (discussing "the mischief" a defendant who abuses voter challenge laws "could inject into an election cycle").  Those foreseeable consequences may intimidate, threaten, or coerce reasonable voters.

In other words, submitting knowingly or recklessly false voter challenges may intimidate, threaten, or coerce voters into not voting by "nullifying [their] individual will or desire" to vote or making them "timid or fearful."  *Webster's Third New International Dictionary* 438, 1183.  Such challenges also may have the long-term effect of intimidating, threatening, or coercing challenged voters from voting again.

## B.    Defendants can violate Section 11(b) even when the success of their scheme relies on the actions of independent intermediaries.

While the district court recognized that True the Vote "facilitate[ed] a mass number of seemingly frivolous challenges" (Doc. 335, at 123 n.60), it held after

- 13 -

trial that the county Boards of Elections' role as an "intermediary" "breaks the chain of causation" for a voter intimidation claim (*id.* at 126).  The court stated that it "does not mean to suggest that [Georgia voter] challenges can never be a violation of Section 11(b)."  *Id.* at 137.  Yet much of the court's analysis treats the Boards' statutory role as necessarily foreclosing liability, reasoning that "Defendants' Section 230 challenges could not have reasonably attempted to [coerce or threaten voters]" due to "the statutorily imposed intermediary of the county Boards of Elections."  *Id.* at 130-131.  As the court saw it, plaintiffs were required to, but did not, provide evidence that defendants "had control over" or "attempted to manipulate these county Boards of Election[s]" to establish liability.  *Id.* at 128 & n.68; *accord id.* at 130-131.

To the extent the district court applied a per se rule that the Boards' intermediary role foreclosed defendants' liability, that was an error this Court should reject.  That a third party must take a step to effectuate the voter-challenge scheme defendants devised does not prevent defendants from being held responsible for the chain of events that their conduct set into motion if those events are the natural and foreseeable consequences of defendants' own acts.

### 1.    Section 11(b) does not contain a standalone causation requirement.

a.  The district court fundamentally erred in reading a causation element into Section 11(b)'s text that does not appear there.  The statute speaks only of acts that

"intimidate, threaten, or coerce." 52 U.S.C. 10307(b). A defendant need not actually cause a particular voter to feel intimidated, threatened, or coerced. Far from "impl[ying] a causation requirement" (Doc. 335, at 126 n.65), the statute instead means that any conduct that foreseeably would intimidate, threaten, or coerce a reasonable person is actionable. *See* pp. 9-10, *supra*. The court's insistence on imposing a causation element is especially out of place because Section 11(b) also prohibits "attempt[s]," 52 U.S.C. 10307(b)—and attempts, by definition, do not need to cause any particular result.

Congress knows how to craft statutes, including voting statutes, that do require a defendant to cause a particular injury. For instance, a nearby provision, Section 11(e), creates criminal sanctions for any voter who "votes more than once in an election," when doing so actually leads to the casting of multiple ballots for "an election to the same candidacy or office." 52 U.S.C. 10307(e)(1) and (3). Section 2 of the VRA prohibits procedures that "result[] in a denial or abridgement of the right of any citizen of the United States to vote." 52 U.S.C. 10301(a). And the Materiality Provision of the 1964 Civil Rights Act prohibits state actors from using immaterial paperwork errors to "deny the right of any individual to vote in any election." 52 U.S.C. 10101(a)(2)(B). Section 11(b) lacks similar causation language.

- 15 -

It is unsurprising, therefore, that "[t]he caselaw" on Section 11(b) is "not overt in naming a causation requirement" for plaintiffs' injury. Doc. 222, at 23-24. Courts routinely have found Section 11(b) violations in cases where defendants relied on third parties not under their control to fully effectuate their conduct.[7] And prior binding cases have rejected the idea that the use of otherwise legal channels or processes necessarily shields a defendant from Section 11(b) liability for actions that would intimidate or coerce reasonable voters. *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (holding that "spurious prosecutions" of those aiding voter registration allowed plaintiffs to invoke protection of Section 11(b) and similarly-worded provision of Title II of 1964 Civil Rights Act); *United States v. Wood*, 295 F.2d 772, 781 (5th Cir. 1961) (holding

---

[7] *See, e.g.*, *Arizona All. for Retired Ams. v. Clean Elections USA*, No. 2:22-cv-1823, 2022 WL 17088041, at *1-2 (D. Ariz. Nov. 1, 2022) (enjoining an out-of-state defendant from, *inter alia*, encouraging certain ballot drop-box monitoring activities, even though the poll-watchers whose actions directly caused voter intimidation were free to decide for themselves whether to follow the defendant's exhortations to monitor the drop boxes); *Wohl*, 661 F. Supp. 3d at 123-124 (granting summary judgment to plaintiffs under Section 11(b) for a robocall campaign executed by a third-party communications company); *LULAC-Richmond*, 2018 WL 3848404, at *4 (finding that plaintiffs plausibly pleaded a Section 11(b) violation where defendants allegedly had "linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium" by others); *see also Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 196 (3d Cir. 2012) (discussing enforcement of consent decree resolving Section 11(b) claims that proscribed discriminatory voter challenge campaigns conducted through third parties, among other conduct).

that baseless arrest and prosecution of Student Nonviolent Coordinating Committee volunteer violated Section 131(b) because "Congress contemplated just such activity as is here alleged—where the state criminal processes are used as instruments for the deprivation of constitutional rights").

b.  Hence, lodging indiscriminate mass voter challenges can violate Section 11(b) despite the Boards of Elections' statutory role in deciding whether to sustain a challenge.  It can do so if, as a natural consequence of the mass challenges, at least some eligible voters would learn that their voting eligibility had been challenged and reasonably would be intimidated, threatened, or coerced into abandoning their will or desire to vote.  Just as "under common-law principles, a plaintiff can be directly injured by a misrepresentation even where 'a third party, and not the plaintiff, . . . relied on' it," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (citation omitted; alteration in original), a knowingly or recklessly false voter challenge may in some circumstances intimidate or coerce a reasonable voter even when it is a third party (a Board of Elections) that relies on the false challenge to inflict the statutory injury.

The existence of a governmental intermediary could be relevant to whether Section 11(b) plaintiffs can establish liability.  But whether defendants' actions naturally would have intimidated, threatened, or coerced reasonable voters, due to

the timing or number of voter challenges or other circumstances, presents a factual question.  That question cannot be answered as a matter of law simply by pointing to the intermediary role of the county Boards.

Indeed, the use of government officials to facilitate intimidation, threats, or coercion through improper voter challenges may *exacerbate* the impact of such conduct.  Government communications carry the official imprimatur of the State, and formal governmental processes can raise for the reasonable voter the specter of administrative difficulties and adverse legal consequences.  Therefore, an interpretation of Section 11(b) that would cut off liability whenever an intermediary can make an independent decision about whether to follow a defendant's lead would seriously hamper enforcement of the statute.

To give just one example, recent years have witnessed a great increase in the phenomenon of "swatting."  "Swatting involves placing a hoax emergency call reporting serious threats to provoke an armed law enforcement response to an individual's residence, usually as an act of harassment or revenge."  *Finch v. Rapp*, 38 F.4th 1234, 1237 (10th Cir. 2022).  But whether a swatter succeeds in his attempt to harass his intended victim depends on police officers' exercise of independent judgment about whether to respond to the swatter's call.

Adopting the district court's understanding of Section 11(b) could make it extremely difficult for the United States or private plaintiffs to enforce the statute

and other similarly worded statutes against people who intimidate, threaten, or coerce others (or attempt to do so) through means such as swatting and other types of false reports to law enforcement authorities.

> **2.    The district court's analysis was incorrect even if causation principles applied.**

Even if causation were the proper analytical lens—despite lacking textual support in Section 11(b)—the district court still erred to the extent it imposed a per se rule that the county Boards' intermediary role cut off the causal chain.  As Section 11(b)'s text does not contain a causation requirement, a court could impose one only by applying the background assumption that Congress incorporates common-law proximate causation rules into federal tort statutes.  *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017).  But that background principle of proximate causation does not determine whether a defendant's conduct *violates the statute*, as the district court appeared to reason.  Rather, it determines only whether recovery for a *particular plaintiff* is barred because he or she alleges a "harm that is 'too remote' from the defendant's unlawful conduct."  *Lexmark*, 572 U.S. at 133.

Even assuming this standard applies here, the Boards' potential intermediary role does not automatically cut off proximate causation.  "Supreme Court precedent makes crystal clear that an intervening step does not necessarily mean proximate cause has not been plausibly alleged."  *City of Miami v. Wells Fargo &*

*Co.*, 923 F.3d 1260, 1273 (11th Cir. 2019), *cert. granted, judgment vacated as moot*, 140 S. Ct. 1259 (2020). Likewise, under state common law, "[a]n intervening cause is not sufficient and independent" and does not cut off causation "if 'its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer.'" *Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*, 944 F.3d 886, 892 (11th Cir. 2019) (citations omitted) (discussing Georgia common law).

The "nature of [Section 11(b)'s] statutory cause of action" is inclusive and public-minded, *Bank of Am.*, 581 U.S. at 203 (citation omitted), prohibiting attempts as well as completed offenses, which further confirms that any proximate causation requirement under Section 11(b) would extend broadly. And applying Section 11(b) broadly does not create the sort of administrative problems that have led courts to cut off proximate causation. There are not "more directly injured plaintiffs" who can bring their own Section 11(b) suits, *City of Miami*, 923 F.3d at 1288 (discussing Fair Housing Act); it is the voters and those "aiding" them, 52 U.S.C. 10307(b)—not the intermediary county Boards of Elections—who are being harmed in the manner defined by the statute. It also is "entirely practicable and not unduly inconvenient for the courts to" apply the natural and foreseeable consequences standard, *City of Miami*, 923 F.3d at 1281, as prior Section 11(b) cases illustrate (*see* pp. 16-17 & note 7, *supra*).

- 20 -

Accordingly, Section 11(b) defendants cannot avoid liability simply because third parties—here the county Boards—had a role to play in effectuating the voter-challenge scheme defendants hatched.  Rather, Section 11(b) "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Roberts v. Williams*, 456 F.2d 819, 826 (5th Cir. 1971) (discussing Section 1983); *accord Wohl*, 661 F. Supp. 3d at 117 (holding that under Section 11(b) "a person is presumed to have intended the natural consequences of his deeds" (citation omitted); VRA Hearing 16; p. 11, *supra*.

### C.    To the extent the district court applied a per se causation bar, this Court should reject its reasoning.

1.  The court's post-trial decision departed from the above principles by holding—seemingly as a matter of law—that the Boards' status as an intermediary meant that defendants could not be held responsible for their own actions.  *See* Doc. 335, at 126; *but see* Doc. 222, at 49 (noting at summary judgment that "Defendants do not appear to contest that they intended, as a natural consequence of the challenges, that once a challenge was made, then the challenged voter would be forced to prove their eligibility").  The proper question is whether, given the evidence at trial, voter intimidation or coercion was a natural and foreseeable consequence of defendants' decision to submit what "verged on being a systemic challenge" to hundreds of thousands of voters, based on a "shoddy" list of potentially ineligible voters that "utterly lacked reliability."  Doc. 335, at 90-91.

- 21 -

Here, defendants ultimately submitted 260,000 voter challenges across many counties (Doc. 310, at 67), based on an unreliable list of over 360,000 potentially ineligible voters (Doc. 335, at 86, 90-91).[8]  Had the district court properly applied the rule that defendants are responsible for the natural and foreseeable consequences of their actions, it might have found it reasonably foreseeable that at least *some* of the county Boards of Elections would accept at least *some* of these hundreds of thousands of challenges and notify challenged voters, many of whom were in fact eligible to vote.  Indeed, as the district court noted, these consequences did occur in some counties.  For instance, one plaintiff in Banks County "discover[ed] she had been challenged" when "she arrived to vote."  Doc. 335, at 127.  Muskogee County was under a federal court order "which required the Board to inform challenged voters that they had been challenged."  *Id.* at 126-127.  And some voters contacted Fair Fight because they had been challenged in the lead-up to the 2021 Senate runoff.  *Id.* at 100 n.53.

As the evidence of both experts and lay witnesses in this case suggested, learning that one's eligibility to vote is under challenge and that one must produce documentation to prove one's eligibility might reasonably intimidate, threaten, or

---

[8]  Though Georgia law required registered voters in each county to submit challenges (Doc. 335, at 4), "[True the Vote] typically sent the challenge letters *directly* to the county without oversight or review by the volunteer" (*id.* at 92).

coerce the voter.[9]  If the district court were to find that at least some reasonable

voters would be intimidated, threatened, or coerced as a "natural outcome of"

defendants' mass voter challenges here, then liability would attach, as "normally, a

person is presumed to have intended the natural consequences of his deeds." *Wohl*,

661 F. Supp. 3d at 117 (citation omitted); *accord Jackson v. Sauls*, 206 F.3d 1156,

1168 (11th Cir. 2000).

2.  The district court's flawed approach may have particularly affected its

views on whether defendants *attempted* to intimidate, threaten, or coerce.  Indeed,

---

[9] *See* Doc. 335, at 100 n.53 (noting testimony from a Fair Fight representative that people called the organization stating that they felt threatened because they had been subjected to voter challenges); *id.* at 135-137 (discussing expert testimony); *id.* at 133 n.70 (discussing plaintiff Gamaliel Turner's testimony and stating that, "absent the causation and directness problems discussed elsewhere, it is possible that Turner's testimony would be sufficient to support a conclusion that the Section 230 challenge against him attempted to intimidate him as a voter").

Notably, the court discounted all this evidence.  But it appeared to do so either because of its erroneous causation standard (*e.g.*, Doc. 335, at 133 n.70), or because of a misapplication of the reasonable voter standard.  Despite correctly articulating that standard elsewhere, in examining the evidence the court stated that it must find a particular plaintiff or other person who in fact *was* intimidated and determine that *that person*'s fear was reasonable, rather than determining whether a *hypothetical* reasonable person *would have been* intimidated.  *E.g.*, *id.* at 100-101 n.53, 131, 133 n.70, 134, 137.  This latter error led the court to dismiss as insufficient the evidence that remained after the court's erroneous causation analysis had winnowed the evidentiary pool.  *See, e.g.*, *id.* at 136-137 (discounting expert testimony about the likely intimidating effects of mass voter challenges on a reasonable voter and evidence about the scope of the voter-challenge scheme).

the court's analysis ignores that the statute prohibits any "*attempt* to intimidate, threaten, or coerce," just as it prohibits the completed act.  52 U.S.C. 10307(b) (emphasis added); *see Wohl*, 661 F. Supp. 3d at 90, 116 (granting plaintiffs summary judgment on Section 11(b) claim involving robocalls conveying "false information intended to prevent recipients from voting by mail through threats and intimidation," and holding that "an attempt to intimidate, threaten, and coerce others—regardless of race—for exercising their right to vote, even if ultimately unsuccessful, still violates Section 11(b)"); *Clark*, 249 F. Supp. at 728 (discussing Section 131(b)); pp. 9-10, *supra*.  The court simply held that the Boards' role in examining voter challenges ruled out as a matter of law any argument for attempted coercion (Doc. 335, at 130-131), and then found that plaintiffs could not prove that defendants engaged in attempted intimidation (*id.* at 131).

However, submitting knowingly or recklessly false voter challenges *can* violate, at the very least, Section 11(b)'s prohibition on attempts.  If a person "foresees the possibility" of harmful consequences "and consciously takes the risk," Recklessness, *Black's Law Dictionary* (11th ed. 2019), that person's decision to file a voter challenge may indicate an attempt to intimidate, threaten, or coerce the challenged voter out of voting.  In *McLeod*, 385 F.2d at 745, for instance, the pre-split Fifth Circuit held that "indiscriminate mass arrests of persons violating a valid law, together with baseless or unconstitutional arrests of others engaged in

the same voting-related activity[,] shows the purpose to interfere" under a similar provision of the Civil Rights Act of 1957, Section 131(b).

In the criminal-law context, an attempt requires intent to carry out the relevant violation and a substantial step taken toward that end. *See United States v. Taylor*, 596 U.S. 845, 851 (2022). By analogy, in Section 11(b)'s civil context, knowingly or recklessly false voter challenges can be construed as evidence of the challenger's intent to intimidate, threaten, or coerce eligible voters into abstaining from voting, and filing the challenge is a substantial step in pursuit of that goal.[10]

The district court appeared to accept that "the requirements for criminal attempts" can be used "to assess attempted voter intimidation." Doc. 355, at 136. Yet the court asserted that the intercession of county Boards of Elections would destroy even an *attempt* claim, because "the prohibited action under Section 11(b) is attempted *voter intimidation*—not attempted voter challenges otherwise valid under Georgia law." *Id.* at 137. It did not matter to the court whether plaintiffs could show that defendants had "attempted to affect a large number of the voting populace" by filing indiscriminate challenges. *Ibid.* On the court's view, plaintiffs could not prove even an attempt absent evidence that defendants either "direct[ed]

---

[10] The analogy to criminal attempts is particularly apt here because violating Section 11(b) originally led to criminal as well as civil sanctions. *See* Pub. L. No. 89-110, § 12(a), 79 Stat. 443 (1965) (as amended, 52 U.S.C. 10308(a)).

county Boards of Elections to pursue an eligibility inquiry" or caused (or attempted to cause) a particular voter to be "intimidated, coerced, or threatened." *Id.* at 138.

The district court's reasoning abandons Section 11(b)'s reasonable voter standard. *See* p. 10, *supra*; *see also McLeod*, 385 F.2d at 741 (holding in Section 131(b) case that "the failure of the arrests and other coercive acts" at issue "to intimidate a few persons does not negative their general coercive effect"). It also conflates the *substantial step* in an attempt claim (here, the filing of a voter challenge) with the ultimate illegal *consequence* being attempted (voter intimidation or coercion). An attempt, by definition, does not require completing the offense; it merely requires some "conduct 'strongly corroborative of the firmness of the defendant's criminal intent.'" *United States v. Ballinger*, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (en banc) (citation omitted). Filing mass, indiscriminate voter challenges can constitute such a substantial step. And courts can consider voter challenges alongside any other overt acts as "part of a single course of conduct culminating in the charged 'attempt.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007). Filing knowingly or recklessly false voter challenges therefore can constitute an attempt under Section 11(b) despite any intermediary role the Boards may have played. This is so even if the county Boards denied *all* of defendants' challenges.

- 26 -

Nor does it matter, as the district court reasoned, whether the voter challenges would "otherwise" be "valid" under state law. Doc. 335, at 137. Making "indiscriminate mass" challenges, so that challenges to ineligible voters were haphazardly mixed "together with baseless" challenges of eligible voters, "must be considered as strong evidence that the purpose of the [challenges] was to interfere with the right to vote" and thus illegal under federal law, regardless of whether legitimate voter challenges would be valid under state law. *McLeod*, 385 F.2d at 745; *see also Arizona All. for Retired Ams. v. Clean Elections USA*, No. 2:22-cv-1823, 2022 WL 17088041, at *2 (D. Ariz. Nov. 1, 2022) (restraining defendants in Section 11(b) action from "claim[ing] that individuals committed voter fraud based solely on the fact that they deposited multiple ballots in a drop box," even though dropping off multiple ballots did violate state law in some circumstances, because such statements intimidated voters who could validly drop off multiple ballots under state-law exceptions).

* * *

Congress "contemplated" that its voter-intimidation statutes would reach situations in which government "processes are used as instruments for the deprivation of constitutional rights." *Wood*, 295 F.2d at 781; *see Whatley*, 399 F.2d at 526. The district court erred in holding that the role of the county Boards of Elections necessarily relieved defendants of responsibility for their actions.

- 27 -

## CONCLUSION

For the foregoing reasons, this Court should reject the district court's conclusion (and related analysis) that the role of the county Boards of Elections necessarily immunized defendants from liability for their actions.

Respectfully submitted,

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA  30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
BONNIE I. ROBIN-VERGEER
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains because it contains 6,488 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  May 20, 2024