IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 24-10372

---

FAIR FIGHT, INC.,

*Plaintiffs-Appellant*,

v.

TRUE THE VOTE, INC., et al.,

*Defendants-Appellees*.

---

RESPONSE BRIEF OF DEFENDANTS-APPELLEES
TRUE THE VOTE, INC. and CATHERINE ENGELBRECHT

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

---

Jake Evans
Philip J. George
Julia Martin
GREENBERG TRAURIG, LLP
Terminus 200 | 3333 Piedmont Road NE | Suite 2500
Atlanta, GA 30305
Telephone: 678.553.2342
Jake.Evans@gtlaw.com
Philip.George@gtlaw.com
Julia.Martin@gtlaw.com

*Counsel for Defendants-Appellees True the Vote, Inc. and Catherine Engelbrecht*

*FAIR FIGHT, INC. v. TRUE THE VOTE, INC., ET AL.*
CASE No. 24-10372

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, Defendants-Appellees True the Vote, Inc. and Catherine Engelbrecht submit this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this review:

1.  Bao, Judy— *Attorney for Intervenor*

2.  Belinfante, Joshua Barrett— *Attorney for Movant*

3.  Berson, Scott—*Plaintiff*

4.  Berwick, Benjamin L.—*Attorney for Amicus*

5.  Bopp Jr., James— *Former Attorney for Defendants-Appellees*

6.  Branch, Aria Christine— *Attorney for Plaintiff-Appellant*

7.  Bryan, Leslie J.— *Attorney for Plaintiff-Appellant*

8.  Clark, David— *Objector*

9.  Cogen, Maia J.— *Attorney for Plaintiff-Appellant*

10. Cooper, James— *Defendant*

11. David F. Guldenschuh, P.C.—*Former Attorney for Defendants-Appellees*

12. Davis, Mark—*Defendant*

13. Department of Justice—*Attorney for Intervenor*

14. Devaney, John M.—*Former Attorney for Plaintiff-Appellant*

15. Doe, Jane— *Plaintiff*

16. Elias Law Group LLP—*Attorney for Plaintiff-Appellant*

17. Elias, Marc E.— *Attorney for Plaintiff-Appellant*

18. Engelbrecht, Catherine— *Defendant-Appellee*

19. Evans, James C.—*Attorney for Defendants-Appellees*

20. Fair Fight, Inc.— *Plaintiff-Appellant*

21. Ford, Christina Ashley — *Attorney for Plaintiff-Appellant*

22. Gallant, Jeffrey P.—*Former Attorney for Defendants*

23. George, Philip J.—*Attorney for Defendants-Appellees*

24. Greenberg Traurig LLP—*Attorney for Defendants-Appellees*

25. Gregory Wynne Arney PLLC— *Attorney for Defendants*

26. Guldenschuh, David F.—*Former Attorney for Defendants*

27. Heredia, Jocelyn—*Plaintiff*

28. Hughes, Aileen Bell—*Attorney for Intervenor*

29. Johnson, Ron— *Defendant*

30. Jones, Judge Steve C.— *U.S. District Court Judge*

31. Kistler, Cameron O.— *Attorney for Amicus*

32. Larsen, Joseph R.— *Attorney for Defendants*

33. Lawrence & Bundy, LLC— *Attorney for Plaintiff-Appellant*

34. Lawrence, Allegra— *Attorney for Plaintiff-Appellant*

35. Lindenbaum, Dara— *Former Attorney for Plaintiff-Appellant*

36. Martin, Julia—*Attorney for Defendants-Appellees*

37. McClafferty, Michelle L. — *Attorney for Plaintiff-Appellant*

38. Mellett, Timothy— *Attorney for Intervenor*

39. Mobley, Ansley Mikayla— *Attorney for Defendants-Appellees*

40. Mocine-McQueen, Marcos— *Attorney for Plaintiff-Appellant*

41. Morley, Cindy— *Objector*

42. Morrison, Tina Meng— *Attorney for Plaintiff-Appellant*

43. Nkwonta, Uzoma— *Attorney for Plaintiff-Appellant*

44. O'Lenick, Alice— *Objector*

45. Paikowsky, Dana—*Attorney for Intervenor*

46. Paredes, Eric John Galvez—*Attorney for Amicus*

47. Powell, Cameron—*Attorney for Defendants*

48. Project Democracy Project—*Attorney for Amicus*

49. Raffensperger, Brad—*Movant*

50. Ramirez, Joel J.— *Former Attorney for Plaintiff-Appellant*

51. Reynolds, Larry—*Objector*

52. Rodgers, Torryn Taylor—*Former Attorney for Plaintiff-Appellant*

53. Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.— *Former Attorney for Plaintiff-Appellant*

54. Shelly, Jacob D.— *Attorney for Plaintiff-Appellant*

55. Shepherd, Jason—*Objector*

56. Siebert, Melena— *Former Attorney for Defendants-Appellees*

57. Smith & Liss, LLC— *Former Attorney for Defendants-Appellees*

58. Smith III, Ray Stallings—*Former Attorney for Defendants-Appellees*

59. Somerville, Derek—*Defendant*

60. Sparks, Adam Martin— *Attorney for Amicus*

61. The Bopp Law Firm, PC— *Former Attorney for Defendants-Appellees*

62. Tobin, Thomas— *Former Attorney for Plaintiff-Appellant*

63. True the Vote, Inc.— *Defendant-Appellee*

64. Van Gundy, B.J.— *Objector*

65. Williams, Mark—*Defendant*

66. Wynne, Michael John—*Attorney for Defendants*

67. Yun, Jennifer J.—*Attorney for Intervenor*

68. Zappendorf, Seanie—*Objector*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellee True the Vote, Inc. has no parent corporation and no corporation(s) own(s) 10% or more of any of its stock. Appellee Catherine Engelbrecht is an individual and has no parent corporation. Appellees certify that no publicly held company or corporation has an interest in the outcome of this case or appeal. As required by Circuit Rule 26.1-2(c), Appellees certify that the CIP contained in this brief is complete and correct.

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns the trial court's routine application of Section 11(b) of the Voting Rights Act. The court correctly found that Appellant failed to introduce evidence sufficient to satisfy the elements of its claim. This appeal is straight-forward and does not present any novel area of law or issue that would require further development through oral argument. Therefore, oral argument is unnecessary.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................ i

TABLE OF CONTENTS........................................................................... ii

TABLE OF CITATIONS ........................................................................ iii

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION........................................................4

STATEMENT OF THE ISSUES.............................................................4

STATEMENT OF THE CASE ...............................................................5

   I.    FACTUAL BACKGROUND.........................................................5

     A.   2020 and Georgia Election Law .................................................5

     B.   True the Vote, Inc. ....................................................................6

     C.   Fair Fight, Inc. ......................................................................11

     D.   Challenged Voters....................................................................11

       i.   Scott Berson....................................................................11

       ii.   Jocelyn Heredia................................................................13

       iii.  Gamaliel Turner................................................................15

iv.   Stephanie Stinetorf ..............................................................16

E.    Other Witnesses .................................................................17

II.   PROCEDURAL HISTORY ..........................................................21

A.    Pre-Trial ...............................................................................21

B.    The Bench Trial and Opinion ...........................................22

III.  STANDARD OF REVIEW ...........................................................24

SUMMARY OF THE ARGUMENT ....................................................26

ARGUMENT ..........................................................................................29

I.    THE TRIAL COURT PROPERLY APPLIED SECTION 11(B) IN
      DETERMINING THAT THERE WAS NO VOTER INTIMIDATION OR
      COERCION. ..................................................................................30

A.    Appellant Erroneously Claims the Trial Court Found That Georgia Law
      "Insulate[s]" TTV's Conduct Under Section 11(b). ...............31

B.    The Trial Court Analyzed the Evidence and Correctly Found, Under the
      Correct Causation Standard, That Plaintiffs Failed to Establish
      Defendants Caused Any Harm. .............................................35

C.    The Trial Court Correctly Found That There Was Insufficient Evidence
      of Coercion and Intimidation. ................................................39

II.   THE TRIAL COURT CORRECTLY DETERMINED THAT THERE WAS
      ALSO NO ATTEMPT AT INTIMIDATION. ...............................41

A.    There Was No Evidence of Any Attempt at Voter Intimidation. ...........42

B.    Appellant's Arguments Are Factually and Legally Erroneous. .............45

CONCLUSION ......................................................................................................51

# TABLE OF CITATIONS

**Cases**

*A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097 (11th Cir. 2022) ...................................................................................25

*Ariz. All. For Retired Ams. v. Clean Elections USA*, 638 F. Supp. 3d 1033 (D. Ariz. 2022) ............................................................................................33

*Ariz. All. for Retired Ams. v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694  (D. Ariz. Oct. 28, 2022).....................................................35

*Ariz. Dem. Party v. Ariz. Rep. Party*, 2016 U.S. Dist. LEXIS 154086 (D. Az. Nov. 4, 2016) ..........................................................................................40

*Colorado Montana Wyoming State Area Conference of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861 (D. Colo. 2023) ..........................................33

*Council on American-Islamic Relations—Minnesota v. Atlas*, 497 F. Supp. 3d 371 (D. Minn. Oct. 29, 2020)......................................................................40

*Cuenca v. Rojas*, 99 F.4th 1344 (11th Cir. 2024) ........................................... passim

*Democratic Nat'l Comm. v. Bostelmann*, 488 F. Supp 3d 776 (W.D. Wisc. 2020)39

*Denis v. Liberty Mutual Ins. Co.*, 791 F.2d 846 (11th Cir. 1986) ..........................36

*Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144 (11th Cir. 2018)............ 24, 25

*Fuller v. Metro. Atlanta Rapid Transit Auth.*, 810 F. App'x 781 (11th Cir. 2020).25

iii

*Garcia v. Public Health Trust of Dade County*, 841 F.2d 1062 (11th Cir. 1988)...36

*LULAC v. Public Interest Legal Foundation*, 2018 U.S. Dist. LEXIS 136524 (E.D. Va. 2018)....................................................................................................35

*Montana Democratic Party v. Eaton*, 581 F. Supp. 2d 1077 (D. Mont. 2008).......50

*Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021) ................................................................................. 36, 43

*National Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) ...............................................................................38

*National Coalition on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78 (S.D.N.Y. 2023) ...............................................................................34

*New Jersey Democratic State Comm. v. New Jersey Oath Keepers*, 2016 U.S. Dist. LEXIS 154272 (D.N.J. Nov. 11, 2016) ..............................................38

*Parson v. Alcorn*, 157 F. Supp. 2d 479 (E.D. Va. 2016) .......................................38

*People v. Trepanier*, 84 A.D.2d 374 (N.Y. App. Div. 4th Dep't 1982).................47

*Perez v. City of Sweetwater*, 770 F. App'x 967 (11th Cir. 2019)...........................48

*See Pa. Democratic Party v. Republican Party of Pa.*, No. 16-5664, 2016 U.S. Dist. LEXIS 153944 (E.D. Pa. Nov. 7, 2016) .....................................33

*U.S. Bank N.A. v. Village at Lakeridge, LLC*, 583 U.S. 387 (2018) .............. passim

*United States v. Balfany*, 965 F.2d 575 (8th Cir. 1992)..........................................50

*United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005)...................................46

*United States v. Elliott*, No. 1:19-cr-00278-LMM-JSA-4, 2022 WL 20613209

  (N.D. Ga. Oct. 4, 2022)...........................................................................46

*United States v. McDowell*, 705 F.2d 426 (11th Cir. 1983) ...................................46

*United States v. McLeod*, 383 F.2d 734 (5th Cir. 1967)........................................50

*United States v. Murrell*, 368 F.3d 1283 (11th Cir. 2004).......................................45

## Statutes

28 U.S.C. § 1291 ........................................................................................4

28 U.S.C. § 1331 ........................................................................................4

52 U.S.C. § 10307 ............................................................................ 1, 32, 46

O.C.G.A. § 21-2-230............................................................................ passim

## Rules

Fed. R. Evid. 801(c)(2) ...............................................................................49

## INTRODUCTION

This appeal involves Appellant's erroneous challenge to the trial court's routine application of the facts to the law. Judge Steven C. Jones, following a seven-day bench trial, found that Appellant failed to present sufficient evidence to prove its claim. Although Appellant tries to complicate matters with specious arguments, the issues are straight forward, and Appellant fails to show why Judge Jones's opinion should be reversed.

Appellant Fair Fight, Inc. ("Appellant" or "Fair Fight"), and several individual voters (not parties to this appeal),[1] brought a single claim under Section 11(b) of the Voting Rights Act ("VRA")[2] ("Section 11(b)"). The crux of Appellant's argument is that Appellees True the Vote, Inc. ("TTV") and Catherine Engelbrecht violated Section 11(b) by making certain voter challenges under a Georgia statute, O.C.G.A. § 21-2-230(a) (2019) ("Section 230"). Section 230 allows voters to challenge other voters' eligibility to vote in an election, but the county Boards of Elections decide the merits of the challenge. Appellant did not challenge Section 230 itself. There is

---

[1] Appellant's case is politically motivated and has been a message in search of a messenger, but with no supporting facts since the beginning. The Complaint originally named Fair Fight, Jocelyn Heredia, Scott Berson, and Jane Doe as Plaintiffs, and True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper as Defendants. For its appeal, Fair Fight decided to only include itself as the Appellant and TTV and Engelbrecht as the Appellees.

[2] 52 U.S.C. § 10307(b).

no argument Defendants did not comply with Section 230. And there was no evidence that Defendants attempted to disrupt the county Boards of Elections' process or otherwise targeted Plaintiffs. Appellant, therefore, could not succeed on its Section 11(b) claim, which was the only claim decided.

Judge Jones heard a significant amount of evidence and, in a well-reasoned 145-page Opinion and Memorandum of Decision, Doc. 335 (the "Opinion"), found there was no Section 11(b) violation. Plaintiffs had to, but failed to prove each of the following elements: (1) Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably be intimidated, threatened, or coerced from voting or attempting to vote. Opinion at 115.

Judge Jones correctly ruled that the evidence was "lacking on a number of fronts" and that "Plaintiffs have not met their burden to show that there has been a violation of Section 11(b) by any of the named Defendants in this case." Opinion at 112, 131. Because the county Boards of Elections served as an intermediary between the challenger and the eligibility inquiry, this "creates a significant causation issue for Plaintiffs' case." *Id.* at 126. There was no evidence that Defendants controlled or attempted to manipulate these boards, or otherwise acted to overcome the break in causation. *Id.* at 128. Moreover, Plaintiffs' evidence only connected Defendants' actions to one voter. *Id.* at 131. As for that one voter, Defendants submitted a

2

reasonable challenge because there was a reasonable question about her proper residency. *Id.* at 134. Even if there had been evidence connecting Defendants' actions to the other voters, there was "no evidence that Defendants attempted to make any of the voters in this case feel timid or fearful, or that they experienced any actual reasonable intimidation." *Id.* at 131. Appellant must, but cannot, overcome all these evidentiary deficiencies.

Understanding these evidentiary deficiencies are fatal, Appellant's brief is filled with red herrings that mischaracterize arguments on factual matters as arguments of legal error. First, Judge Jones explicitly found that, while there was no Section 11(b) violation here, a Section 230 challenge could, under other circumstances, result in a Section 11(b) violation. Opinion at 137. Nonetheless, having no colorable argument to support its appeal, Appellant falsely claims that the trial court held that Section 230 "immunizes" all challenges from Section 11(b) scrutiny. Second, the trial court applied the correct causation analysis, which the trial court clearly laid out earlier, to which Plaintiffs did not object. But, to manufacture an argument for its appeal, Appellant belatedly and incorrectly argues that the trial court's application of law was "standardless." Third, having no other option, Appellant takes issue with the trial court's weighing of the evidence, ignoring the lengths to which Judge Jones credited the evidence Plaintiffs introduced. The trial court, however, correctly found that Plaintiffs' evidence failed to satisfy the

elements of their Section 11(b) claim. <u>Fourth</u>, Appellant's arguments claiming that Defendants attempted to intimidate fair no better. The trial court thoroughly addressed the attempt element of the statute and again found there was no evidence of an attempt at voter intimidation. Appellant conflates mere voter challenges (what happened here) with attempted voter intimidation, but the two are not the same. Because Appellant's arguments primarily relate to factual and evidentiary disputes, the Opinion is subject to the high "clearly erroneous" standard, which Appellant comes nowhere near satisfying.

 This Court should affirm the trial court's Opinion in its entirety.

## STATEMENT OF JURISDICTION

The trial court had subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. The trial court entered its final order on January 2, 2024. Doc. 335. Fair Fight filed a notice of appeal on February 1, 2024. Doc. 340. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the trial court correctly concluded Appellees were not liable under Section 11(b) of the Voting Rights Act where there was insufficient evidence to show voter intimidation or attempted voter intimidation because Appellant failed to prove that: (1) Defendants' actions directly or through means of a third-party in

4

which they directed, (2) caused, or could have caused, (3) any person to be reasonably be intimidated, threatened, or coerced from voting or attempting to vote.

## STATEMENT OF THE CASE

I.    **FACTUAL BACKGROUND**

A.    **2020 and Georgia Election Law**

There was perhaps no greater topic of public debate in the 2020 election cycle than election integrity. *See* Opinion at 4. Following the 2020 general election, neither of Georgia's seats in the United States Senate were filled, as no candidate obtained a majority vote. *Id*. Under Georgia law, the election went to a runoff to determine both of Georgia's senators. *Id*.

In 2020, Georgia law provided that "[a]ny elector" in a county "may challenge the right of any other elector to vote in that county." O.C.G.A. § 21-2-230(a) (2019). Once a challenge was made, the individual county Boards of Elections were required to consider the challenge and determine whether probable cause existed to sustain the challenge. O.C.G.A. § 21-2-230(b) (2019). As public concern over the accuracy of voter rolls grew, several organizations assisted electors in filing challenges of potentially ineligible voters in Georgia under Section 230. Opinion at 4. TTV was one such organization.

### B.    True the Vote, Inc.

True the Vote, Inc. was founded in 2010 by Catherine Engelbrecht, who testified at trial. TTV's mission is to empower citizens to serve and to support fair, secure, and accurate elections. Opinion at 23; Tr. 1754:16–19, 1760:12-1761:8 (Doc. 327). In its 14 years of operation, TTV has, among other things, hosted voter registration drives, reviewed absentee ballots, advocated for election volunteering, and trained poll workers on signature verification. Opinion at 23-24; Tr. 1757:21–1758:8 (Doc. 327). Election integrity and security has particularly become a priority for TTV in recent years. Opinion at 24; Tr. 1762:4–5 (Doc. 327).

The COVID-19 pandemic brought many changes to the American electoral system, including large scale mail-in ballot initiatives, the use of unmonitored drop boxes, changes to signature verification standards, and chain of custody issues. Opinion at 25; Tr. 1765:15-1767:18, 1768:13–1769:6 (Doc. 327). Based on its analysis, TTV determined that absentee and mail-in ballots were the least secure ways to vote. Tr. 1771:14-1772:4 (Doc. 327). TTV believed election integrity was "fundamental to the [election] process" and grew concerned with the impact these changes were having on the security of the electoral process. Opinion at 24; Tr. 1762:4–5 (Doc. 327). Accordingly, TTV launched several new projects, including a national hotline to support incoming reports of election fraud or process problems,

a veterans' initiative to recruit poll workers, and a project to improve the accuracy of the voter roll. Opinion at 24, 29, 31.

In December 2022, working with volunteers in individual counties, TTV assisted with the filing of Section 230 voter challenges in Georgia. Opinion at 26-27. TTV determined that these challenges were "the best way to ensure only eligible voters [were] voting in the upcoming runoff elections," and that the challenges did "not remove voter names from the registry [because] [v]oters who have been challenged will have the opportunity… to prove eligibility and still have their vote counted[.]" *Id*. The challenges "were an effort to ensure the Georgia voter roll was accurate." *Id*. at 28.

TTV performed a significant amount of diligence before undertaking the Section 230 challenges. Tr. 1777:3-5 (Doc. 327). Engelbrecht spoke with TTV's counsel and at least two Georgia law firms about Section 230 challenges. Tr. 1777:6-9 (Doc. 327). She spoke with two commissioners at the Election Assistance Commission regarding Section 230 challenges, which they were "wholly supportive of." Tr. 1777:10-14, 1793:24-25 (Doc. 327). Engelbrecht also spoke with a Department of Justice Attorney in the Civil Rights Division, Election Integrity Department, and legislators from Georgia. Tr. 1777:15-20, 1793:12-23, 1794:15-16 (Doc. 327). Based on these conversations, Engelbrecht understood that Georgia law allowed for citizens to file challenges based upon their belief of potential

ineligibility. Tr. 1777:25-1778:21, 1793:19-23, 1794:10-14, 1794:17-1795:1 (Doc. 327).

Before submitting Section 230 challenges, TTV also requested a meeting with the Georgia Secretary of State's office. Tr. 1780:24-1781:1 (Doc. 327). TTV wanted to walk through its understanding of Section 230 challenges and the process of filing them. Tr. 1781:2-14 (Doc. 327). Understanding the county's role in the process was a "big concern." Tr. 1782:22-1783:13 (Doc. 327). Engelbrecht left the meeting believing that TTV had done everything that it could and should do to support Georgia citizens according to the law. Tr. 1782:18-21, 1787:22-23 (Doc. 327). All the diligence TTV performed delayed it in submitting eligibility inquiries because it wanted to be certain what it was doing would add value. Tr. 1795:25-1796:3 (Doc. 327).

TTV generated a list of potentially ineligible voters that TTV believed warranted inquiry by Georgia county Boards of Elections. Tr. 1801:18-21, 1802:22-1803:8, 1804:2-4 (Doc. 327). TTV first obtained the Georgia voter role. Tr. 1804:9 (Doc. 327). It then used the National Change of Address ("NCOA") registry maintained by the USPS, which, based on experience, TTV understood was a reliable index of individuals that had moved. Tr. 1808:20-1809:14 (Doc. 327). Next, TTV used a variety of sources, including NCOALink and TrueNCOA, which go through a multivariate process, including a Coding Accuracy Support System

("CASS") filter, to recognize discrepancies between the address provided by voters when they register and actual USPS addresses to "normalize" the data. Tr. 1804:14-21, 1811:21-1812:14 (Doc. 327). The process uses "delivery point validation" to ensure the output from CASS is recognized as a deliverable address. Tr. 1804:22-25, 1812:15-22 (Doc. 327). Next, NCOALink reviews addresses involving moves based on data provided by USPS. Tr. 1805:1-2 (Doc. 327). TTV also ran its data through a parallel provider called "Smarty," which is similar to NCOALink. Tr. 1805:3-5, 1813:16-23 (Doc. 327). TrueNCOA also integrated the Social Security Death Index, which runs demographics in a process called "TrueAppend," all of which provide a normal distribution compared to the state file. Tr. 1805:8-14, 1813:13-15 (Doc. 327).

After using all these databases and programs, TTV edited out and pared down its list of potential challenges. Tr. 1805:20-21 (Doc. 327). The first step was filtering out military individuals, which was done through NCOALink. Tr. 1805:20-1806:2, 1807:18-23, 1813:24-1814:19 (Doc. 327). With this smaller dataset, TTV then removed all international addresses, certain zip codes for those in the military, P.O. box addresses, and duplicates. Tr. 1806:3-1807:1, 1807:24-25, 1813:8-12, 1814:20-1815:2 (Doc. 327). TTV recognized that it is very difficult to determine where students reside, so TTV did the best it could to identify potential school addresses. Tr. 1807:6-17, 1815:3-9 (Doc. 327). TTV also used robust sampling for quality

control processes. Tr. 1811:2-6 (Doc. 327). It randomly sampled 2,500 records and evaluated those with major data providers such as LexisNexis, Experian, and TransUnion. Tr. 1811:7-10 (Doc. 327). TTV got within an error rate of plus or minus three (3) percent. Tr. 1811:15-18 (Doc. 327). TTV also reviewed the distribution patterns to ensure they were consistent with the state voting rolls, which they broadly were. Tr. 1815:21-1816:2 (Doc. 327).

Once the challenges were filed, it was up to the individual county Board of Elections to determine how to proceed. Opinion at 28; Tr. 505:18–19 (Doc. 321). If the county Boards found that a challenge was meritorious, they could require the challenged voter to provide further evidence of residency. Opinion at 28; Tr. 907:23–908:5 (Doc. 313). TTV understood that the county Boards made the ultimate determinations and that submitting Section 230 challenges as TTV did was consistent with the law. Tr. 1783:22-1784:13, 1796:13-1797:18 (Doc. 327).

TTV never spoke with, communicated with, or made social media posts about any specific challenged voter, including Plaintiffs in this case. Opinion at 31; Tr. 104:6–105:22 (Doc. 310); 582:24–583:4 (Doc. 312); 464:5–465:24 (Doc. 321); 235:3–236:10 (Doc. 320); 1830:22–1833:15 (Doc. 327). In submitting eligibility inquiries, TTV's motivation was "[a]bsolutely not" to intimidate, threaten, or coerce any voters. Tr. 1799:21-1800:9 (Doc. 327).

### C.    Fair Fight, Inc.

Fair Fight, Inc. is a national voting rights organization with operations in Georgia. *See* Opinion at 7. At trial, Cianti Stewart-Reid, Fair Fight's current executive director (and prior managing director), testified. *Id.* In 2020, Fair Fight directed part of its efforts to responding to TTV's initiatives in Georgia. *Id*. at 8. Fair Fight particularly focused on the Section 230 voter challenges, launching a project named "Democracy Watch" to respond to the voter challenges filed in Georgia. *Id*. at 9.

After the 2020 elections, Fair Fight sought out voters in Georgia whose voting eligibility was challenged under Section 230 to potentially serve as plaintiffs and witnesses in this case. *See generally* Opinion at 7-22. Fair Fight only identified a handful of voters in Muscogee County and Banks County who it claimed were affected by TTV's challenge project, even though none of these individuals had ever met or spoken with any TTV representative or volunteer. *Id.* at 31. Fair Fight admitted that Section 230 challenges went to the county Board of Elections, which determined what to do with the challenges. Tr. 73:9-15 (Doc. 310).

### D.    Challenged Voters

#### i.    *Scott Berson*

One of the Plaintiffs, Scott Berson, was challenged in the 2020 runoff election, but he was able to vote and his vote was counted. Opinion at 10; *see* Tr. 120:6-9

(Doc. 310). Berson had never spoken to any of the Defendants and they did not direct any communications at Berson. Tr. 104:18-105:22 (Doc. 310). Berson agreed that he had lived in a lot of different places recently, and that he had moved "[a] good many" times. Tr. 120:10-121:13 (Doc. 310). At the time of the challenge, Berson was attending graduate school in Auburn, Alabama, where he lived in three different apartments. Opinion at 10; Tr. 106:5-9 (Doc. 310). While attending school, Berson changed his mailing address to his apartment in Alabama. *Id*. Although Berson testified that he intended to return to Muscogee County (Opinion at 10-11), at the time of the trial, Berson did not live in Georgia (Tr. 103:8-9 (Doc. 310)), he lived in North Carolina from July of 2021 through July 2023 (Tr. 103:10-14 (Doc. 310)), and then he moved to Pittsburgh, Pennsylvania without ever moving back to Georgia (Tr. 103:12-14, 104:1-5 (Doc. 310)).

Berson voted in the 2020 primary and general elections and planned to vote in person for the runoff. Opinion at 11. After reading a news article about the ongoing voter challenges, Berson received a phone call from an unknown community organizing group informing him that he had been challenged as a Muscogee County voter because of his out-of-state mailing address. *Id*.; *see* Tr. 179:7-18, 180:2-7 (Doc. 320). A law firm reached out to Berson, and Berson testified that he probably would not have sued anyone without being approached. Tr. 139:2-18 (Doc. 310), 178:4-17 (Doc. 320). Berson testified that Fair Fight's counsel

12

advised him to sue Defendants. Tr. 136:4-5 (Doc. 310). Berson generally testified that he was intimidated by the challenge, but did not use the word "intimidating" in his discovery responses and only used the word at trial. *See* Opinion at 11, 12 n.8; Tr. 97:20–25, 116:24-118:16 (Doc. 310). Berson did not connect his voter challenge or the notification of said challenge to TTV in any way. Opinion at 11; Tr. 112:9–15, 124:12-15 (Doc. 310).

At the polling place, Berson filled out a provisional ballot, submitted documentation to support his Muscogee County residency, and his ballot was subsequently counted in that election. Opinion at 11-12; Tr. 100:11–13 (Doc. 310). When Berson voted, nobody yelled at him, nobody threatened to take anything away from him, and nobody threatened any type of harm against him. Tr. 118:22-119:7, 123:11-20 (Doc. 310).

### ii.    *Jocelyn Heredia*

Jocelyn Heredia was another Plaintiff recruited by Fair Fight. Opinion at 14. Heredia grew up in Banks County. *Id*. After graduating from the University of Georgia in 2019, she began working in Atlanta, only returning to Banks County for weekends and holidays to see family. Opinion at 14; *see* Tr. 558:17-24 (Doc. 312). Heredia testified that she lived in Alpharetta at the time and commuted to Atlanta for work. Opinion at 14. She eventually signed a lease for an apartment in February 2020 in Decatur, and completed a National Change of Address form, listing this new

apartment as her new mailing address. *Id*. at 13-14; *see* Tr. 558:22-559:5, 559:12-17 (Doc. 312). Heredia had her car serviced in Atlanta and Marietta, close to her apartment in Decatur. Opinion at 14; *see* Tr. 560:9-561:23 (Doc. 312). Heredia then moved to west midtown in Atlanta with her boyfriend and again filed a National Change of Address form, and after that moved to a different apartment in the same building. Tr. 563:3-10, 567:3-20, 568:20-2, 569:10-13 (Doc. 312). Heredia admitted that a person looking at her situation may have been reasonably confused about what she called her domicile. Tr. 571:21-572:3, 591:19-592:3 (Doc. 312). The trial court agreed, determining that it "does not find that a challenge to Heredia's voting eligibility [] was unreasonable." Opinion at 97.

When Heredia arrived at the polls to vote in the 2020 Georgia runoff election, she was told by a poll worker that her eligibility to vote in Banks County had been challenged. Opinion at 16. Heredia provided additional documentation confirming her eligibility from mail she had in her car. *Id.* at 16; *see* Tr. 587:11-19 (Doc. 312). Heredia generally testified that she experienced stress, nervousness, and confusion about whether her additional documentation would be accepted, but confirmed that she was not yelled at, threatened, or coerced at any time. Opinion at 16-17. Heredia was unable to name any of the Defendants in this case and she had never spoken with or had any direct communication with any of them. *Id*. at 18; *see* Tr. 582:11-583:7 (Doc. 312). Heredia's eligibility was challenged by Banks County residents

14

Jerry Boling and Dan Gasaway, neither of whom Heredia connected to TTV. Opinion at 18; Tr. 588:3-8 (Doc. 312). Heredia also testified that she felt uncomfortable the minute she walked into the polling place in 2020 (even before she knew her vote had been challenged) and had been "uncomfortable" in a polling place prior to her challenge in 2020. Opinion at 16; *see* Tr. 584:10-25 (Doc. 312). Heredia agreed that when she went to vote, no one screamed at her, no one threatened her, and no one coerced her. Tr. 588:9-14 (Doc. 312).

### iii.     *Gamaliel Turner*

Gamaliel Turner is a non-party voter whose eligibility was challenged in the leadup to the Georgia 2020 runoff election, and he was called to testify by Plaintiffs. Opinion at 58, 60. Turner moved to California in 2019, resided there from 2019 through the time of trial, and worked in California. *Id.* at 59; Tr. 240:22-241:21, 243:3-2221, 244:4-14 21, 244:22-245:11 21 (Doc. 320). Turner leased an apartment in California and listed his California address as his residence on various public websites and social media accounts. Opinion at 59; Tr. 240:22-241:2121, 243:3-22 21, 244:4-14 21, 244:22-245:11 21 (Doc. 320). Turner agreed that a "reasonable person" that did not know him may assume he had moved to California. Opinion at 59-60; Tr. 247:5-1921, 252:23-253:1 21 (Doc. 320).

When Turner did not receive his absentee ballot for the Georgia 2020 runoff, he called Muscogee County's registrar and was told that his eligibility had been

15

challenged under Section 230. Opinion at 60. Plaintiffs produced no admissible evidence connecting the individual who challenged Turner to the Defendants in the case, and Turner testified that he did not know and had never spoken to any of the Defendants. *Id.* at 60; *see* Tr. 234:25-236:621 (Doc. 320). In response to the challenge, Turner filed a lawsuit to ensure his ballot was cast. Opinion at 58. Turner testified that no one threatened or coerced him in his voting efforts for the 2020 Georgia runoff election. *Id*. at 61; Tr. 301:23-302:921 (Doc. 311).

### iv.    *Stephanie Stinetorf*

Stephanie Stinetorf is another non-party voter who was called to testify by Plaintiffs. Opinion at 62. Stinetorf's eligibility as a Muscogee County voter was challenged in the leadup to the Georgia 2020 runoff. *Id*. at 63. Stinetorf originally lived in Muscogee County, but then moved to Germany in August 2020 and was living there at the time of trial. Opinion at 62; Tr. 462:4-5 (Doc. 321).

Stinetorf received and submitted an absentee ballot in the Georgia 2020 runoff election, just as she had in the general election. Opinion at 63. Nobody reached out to Stinetorf to tell her there were any complications with her ballot. Tr. 466:5-13 (Doc. 321). After discovering the status of her ballot was marked "challenged" on the voter website, she contacted the Muscogee County Board of Elections on December 20, 2020. Tr. 466:22-467:3 (Doc. 321). Stinetorf received an email on December 23 from the board, indicating that her ballot had been accepted and

received on December 11. Tr. 473:24-474:8 (Doc. 321). By the time she received the December 23 response and spoke with someone from the board on December 24, the board assured Stinetorf that her ballot had been accepted and any challenge lifted. Tr. 467:4-17, 467:25-468:13 (Doc. 321). Stinetorf testified that she had no direct contact with any representative from TTV and had no evidence connecting TTV with the Muscogee County resident who challenged her eligibility. Opinion at 63-64; Doc. 321 at 18; Tr. 464:2-465:24, 481:4-16 (Doc. 321). When Stinetorf voted, no one yelled at her, no one threatened her, no one coerced her, and no one reached out to her about her vote. Tr. 479:18-480:1 (Doc. 321).

### E.    Other Witnesses

Plaintiff Jane Doe did not testify at trial, but Plaintiffs introduced her declaration into evidence. Opinion at 19. The trial court expressed its "severe concerns about the reliability" of her declaration and exhibits and hyperlinks attached thereto. *Id.* at 20-21. The affidavit was self-serving, made without the benefit of cross-examination, and her statements were all out-of-court statements offered for the truth of the matter asserted. *Id.* Accordingly, the trial court only considered the declaration and its attachments with very little weight. *Id.* at 22.

Defendant Derek Somerville testified that he was concerned about election integrity in November 2020. Opinion at 35. He partnered with Defendant Mark Davis to create a list of potentially ineligible Georgia voters to facilitate challenges

under Section 230. *Id.* at 36, 46; Tr. 1629:2-1630:10 (Doc. 326). Davis is the president of a data processing and project management company. He personally handles data processing, has provided expert testimony about voter data analytics and residency issues five times, and had been working with Georgia voter files for decades. Opinion at 44-45; Tr. 1240:2-12 (Doc. 324), 1240:20-1241:5 (Doc. 324), 1603:8-23 (Doc. 326), 1614:1-5 (Doc. 326).

Davis had already prepared a dataset that he thought demonstrated residency issues, and Sommerville independently analyzed it. Tr. 1240:20-1241:21 (Doc. 324), 1630:3-1633:10 (Doc. 326). The two started with a data set based on NCOA data as amended by Davis, and then took several additional steps, including: (1) reviewing the U.S. Postal Service's manuals; (2) removing the population of inactive voters; (3) ensuring those on their list had moved more than 30 days before the general election; (4) ensuring the change of address was to a different county; (5) ensuring the change of address was not temporary; and (6) removing those that had moved more than 18 months prior because they assumed the Secretary of State had already identified those voters. Tr. 1508:25-1511:4 (Doc. 325), 1650:18-1653:8 (Doc. 326).

Somerville and Davis never intended for anyone to be or feel intimidated or targeted. Opinion at 37; Tr. 1256:23-1257:25 (Doc. 324), 1643:25-1644:5 (Doc. 326). Their analysis did not target voters on any demographic factors like race, gender, or political party. Tr. 1657:15-24 (Doc. 326). When a volunteer made a

18

challenge, Davis expected the county Board of Elections to determine if probable cause existed to make a voter show proof of residency in the county. Opinion at 48-49; Tr. 1645:18-1646:6 (Doc. 326). Davis did not intend for any voters to be removed from the voter rolls through the challenges. Tr. 1641:2-14 (Doc. 326). Ultimately, Somerville's and Davis's challenges were not accepted. Opinion at 42.

Defendant Mark Williams owns a printing and mailing company. Opinion at 50. He was hired to help TTV with the printing of TTV's Section 230 challenges to submit to county Boards of Elections. *Id.* Williams submitted challenges on behalf of TTV in Gwinnett County which were not ultimately accepted. *Id.* at 51-52. He testified that in assisting TTV, he experienced firsthand how it continued to "scrub the list as best they could." *Id.* at 51-52 (citing Tr. 1744:2-8 (Doc. 327)).

Defendants Ron Johnson and James Cooper assisted TTV in recruiting volunteer challengers across Georgia. Opinion at 53, 55. Although Johnson worked with TTV to submit voter challenges in Jackson County before the 2020 general election, Jackson County did not act on these challenges. *Id.* at 54. Cooper did not submit Section 230 challenges himself. *Id.* at 56. Johnson and Cooper did not testify at trial, but the trial court considered their deposition testimony. *Id.* at 55, 58.

Ryan Germany, former general counsel for the Georgia Secretary of State's Office, also testified. Opinion at 65. Germany testified that federal regulations often make the State's voter list maintenance difficult. *Id.* After the 2020 general election,

the Secretary of State's office received a list of people believed to have moved out of state and thereby ineligible to vote in Georgia. *Id.* at 66. Germany could not recall the source of the list. *Id.* The Secretary of State's office sent out a form inquiring about residency, to which 1,000 individuals responded. *Id.* at 67. 26 reported being in the "process of relocating" and 13 reported having "relocated prior to July 2020." *Id.* (citing PX 8). Although Germany raised concerns regarding TTV's challenges, he confirmed that one of the few remaining ways to scrutinize voter rolls immediately prior to an election was an eligibility challenge under Section 230. Opinion at 67-69 (citing Tr. 513:5-8 (Doc. 321)). Germany highlighted the importance of the county Board of Elections in the Section 230 process, noting that the boards solely make the determination regarding whether probable cause exists to inquire further into a challenge. Opinion at 67-69.

The trial court also heard from two expert witnesses tendered by Plaintiffs. Opinion at 75-89.[3] First, <u>Dr. Kenneth Mayer</u> testified as an expert in political science, quantitative analysis, election administration, and voter behavior, and the trial court credited his testimony and afforded it great weight. *Id.* at 75-76. Although Mayer criticized TTV's voter file, which had been assembled by Fair Fight, he did not assess the impact of TTV's challenges on any actual voter. *Id.* at 76-82. Mayer admitted that once a challenge was made, the county Boards of Elections ultimately

---

[3] The trial court heard testimony from certain other witnesses. *See* Opinion at 70-75.

determined what additional steps (if any) a voter had to go through to prove his or her eligibility to vote. *Id.* at 82-83 (citing Tr. 369:1-19 (Doc. 311)). He also stated that the determination of a voter's eligibility is up to the county Boards of Elections. Opinion at 83 (citing Tr. 389:24-390:1 (Doc. 321)).

Plaintiffs also tendered <u>Dr. Orville Burton</u> as an expert in the history of racial discrimination, voting, and politics in the South, including in Georgia. Opinion at 84-89. Again, the trial court credited Burton's testimony and afforded it great weight. *Id.* at 85. Despite opining on what he saw as the effects of TTV's challenges, Burton acknowledge the role of county Boards of Elections in making decisions to act on a voter challenge made. *Id.* at 87.

## II.   PROCEDURAL HISTORY

### A.   Pre-Trial

The original Plaintiffs, Fair Fight, John Doe, and Jane Doe[4] sued Defendants TTV, Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper, claiming violations of Section 11(b) and requesting an emergency temporary restraining order barring TTV from filing any further challenges in the State of Georgia. *See* Doc. 1. Following full briefing and an evidentiary hearing on Plaintiffs' request for a restraining order, the trial court denied the request. *See* Doc. 29. The trial court found that Plaintiffs failed to provide

---

[4] Plaintiffs later included Fair Fight, Scott Berson, Jocelyn Heredia, and Jane Doe.

sufficient evidence that Defendants harassed or intimidated voters. *Id*. at 26. Thereafter, the case proceeded to discovery.

After 17 months of discovery, the parties filed Cross Motions for Summary Judgment. Doc. 155-1, 156-1. In a thorough 87-page order, the trial court granted in part and denied in part both motions. Doc. 222. The trial court's order set out the exact standard it would later apply at trial, based on existing Section 11(b) precedent:

> [T]he Court concludes that for Plaintiffs to succeed in their Section 11(b) claims against Defendants, they must show that (1) Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably be intimidated, threatened, or coerced from voting or attempting to vote. To assess these required showings, the Court will use a totality of relevant circumstances inquiry.

*Id*. at 16-17.

Following the trial court's summary judgment order, Plaintiffs filed a limited motion to reconsider a portion of the order (which the trial court granted), but Plaintiffs did not challenge the standard the trial court enunciated in its original summary judgment order. *See generally* Doc. 232, 235.

## B.    The Bench Trial and Opinion

The case proceeded to a bench trial, where the trial court heard seven days of testimony and evidence, including testimony from 18 witnesses. The trial court issued a thorough and well-reasoned 145-page Opinion on January 2, 2024, finding Defendants had not violated Section 11(b). Opinion at 145.

The trial court recognized that Section 230—which Appellant has not challenged—allows voter challenges and dictates the procedure by which they are assessed. Opinion at 122. It noted that the statute "does not limit in any relevant way the number of voter challenges or their proximity to an election," and does not "require any particular quality control over the challenges made." *Id.* at 123 & n.60. After a challenge is made, the determination to pursue an eligibility inquiry (or to dismiss a challenge as being without probable cause) is left with the county Boards of Elections. *Id.* at 123 n.60 (citing O.C.G.A. § 21-2-230(b) (2019)).[5] The Boards of Elections serve as intermediaries between the challenger and the eligibility inquiry, which "breaks the chain of causation for purposes of establishing liability for voter intimidation." *Id.* at 126.

Plaintiffs' evidence failed to prove their Section 11(b) claim. "No evidence was submitted that TTV, Davis, Somerville, or any recruited volunteer challenger had control over, attempted to manipulate these county Boards of Elections, or otherwise acted to overcome this break in causation." Opinion at 128. The trial court found that "Defendants' lack of success in these Section 230 challenges highlights

---

[5] "Upon the filing of such challenge, the board of registrars shall immediately consider such challenge and determine whether probable cause exists to sustain such challenge. If the registrars do not find probable cause, the challenge shall be denied." O.C.G.A. § 21-2-230(b).

the lack of control Defendants and its volunteers had over the challenges once they were submitted." *Id.* at 128 & n.68.

The trial court concluded that Plaintiffs' Section 11(b) claims "failed on the evidence adduced at trial because they have not shown Defendants intimidated or attempted to intimidate 'any voter." Opinion at 130. It found that Section 11(b) prohibits Defendants from intimidating or attempting to intimidate any voter, which includes making a voter fearful, compelling voter action or inaction, promising reprisal or distress, or restraining, controlling, or dominating a voter. *Id.* The trial court methodically analyzed each of these elements, finding the evidence was lacking as to each of them. *See id.* at 130-35. It further found that general evidence of mass challenges and voter intimidation did not suffice. *See id.* at 135-37. Although recognizing that in certain circumstances a Section 230 challenge could constitute a Section 11(b) violation, the trial court concluded that the evidence and Defendants' challenges here did not violate Section 11(b). *Id.* at 137. "[B]ased on the evidence before it, there [was] insufficient evidence to show voter intimidation or attempted voter intimidation by Defendants against the voters in this case." *Id.* at 138.

## III.    STANDARD OF REVIEW

On appeal from a bench trial, this Court reviews the trial court's conclusions of law *de novo* and its factual findings for clear error. *Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144, 1149 (11th Cir. 2018). "[F]indings of fact, whether based

on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." *Id.* This Court may only reverse the trial court's findings of fact if, "after viewing all the evidence, [the Court is] left with the definite and firm conviction that a mistake has been committed." *Id.*

For a mixed question of fact and law, the standard of review depends on whether answering it entails primarily legal or factual work. *U.S. Bank N.A. v. Village at Lakeridge, LLC*, 583 U.S. 387, 395-96 (2018). Where mixed questions "immerse courts in case-specific factual issues—compelling them to marshal and weigh evidence, make credibility judgments, and otherwise address . . . 'multifarious, fleeting, special, narrow facts that utterly resist generalization,'" appellate courts should review decisions with deference and under the "clearly erroneous" standard. *Id.* at 396; *Cuenca v. Rojas*, 99 F.4th 1344, 1350 (11th Cir. 2024). Importantly, parties cannot "cloak their arguments under the guise of a legal issue," when arguments in fact hinge on factual disputes. *Fuller v. Metro. Atlanta Rapid Transit Auth.*, 810 F. App'x 781, 783 (11th Cir. 2020).

Evidentiary rulings are reviewed "only for an abuse of discretion" and will not be overturned "unless the moving party proves a substantial prejudicial effect." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097, 1107 (11th Cir. 2022).

## SUMMARY OF THE ARGUMENT

I.    The trial court correctly found that Plaintiffs failed to introduce evidence proving any of the elements required for a Section 11(b) violation. Defendants legally challenged certain voters' eligibility under Georgia's Section 230. Under that statute, the determination to pursue an eligibility inquiry is left with the county Boards of Elections. Opinion at 123 (citing O.C.G.A. § 21-2-230(b)). The trial court left open the possibility that Section 230 challenges could, under the right circumstances, constitute a Section 11(b) violation. However, it correctly found that based on the evidence here—especially because Defendants never contacted any of the Plaintiffs and never did anything to pressure the Boards—there was no Section 11(b) violation. The trial court's findings were accurate and, in any event, are primarily factual and not clearly erroneous, so they should be affirmed. *See U.S. Bank N.A.*, 583 U.S. at 395-96; *Cuenca*, 99 F.4th at 1350.

Contrary to Appellant's argument, the trial court correctly applied the facts to the law as it relates to causation. Significantly, the trial court applied the same standard it said it would apply in its 87-page order on summary judgment, to which Appellant never objected. Appellant's argument is therefore waived and, regardless, the trial court's causation standard is correct, and the evidence showed that Appellant failed to satisfy its burden on this element.

Even if it is not waived, Appellant's arguments fail on the merits. The trial court recognized that, with the Boards of Elections acting as an intermediary, Defendants had no control over the outcome of the challenges. Under Section 230, individuals can lodge challenges, but after that, the Boards of Elections decide what to do with the challenges. The trial court acknowledged that it was theoretically possible for Section 230 challenges to implicate Section 11(b), but Plaintiffs failed to present evidence to support such an argument. This finding alone directly eviscerates Appellant's primary basis for its appeal. The trial court methodically analyzed the evidence as it applied to each Plaintiff, and found that the evidence could not connect any of the Defendants' actions to reasonable intimidation.

Finally, the trial court correctly found there was no evidence of coercion and intimidation. Evidence that there were legal voter challenges, without more, did not show any intimidation. Appellant's arguments amount to complaining about Section 230 itself, a statute it never challenged. As the trial court recognized, Section 230 challenges were valid; any argument about their propriety is "a question for the Georgia General Assembly, not this Court." Opinion at 138.

II.    The trial court also correctly found that Plaintiffs did not prove that Defendants attempted to intimidate Plaintiffs. It applied the same standard it said it would apply in its summary judgment order, which Plaintiffs did not challenge. And the trial court carefully considered the "attempt" element in its analysis.

27

Preliminarily, Appellant attempts to gloss over all the elements which it had to but failed to prove: (1) Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably be intimidated, threatened, or coerced from voting or attempting to vote. Opinion at 115.

Furthermore, there was no evidence proving an attempt. Based on prior case law, the trial court determined that there are four potential means of proving an attempt at intimidation: attempting to: [1] make a voter fearful, [2] compel voter action or inaction, [3] promise reprisal or distress, or [4] restrain, control, or dominate a voter. Opinion at 130-31. Because the county Boards of Elections controlled the Section 230 process, and there was no evidence Defendants took any action to affect the Boards' decisions or target the voters directly, the Section 230 challenges could not have reasonably attempted to [2] *compel* voter action, to [3] *promise* any adverse effect, or to [4] assert other means of *control* over a voter." *Id.* at 130-31. The trial court also found that "evidence is lacking on a number of fronts" of any attempt to make any voter [1] "timid or fearful." *Id.* at 131. Specifically, Plaintiffs' evidence only connected Defendants' actions to *one* voter (Heredia) in Banks County, and failed to connect Defendants' actions to the remaining three Plaintiffs from Muscogee County. *Id.* at 131-32. And for Heredia, the trial court found that "Defendants submitted a reasonable challenge to Heredia,"

and that there was no reasonable intimidation for Section 11(b) purposes. *Id.* at 134-35. The trial court concluded that Defendants' Section 230 challenges did not violate Section 11(b). *Id.* at 137. Again, these conclusions are accurate and, in any event, are primarily factual findings that are not clearly erroneous, so should be affirmed. *See U.S. Bank N.A.*, 583 U.S. at 395-96; *Cuenca*, 99 F.4th at 1350.

## ARGUMENT

Despite Appellant's efforts to confuse the issues in its Opening Brief, the trial court correctly found, in a well-reasoned 145-page Opinion, that Plaintiffs did not carry their burden to prove the elements of their Section 11(b) claim. Appellant's attempt to force its Section 11(b) claim without any supporting evidence dooms its claim. The trial court correctly identified that each Board of Elections determined what to do with Section 230 challenges, and there was no evidence that any of the Defendants manipulated that process. Moreover, Plaintiffs were unable to tie Defendants to all but one of the Plaintiffs (for whom the trial court found the challenge was reasonable). And there was no evidence that Defendants attempted to make any of the voters feel timid or fearful, or that they experienced any actual reasonable intimidation. Accordingly, there could be no viable Section 11(b) claim. Appellant contorts the facts and the law to attempt to breathe life into its claim, but its arguments are wrong. Appellant's arguments, if accepted, would be a substantial deviation from Section 11(b) jurisprudence.

## I.    THE TRIAL COURT PROPERLY APPLIED SECTION 11(B) IN DETERMINING THAT THERE WAS NO VOTER INTIMIDATION OR COERCION.

In its Opinion, the trial court applied a three-part test, established by applicable case law, which it previously applied at the summary judgment stage. A Section 11(b) violation requires that: "(1) Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably intimidated, threatened, or coerced from voting or attempt." Opinion at 115. The trial court found that "[n]ot only have Plaintiffs failed to overcome the fact that their actions did not result in any direct voter contact or alone include or direct county Boards of Elections to pursue an eligibility inquiry, but there is no evidence that Defendants' actions caused (or attempted to cause) any voter to be intimidated, coerced, or threatened in voting." *Id.* at 138. The trial court's findings were correct and certainly not clearly erroneous. *See U.S. Bank N.A.*, 583 U.S. at 395-96; *Cuenca*, 99 F.4th at 1350.

Failing to meet its evidentiary burden, Appellant now contorts and misconstrues the Opinion and all but ignores the actual evidence (or lack thereof) in the case. First, Appellant incorrectly argues that the trial court erred in finding that TTV's actions were "insulate[d]" by Georgia's Section 230 challenge process. In fact, the trial court expressly <u>disclaimed</u> this notion in its Opinion. Second, Appellant claims that the trial court imposed a "sole cause" standard, which is not what the

trial court did; through its rigorous analysis, it just found causation wanting. Third, Appellant asserts that the trial court failed to properly weigh the evidence and came to the wrong conclusion as to whether there was a Section 11(b) violation. In fact, the trial court carefully considered all the evidence and found Plaintiffs failed to satisfy the elements of their claim. Appellant's arguments all fail to show why this Court should reverse the trial court's thorough Opinion.

### A.    Appellant Erroneously Claims the Trial Court Found That Georgia Law "Insulate[s]" TTV's Conduct Under Section 11(b).

The trial court's Opinion highlights the procedure for voter challenges under Georgia law, which Appellant does not challenge and all but ignores. Opinion at 121. TTV followed Section 230 by facilitating individual voter challenges by residents of certain counties and providing grounds for each challenge. *Id*. at 122. Once filed, "the determination to pursue an eligibility inquiry (or conversely, to dismiss a challenge as being without probable cause) is left with the county Boards of Elections." *Id*. at 123 (citing O.C.G.A. § 21-2-230(b)); *see also id.* at 125 ("[u]nder Georgia law, it is not the voter who makes the challenge (or the entity that facilitates the challenge) who causes a voter to provide additional information regarding his or her eligibility to vote in a particular county. That is a decision left to the county Boards of Election alone."). The record incontrovertibly established that there was no evidence of intimidation, especially because TTV never directly contacted any of the challenged voters. *See supra* at 8, 11, 12, 14, 15.

31

Appellant and amicus curiae argue that the trial court's finding automatically immunizes parties that make Section 230 challenges, but the Opinion expressly disclaimed this conclusion:

> To be sure, the Court **does not mean to suggest** that Section 230 challenges can never be a violation of Section 11(b).

Opinion at 137 (emphasis added). The trial court even identified how Plaintiffs could have theoretically succeeded on their Section 11(b) claim—if Defendants had directed voter contact or "had any control over or took any action to affect the Board's decisions." Opinion at 130, 138. In other words, for a Section 230 challenge to implicate Section 11(b), there must be "other conduct." *Id.* at 135. The trial court correctly recognized that under Section 11(b), there must be evidence that a defendant's otherwise lawful action intimidated or attempted to intimidate "*any voter*." *Id.* at 137 (citing 52 U.S.C. § 10307(b) (emphasis added). Without otherwise taking any action to reach out to voters or affect the Board's decisions, the evidence simply showed TTV did not intimidate or attempt to intimidate any voter.[6] These

---

[6] Amicus curiae claims that "lodging a legitimate voter challenge based on credible evidence is not unlawful, [b]ut filing knowingly or recklessly false voter challenges in circumstances in which a reasonable person would be intimidated, threatened, or coerced would violate Section 11(b)." Amicus Br. at 12. However, among other things, amicus (1) does not provide any citation for this argument, (2) presents no evidence that the challenges were "knowingly or recklessly false," (3) does not define what it claims a "legitimate" voter challenge is, and (4) does not define what "credible evidence" would be in this scenario. It also did not present evidence on these arguments at trial.

findings were correct, and there was certainly nothing "clearly erroneous" about them. *See U.S. Bank N.A.*, 583 U.S. at 395-96; *Cuenca*, 99 F.4th at 1350.

The evidence showed TTV: (1) did not reach out to the individual voters; (2) did not direct others to reach out to the individual; and (3) did not take any actions to influence the Boards, affirmatively establishing there was no intimidation, threats, or coercion under Section 11(b). *See Pa. Democratic Party v. Republican Party of Pa.*, No. 16-5664, 2016 U.S. Dist. LEXIS 153944, at *17-18 (E.D. Pa. Nov. 7, 2016) (finding campaign-recruited poll watcher's compliance with state law as evidence of no Section 11(b) violation); *Ariz. All. For Retired Ams. v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1044 (D. Ariz. 2022) (finding likely no violation of 11(b) where volunteers legally gathered near drop boxes to deter ballot harvesting), *vacated and appeal dismissed as moot on other grounds by* 2023 WL 1097766 (9th Cir. Jan. 26, 2023).

The cases Appellant cites affirm Appellees' position. For example, Appellant cites *Colorado Montana Wyoming State Area Conference of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861 (D. Colo. 2023) ("*NAACP*"), a case primarily related to defendants canvasing at peoples' homes, for the proposition that otherwise legal acts may violate Section 11(b) if they have the effect of intimidating voters. *See* Appellant Br. at 26. However, after Appellant filed its Opening Brief here, and after the *NAACP* court heard the actual evidence at trial, that court **granted a Rule**

33

**52(c) motion and final judgment in favor of the defendants** because the plaintiffs failed to introduce evidence of any intimidating or threatening on behalf of the defendants. *See* No. 22-cv-00581, Dkt. 185 (D. Colo. July 18, 2024).[7] Thus, like here, the trial court found that for a Section 11(b) claim, a lack of evidence requires a finding in favor of the defendants.

*National Coalition on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78 (S.D.N.Y. 2023) ("*Wohl II*") also does not help Appellant. The behavior at issue in that case was significantly more extreme than here—robocalls contained false information from the defendants threatening arrest, financial harm, or harassment for voting by mail, and that extreme behavior violated Section 11(b). *Wohl II*, 661 F. Supp. 3d at 113-14. For example, the defendant's prospectus in the case described its plans to "suppress voter turnout among 'important Demographics of Democrat voters,' which included Black voters" and outlined the defendant's strategy which included "making sh** up" and "misdirecting with details aimed to confuse, leading to more inquiry." *Id.* at 91. Moreover, the defendant wrote that "we must HIJACK this boring election." *Id.* at 92. The court found the robocall "was a calculated attempt to deter Black voters by exploiting fears and stereotypes, and not merely the expression of an opinion." *Id.* at 115. In other words, the defendants directly contacted voters and explicitly threatened them. By contrast, TTV never contacted

---

[7] The *NAACP* decision Appellant cited was the earlier summary judgment decision.

any voters, let alone had any plans to suppress turnout or make any threats in retaliation for voting.

In *LULAC v. Public Interest Legal Foundation*, 2018 U.S. Dist. LEXIS 136524 (E.D. Va. 2018) ("*LULAC*"), the defendants published articles accusing legal Virginia voters of committing multiple felonies, including the voters' personal identifying information. *Id.* at \*2. The defendants targeted specific voters with their threats. At the motion to dismiss stage, the trial court unremarkably found Plaintiff had sufficiently stated a claim for relief. By contrast, TTV made no assertions regarding particular voters' eligibility or accused anyone of committing felonies, and the Court had the opportunity to analyze an entire trial record, finding no Section 11(b) violation.

The trial court's well-reasoned finding that Appellant failed to present evidence to meet its burden under Section 11(b) should not be disturbed.

### B. The Trial Court Analyzed the Evidence and Correctly Found, Under the Correct Causation Standard, That Plaintiffs Failed to Establish Defendants Caused Any Harm.

The trial court correctly applied the law as it relates to causation. In an 87-page order on the parties' cross motions for summary judgment, the trial court recognized a clear standard that it would apply to the Section 11(b) claims in this case. Doc. 222 at 13-17 (citing *Ariz. All. for Retired Ams. v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at \*3 (D. Ariz. Oct. 28, 2022)

and *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021)). This standard included a causation requirement, which the trial court derived from existing Section 11(b) case law. *Id*. Appellant **did not object** to the trial court's enunciation of the standard following this ruling, in pre-trial briefing, at trial, or in post-trial briefing. Appellant's arguments are therefore waived. *See Denis v. Liberty Mutual Ins. Co.*, 791 F.2d 846, 849 (11th Cir. 1986) ("Failure to raise an issue, objection or theory of relief to the trial court is generally fatal."); *Garcia v. Public Health Trust of Dade County*, 841 F.2d 1062, 1066 (11th Cir. 1988).

Appellant's argument is also wrong on the merits. The trial court found that:

> [The] intermediary between the challenger and the eligibility inquiry— the county Boards of Election—creates a significant causation issue for Plaintiffs' case. It impugns the direct connection between the alleged intimidating conduct by Defendants and the voter allegedly intimidated, and breaks the chain of causation for purposes of establishing liability for voter intimidation.

Opinion at 126.[8]

Appellant's argument is undermined by the fact that it can only argue that the trial court somehow "implicitly" adopted an incorrect theory of causation. *See* Appellant's Br. at 26-27. Contrary to Appellant's argument, the trial court did not

---

[8] Amicus curiae goes so far as to claim that Section 11(b) has no causation element. *See* Amicus Br. at 14-19. But it repeatedly cites to a "natural consequences" standard, and even points to what it claims are "foreseeable consequences." *Id.* at 13, 15. Amicus does not explain any material difference between its own formulations and a causation requirement.

impose any "sole cause" requirement, but rather correctly found that with the Boards of Elections acting as an intermediary, TTV had no control over the outcome of the challenges. Opinion at 126. And again, the trial court recognized that there could theoretically be a valid Section 11(b) claim with Section 230 challenges, but that that evidence was not present here. *See supra* at 32.[9]

The trial court again focused on Plaintiffs' insufficient evidence and carefully analyzed each Plaintiff's claims in their respective counties. The evidence showed that each county implicated in this litigation treated Section 230 challenges differently. Opinion at 126. Muscogee County was required to notify every voter challenged under Section 230 pursuant to a court order by Chief Judge Leslie Abrams Gardner of the Middle District of Georgia. *Id.* at 127; Doc. 304-1 at 17. In Banks County, Plaintiff Heredia did not learn that her eligibility had been challenged until she arrived at the polls to vote. Opinion at 127. Cobb and Gwinnett Counties did not take any action on the challenges filed, leaving most challenged voters still without knowledge of the filings. *Id*. Significantly, there was no evidence that TTV or any recruited volunteer challenger had control over or attempted to manipulate the county Boards of Elections, and thus did nothing to "overcome this break in causation." *Id*. at 128.

---

[9] Amicus curiae argues that government officials "may exacerbate" the situation (Amicus Br. at 18), but if that is the case, a case could be brought against the government officials, not the party raising a legal Section 230 challenge.

Further, Plaintiffs could not connect any of the Defendants' actions to reasonable intimidation by voter. An unadorned assertion that a potential voter felt intimidated or deterred is alone insufficient to state a viable claim that voting rights have been burdened under the VRA. *Parson v. Alcorn*, 157 F. Supp. 2d 479, 493-95 (E.D. Va. 2016). This make sense because otherwise Section 11(b) would be akin to a strict liability statute.

For the Muscogee County voters, Plaintiffs did not provide admissible evidence connecting TTV to the Section 230 challenges, and none of the voters knew TTV or the other defendants. Opinion at 132-33. *New Jersey Democratic State Comm. v. New Jersey Oath Keepers* is instructive on this point. There, the court held that a defendant cannot intimidate voters who are not aware of their presence. *New Jersey Democratic State Comm. v. New Jersey Oath Keepers*, 2016 U.S. Dist. LEXIS 154272, at *6 (D.N.J. Nov. 11, 2016). So too here. Without a connection between TTV's activities and the Section 230 challenges, the trial court correctly found causation to be lacking for the Muscogee County Plaintiffs.

For Heredia, the trial court found that any intimidation she felt was not reasonable. Opinion at 134-35; *see National Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) ("[T]hreats and intimidation include messages that a reasonable recipient familiar with the context of the message would interpret as a threat of injury tending to deter individuals from exercising their

voting rights."). Not only did Heredia testify to experiencing fear while voting prior to any Section 230 challenge, but she also attributed her fear to being asked to provide additional documentation to vote. Opinion at 134. The trial court found that although this may have been a frustrating and confusing experience, it did not constitute reasonable individuation for Section 11(b) liability purposes. *Id.* at 135.[10]

For these reasons, the trial court correctly applied the facts to the correct causation standard and properly weighed the evidence in this case.

## C. The Trial Court Correctly Found That There Was Insufficient Evidence of Coercion and Intimidation.

The trial court's thorough Opinion properly applied the law to the facts in the case, finding that there was no Section 11(b) violation by any of the Defendants.

Appellant's assertion that Section 11(b) need not involve a voter's fear of physical violence is beside the point for a variety of reasons. First, evidence of a voter's fear alone is insufficient, and the trial court found Plaintiffs failed to prove all the elements of their claim. Moreover, the "intimidation" must result from the actions of a person or entity, not a force or legal procedure. *See Democratic Nat'l Comm. v. Bostelmann*, 488 F. Supp 3d 776, 816 (W.D. Wisc. 2020) (finding that intimidation brought upon by the COVID-19 virus itself was unreasonable).

---

[10] Appellant simply recycles arguments and evidence it raised previously (*see* Appellant's Br. at 29), but does not dispute that the trial court considered and rejected them in its Opinion.

Showing legal voter challenges without anything more is insufficient. Further, reporting an individual to the authorities who one genuinely believes may be breaking the law, without more, is not sufficient to show voter intimidation. *See Ariz. Dem. Party v. Ariz. Rep. Party*, 2016 U.S. Dist. LEXIS 154086, at *42-43 (D. Az. Nov. 4, 2016) (poll workers reporting individuals they believe were breaking the law by ballot harvesting found to likely not violate 11(b) even where poll watchers were wearing red shirts reading "vote protector"). By contrast, conduct amounting to intimidation must be significantly more direct than in this case, such as placing armed guards at polling places without any connection to the government. *See, e.g.*, *Council on American-Islamic Relations—Minnesota v. Atlas*, 497 F. Supp. 3d 371, 379 (D. Minn. Oct. 29, 2020) (granting a preliminary injunction under Section 11(b)).

Unable to prove any intimidation by TTV, Appellant instead improperly seeks to challenge the Section 230 process itself (again, without having challenged the statute previously). *See* Opinion at 134 (Heredia attributed her intimidation to having "to provide additional documentation to vote—that is, she experienced additional 'hoops' to overcome that other voters did not have"); *id.* at 133 (Turner "attributed his discomfort with being challenged to realizing that 'the process is not working'"); *id.* at 63 (Stinetorf testified that "[d]iscovering her ballot to have been challenged was 'stressful and overwhelming.'") The trial court found that the voters in this case

testified to being confused and inconvenienced, which fails to rise to the "fear, coercion, or intimidation" required under Section 11(b). *See* Opinion at 133 n.70.[11] Appellant also rehashes evidence that the trial court considered and found did not constitute intimidation. *See* Appellant's Br. at 34-37. A Section 11(b) claim cannot arise from legal voter challenges under Section 230 without anything more.

Plaintiffs' evidence simply failed to show TTV intimidated any voters.

## II.    THE TRIAL COURT CORRECTLY DETERMINED THAT THERE WAS ALSO NO ATTEMPT AT INTIMIDATION.

In its arguments regarding the "attempt" portion of Section 11(b), Appellant attempts to short-circuit the other elements of its claim that it failed to prove. As discussed in the Opinion and the Court's summary judgment order, Plaintiffs needed to show: (1) that Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably intimidated, threatened, or coerced from voting or attempting to vote. Opinion at 115. Contrary to Appellant's argument, its nebulous arguments on "attempt" fall well short of satisfying that standard, and the trial court correctly analyzed the "attempt" element.

---

[11] Only one voter, Turner, expressed that he experienced "fear" because of the challenges, and the trial court found that the factual basis for this fear was unclear and thus did not conclude that TTV intimidated or attempted to intimidate him. *Id.*

Specifically, the trial court thoroughly and properly analyzed the "attempt" portion of Section 11(b). Appellant's argument that the trial court applied an incorrect standard (or that if "failed to adopt any standard at all") is demonstrably inaccurate. Appellant again attempts to dress up its actual lack of evidence as legal arguments, but the trial court correctly found that Plaintiffs failed to prove the elements of their claim, including with regards to "attempt." Appellant all but ignores and distorts the trial court's meticulous analysis. Again, the trial court's analysis was correct, and there are no findings that are "clearly erroneous." *U.S. Bank N.A.*, 583 U.S. at 395-96; *Cuenca*, 99 F.4th at 1350.

## A. There Was No Evidence of Any Attempt at Voter Intimidation.

The Opinion thoroughly and correctly analyzes the "attempt" element of the statute. The trial court repeatedly acknowledged that, in addition to considering actual intimidation, it also considered attempted intimidation. *See, e.g.*, Opinion at 121 ("The Court now turns to answer the question presented in this matter: did Defendants unlawfully intimidate, coerce, or threaten any voter, or attempt to do so?"); *id.* at 130 ("Evidence of intimidation or attempted intimidation.") (emphasis added). In fact, the trial court specifically recognized that "Plaintiffs emphasize Defendants are liable under Section 11(b) based on their attempts to intimidate, specifically given that the mass challenges were made recklessly and in close

proximity to the election. The Court concludes otherwise." *Id.* at 130 (emphasis added). Plaintiffs' lack of probative evidence bears this out.

Contrary to Appellant's argument, the trial court did not confuse attempted intimidation with actual intimidation. *See* Appellant's Br. at 40. Rather, the trial court correctly analyzed the actual evidence, methodically analyzed the elements of Section 11(b), and found Plaintiffs did not prove their claims. Relying on existing case law, the trial court found Plaintiffs failed to prove that Defendants "attempt[ed] to intimidate (threaten or coerce) any voter," which included four potential means: "[1] making a voter fearful, [2] compelling voter action or inaction, [3] promising reprisal or distress, or [4] restraining, controlling, or dominating a voter." Opinion at 130 (citing *Wohl*, 512 F. Supp. 3d at 509).

First, the trial court correctly found that "[g]iven the statutorily imposed intermediary of the county Boards of Elections in the Section 230 process—and the lack of evidence that Defendants had any control over or took any action to affect the Boards' decisions—Defendants' Section 230 challenges could not have reasonably attempted to [2] *compel* voter action, to [3] *promise* any adverse effect, or to [4] assert other means of *control* over a voter." Opinion at 130-31. In other words, Plaintiffs failed to show means (2) through (4) of an "attempt" because there was no attempt to affect the Boards' decision. Again, the trial court even identified how Plaintiffs could have succeeded on their Section 11(b) claim—if Defendants

"had any control over or took any action to affect the Board's decisions." *Id.* at 130. There simply was no evidence of this. *Id.* O.C.G.A. § 21-2-230(b) gave the power to determine electoral challenges to the Boards of Election, and Plaintiffs never challenged the constitutionality of the Georgia statute.

Second, the trial court correctly found that Plaintiffs failed to prove that "Defendants actions attempted to make any voter [1] "timid or fearful." Opinion at 131. Again, Plaintiffs simply failed to satisfy their burden. "Here, the evidence is lacking on a number of fronts: Plaintiffs' evidence only connects Defendants' actions to *one* voter who testified at trial (Plaintiff Heredia) and, even if the evidence connected Defendants' actions to the other Muscogee County voters in this case, there is no evidence that Defendants attempted to make any of the voters in this case feel timid or fearful, or that they experienced any actual reasonable intimidation." *Id.* at 131. Specifically, the trial court found three of the four voters were from Muscogee County, two of the Defendants did not facilitate any challenges in that county, and the "trial evidence fail[ed] to connect TTV to any challenges in Muscogee County." *Id.* at 132. Thus, there could be no intimidation or attempted intimidation due to this missing nexus. And for the remaining Plaintiff, the trial court found that there could be no attempt to find her timid or fearful because "the facts in this case show Defendants submitted a reasonable challenge to Heredia." *Id.* at 134.

44

The trial court's thorough analysis demonstrates that Appellant's arguments are incorrect because Plaintiffs failed to prove the elements of their claim.

## B.     Appellant's Arguments Are Factually and Legally Erroneous.

Appellant largely ignores the robust analysis from the Opinion. Appellant suggests that the "settled framework" for determining attempt is whether the defendant (1) had "the specific intent to engage in" the proscribed conduct, and (2) took a "substantial step toward commission of the offense." Appellant's Br. at 39 (citing *United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004)). As *Murrell* made clear, however, those elements were sufficient "[t]o sustain a conviction <u>for the crime of attempt</u>." *Id.* (emphasis added). Of course, there is no claim for the crime of attempt in this case. And Appellant fails to cite any authority for the proposition that the *Murrell* test is appropriate in the Section 11(b) context.

Even if the *Murrell* elements applied here, Appellant and amicus curiae misapply them by conflating attempted voter <u>challenges</u> with attempted voter <u>intimidation</u>, but the two are not the same:

> Contrary to Plaintiffs' application of these elements, however, the prohibited action under Section 11(b) is attempted *voter intimidation*—not attempted voter challenges otherwise valid under Georgia law. The Court finds no legal support for the proposition that Section 11(b)'s imputes liability when a plaintiff shows that a defendant's actions merely attempted to affect a large number of the voting populace. There still must be some evidence that a defendant's otherwise lawful action intimidated or attempted to intimidate "*any voter*." 52 U.S.C. § 10307(b) (emphasis added).

Opinion at 137.

Appellant's argument that the trial court somehow "gets the analysis backwards" (Appellant Br. at 41) fails because it does not recognize the trial court's correct key distinction between attempted voter challenges and attempted voter intimidation. There can be no attempted voter intimidation if the evidence presented did not even connect TTV's actions to the voters in the case. *See* Opinion at 137 (recognizing that Section 11(b) requires evidence that a defendant's otherwise lawful action intimidated or attempted to intimidate "*any voter*") (citing 52 U.S.C. § 10307(b)).

Even if the "substantial step" prong applied, as Appellant recognizes, "[i]t must be an act that would normally result in committing the offense." Appellant's Br. at 52 (quoting *United States v. Elliott*, No. 1:19-cr-00278-LMM-JSA-4, 2022 WL 20613209, at *3 (N.D. Ga. Oct. 4, 2022)); *see also United States v. McDowell*, 705 F.2d 426, 428 (11th Cir. 1983) ("the defendant's acts, taken as a whole, must strongly corroborate the required culpability; they must not be equivocal.").[12] Although Appellant cites evidence that Defendants facilitated voter challenges, that

---

[12] This case is nothing like *United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005), where the plaintiff attempted to read an entire term ("in commerce") out of the statute. *Id.* at 138 n.8. Here, the trial court faithfully applied the entirety of Section 11(b) and found Plaintiffs failed to prove their claim.

does demonstrate any substantial step resulting in "committing the offense"—i.e., attempted voter intimidation.

Appellant asserts that the trial court found the county Boards of Elections "might have thwarted" TTV's attempt which does not mean TTV was prevented from forming an attempt (Appellant's Br. at 40), but that misconstrues the Opinion. As discussed above, the trial court thoroughly analyzed the evidence and found there was no attempted intimidation. *See, e.g.*, *People v. Trepanier*, 84 A.D.2d 374, 378 (N.Y. App. Div. 4th Dep't 1982) (in case cited by Appellant, finding there was insufficient evidence to establish attempted grand larceny claim).

Similarly, a large portion of Appellant's brief simply raises arguments that disagree with the trial court's factual findings. *See, e.g.*, Appellant's Br. at 42 (questioning the trial court's "finding that Heredia had lived and worked in Atlanta for three years prior to the runoff election"); *id.* (claiming that evidence defendants relied upon "was *not* a reasonable basis for challenging Heredia"); *id.* at 45-46 (purporting to compare TTV's evidence with the evidence plaintiffs introduced at trial); *id.* at 46-50 (purporting to discuss evidence of intent). Appellant comes nowhere close to showing the "clear error" necessary to disturb the trial court's factual findings. *See U.S. Bank N.A.*, 583 U.S. at 395-96; *Cuenca*, 99 F.4th at 1350. As the trial court recognized, the evidence Appellant points to relates to attempted voter challenges, but <u>not</u> attempted voter intimidation. And, in rehashing certain

evidence, Appellant repeatedly cites the trial court's Opinion, which is further proof that the trial court considered this evidence, but correctly found it did not satisfy Plaintiffs' burden.[13] Appellant's mere disagreement with the outcome cannot overcome the trial court's extensive evidentiary findings.

Appellant provides no reason why this Court should disturb the trial court's proper exclusion of certain evidence. *See* Appellant's Br. at 36-37, 42-44. "The evidentiary rulings of the trial court are reviewed for a clear abuse of discretion," which only occurs if the trial court "applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Perez v. City of Sweetwater*, 770 F. App'x 967, 971 (11th Cir. 2019). Such decisions are owed deference, and reversal should only be considered if the ruling was "manifestly erroneous." *Id.*

Here, the trial court properly excluded certain categories of evidence, and Appellant cannot show that its decisions were "clearly erroneous." <u>First</u>, contrary to Appellant's argument (*see* Appellant's Br. at 42-44), the trial court correctly excluded certain tweets  for numerous reasons: (1) they were hearsay; (2) they had

---

[13] For example, Appellant points to evidence that it claims Defendants "hoped" the counties would act on their challenges. *See* Appellant's Br. at 48. Because that is all Defendants could do, this further supports the trial court's conclusion that Defendants did not attempt to commit voter intimidation, but rather simply attempted to challenge voters.

to be offered for the truth of the matter asserted to be relevant because; (3) while they could have been admitted for the purposes of establishing a reaction of someone who saw them, no such evidence of any reaction was admitted; and (4) there was no evidence the posts were intended to reach any voter to be an attempted intimidation. Opinion at 99-100. Appellant simply disagrees with the trial court's findings. *See* Appellant's Br. at 43 (in contrast to trial court finding (4) above, arguing that "[w]hat is clear is that TTV *intended* to reach Georgia voters").[14] But that is not enough to show "clear error."

Second, contrary to Appellant's argument (*see* Appellant's Br. at 36-37), the trial court correctly excluded hearsay evidence from Turner. *See* Opinion at 60 n.30; Tr. at 236:21-239:6 (Doc. 320). As the trial court found, the testimony was prototypical evidence of out-of-court statements offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(2); Tr. at 237:13-25 (Doc. 320). Appellant does not cite any case law where the Court reversed a trial court's order excluding such evidence. *See* Appellant's Br. at 37. Additionally, counsel for Appellees promptly objected to the offending hearsay. *See* Tr. at 237:15 (Doc. 320).[15]

---

[14] Appellant also distorts the trial court's footnote 52, which noted that although it had concerns about the potential releasing of challenged voter names (which never happened), "[s]uch evidence is just not properly (or persuasively) present in this case." Opinion at 100 n.52.

[15] For example, in a case Appellant cites, the court made this distinction by making clear that "[b]y eliciting Bordeaux's damaging testimony through questioning on a subject other than one to which he had previously objected <u>and then failing to object</u>

Appellant certainly does not present any arguments showing the trial court abused its discretion.[16]

Finally, the cases Appellant cites are inapposite. In *Montana Democratic Party v. Eaton*, 581 F. Supp. 2d 1077 (D. Mont. 2008), the Montana Democratic Party brought an action against the Republican Party and Secretary of State for a temporary restraining order arising out of the Republican Party's challenges (through Eaton) to thousands of registered voters. Significantly, there was no claim brought under Section 11(b). Unlike Section 230, the Montana statute required that the election administrator "shall" question the challenger when a citizen challenged another's right to vote. *Id.* at 1079. *See id.* at 1080 ("the law require[d] the counties in which the challenges [were] filed to respond."). Moreover, the trial court found plaintiffs' arguments unpersuasive at that stage of the case and denied the motion for temporary restraining order, noting that Eaton was not acting as an agent of the state. *Id.* at 1080, 1084. In *United States v. McLeod*, 383 F.2d 734 (5th Cir. 1967),

---

to Bordeaux's answer, Balfany waived any objection on appeal." *United States v. Balfany*, 965 F.2d 575, 583 (8th Cir. 1992) (emphasis added).

[16] In any event, even if Appellant could show an abuse of discretion, any such error would be harmless. *See, e.g.*, Opinion at 133 n.70 ("[E]ven if the Court were to find that such evidence had been submitted, Plaintiffs have not proven that Defendants attempted to make the Muscogee County voters timid or fearful, nor is there sufficient evidence that the Muscogee County voters felt timid or fearful of voting. . . . given the variety of legal impediments with Plaintiffs' evidence in this case and the unclear factual basis for Turner's expressed fear, the Court cannot find that it is more likely than not that Defendants intimidated or attempted to intimidate Turner.").

unlike here, the defendants, who included agents of the state including the sheriff, arrested and prosecuted African American registration works, and their actions were for the "purpose" of disrupting the registration drive. None of these severe factors exist here, and TTV did not exercise any power as an organ of the state. It simply made legal voting challenges under Section 230.

## CONCLUSION

For the reasons set forth above and by the trial court, and for such other reasons as supported by the record, Appellees True the Vote, Inc. and Catherine Engelbrecht respectfully request that the judgment entered in their favor be affirmed.

Dated: August 12, 2024

Respectfully submitted,

*/s/ Jake Evans*
Jake Evans
Philip J. George
Julia Martin
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE Suite 2500
Atlanta, GA 30305
Telephone: 678.553.2342
Jake.Evans@gtlaw.com
Philip.George@gtlaw.com
Julia.Martin@gtlaw.com

*Counsel for Defendants-Appellees*
*True the Vote, Inc. and Catherine*
*Engelbrecht*

51

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the length limit of Fed. R. App. R. Rule 32(a)(7)(B)(i) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f) this document contains 12,310 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2010 in Times New Roman, 14-point font.

*/s/ Jake Evans*
Jake Evans

## CERTIFICATE OF SERVICE

I certify that on August 12, 2024, I electronically filed the foregoing with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Jake Evans*
Jake Evans