No. 24-10372

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Fair Fight, Inc.,

*Plaintiff-Appellant*

v.

True the Vote, Inc., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
No. 2:20-cv-00302-SCJ

## REPLY BRIEF OF APPELLANT FAIR FIGHT, INC.

Allegra J. Lawrence-Hardy
Leslie J. Bryan
Michelle McClafferty
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street,
Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350

Uzoma N. Nkwonta
Jacob D. Shelly
Christina Ford
Tina Meng Morrison
Marcos Mocine-McQueen
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490

*Attorneys for Appellant Fair Fight, Inc.*

**No. 24-10372**
**Fair Fight, Inc. v. True the Vote, Inc.,** *et al.*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

The undersigned counsel of record for Appellant Fair Fight, Inc. certifies that the following is a full and complete list of all persons, associations, firms, partnerships, or corporations having an interest in the outcome of this case and/or appeal:

- Bao, Judy, *Attorney for Intervenor*

- Berson, Scott, *Plaintiff*

- Berwick, Benjamin L., *Attorney for Amicus*

- Bopp Jr., James, *Former Attorney for Defendants-Appellees*

- Branch, Aria Christine, *Attorney for Plaintiff-Appellant*

- Bryan, Leslie J., *Attorney for Plaintiff-Appellant*

- Cogen, Maia J., *Attorney for Plaintiff-Appellant*

- Cooper, James, *Defendant*

- David F. Guldenschuh, P.C., *Former Attorney for Defendants-Appellees*

- Davis, Mark, *Defendant*

- Department of Justice, *Attorney for Intervenor*

- Devaney, John M., *Former Attorney for Plaintiff-Appellant*

- Elias Law Group LLP, *Attorney for Plaintiff-Appellant*

C-1

- Elias, Marc E., *Attorney for Plaintiff-Appellant*

- Engelbrecht, Catherine, *Defendant-Appellee*

- Evans, James Cullen, *Attorney for Defendants-Appellees*

- Fair Fight, Inc., *Plaintiff-Appellant*

- Ford, Christina Ashley, *Attorney for Plaintiff-Appellant*

- Gallant, Jeffrey P., *Former Attorney for Defendants-Appellees*

- Greenberg Traurig LLP, *Attorney for Defendants-Appellees*

- Gregory Wynne Arney PLLC, *Attorney for Defendants-Appellees*

- Guldenschuh, David F., *Former Attorney for Defendants-Appellees*

- Heredia, Jocelyn, *Plaintiff*

- Hughes, Aileen Bell, *Attorney for Intervenor*

- Johnson, Ron, *Defendant*

- Jones, Steve C., *U.S. District Court Judge*

- Kistler, Cameron, *Attorney for Amicus*

- Kramer, Courtney, *Former Attorney for Defendants-Appellees*

- Kramer Law LLC, *Former Attorney for Defendants-Appellees*

- Krevolin & Horst LLC, *Attorney for Amicus*

- Larsen, Joseph R., *Attorney for Defendants-Appellees*

- Lawrence & Bundy, LLC, *Attorney for Plaintiff-Appellant*

- Lawrence, Allegra J., *Attorney for Plaintiff-Appellant*

- Lindenbaum, Dara, *Former Attorney for Plaintiff-Appellant*

- McClafferty, Michelle, *Attorney for Plaintiff-Appellant*

- Mellett, Timothy, *Attorney for Intervenor*

- Milbank, Courtney Turner, *Former Attorney for Defendants-Appellees*

- Mitchell, Molly Elizabeth, *Former Attorney for Plaintiff-Appellant*

- Mobley, Ansley Mikayla, *Attorney for Defendants-Appellees*

- Mocine-McQueen, Marcos, *Attorney for Plaintiff-Appellant*

- Morrison, Tina Meng, *Attorney for Plaintiff-Appellant*

- Nkwonta, Uzoma, *Attorney for Plaintiff-Appellant*

- Paikowsky, Dana, *Attorney for Intervenor*

- Paredes, Eric John Galvez, *Attorney for Amicus*

- Perkins Coie LLP, *Former Attorney for Plaintiff-Appellant*

- Powell, Cameron, *Attorney for Defendants-Appellees*

- Protect Democracy Project, *Attorney for Amicus*

- Ramirez, Joel J., *Former Attorney for Plaintiff-Appellant*

- Rodgers, Torryn Taylor, *Former Attorney for Plaintiff-Appellant*

- Sandler Reiff Lamb Rosenstein & Birkenstock, P.C., *Former Attorney for Plaintiff-Appellant*

- Shelly, Jacob D., *Attorney for Plaintiff-Appellant*

- Siebert, Melena, *Former Attorney for Defendants-Appellees*

- Smith III, Ray Stallings, *Former Attorney for Defendants-Appellees*

- Smith & Liss, LLC, *Former Attorney for Defendants-Appellees*

- Somerville, Derek, *Defendant*

- Sparks, Adam, *Attorney for Amicus*

- The Bopp Law Firm, PC, *Former Attorney for Defendants-Appellees*

- Tobin, Thomas, *Former Attorney for Plaintiff-Appellant*

- True the Vote, Inc., *Defendant-Appellee*

- Williams, Mark, *Defendant*

- Wynne, Michael John, *Attorney for Defendants-Appellees*

- Yun, Jennifer J., *Attorney for Intervenor*

No publicly traded company or corporation has an interest in the outcome of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................C-1

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................2

I.  TTV is liable under Section 11(b) because its conduct caused voters
    to fear the consequences of voting. ...............................................2

II. TTV is separately liable under Section 11(b) for attempted
    intimidation.................................................................................6

    A. The district court failed to identify or apply the elements of
       attempt..................................................................................6

    B. The district court failed to review the record for evidence of
       attempt..................................................................................8

    C. The district court clearly erred in determining TTV's challenge to
       Heredia was "reasonable." ...................................................11

III. TTV's legal defenses are unmoored from Section 11(b)'s standard.........13

    A. TTV's alleged compliance with state law cannot absolve it from
       liability. ..............................................................................13

    B. TTV fails to apply any theory of causation. .........................15

IV. The district court's erroneous exclusion of evidence prejudiced
    Plaintiffs.................................................................................18

    A. The district court erroneously excluded evidence of TTV's
       threats. ................................................................................18

    B. The district court erroneously excluded evidence of Defendants'
       connection to Muscogee County voters.................................21

V.   TTV mischaracterizes the record, its conduct, and its impact on voters......................................................................................................23

CONCLUSION ......................................................................................................26

CERTIFICATE OF COMPLIANCE......................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Coleman v. Hillsborough County*,
  41 F.4th 1319 (11th Cir. 2022) ..........................................................16

*Furcron v. Mail Ctrs. Plus, LLC*,
  843 F.3d 1295 (11th Cir. 2016) ..........................................................18

*Great S. Lumber Co. v. Williams*,
  17 F.2d 468 (5th Cir. 1927) ...............................................................19

*Liverman v. City of Petersburg*,
  844 F.3d 400 (4th Cir. 2016) .............................................................20

*Morrissette-Brown v. Mobile Infirmary Med. Ctr.*,
  506 F.3d 1317 (11th Cir. 2007) ..........................................................12

*National Coalition on Black Civic Participation v. Wohl*,
  661 F. Supp. 3d 78 (S.D.N.Y. 2023) .................................................3, 4

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)..............................................................................20

*Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*,
  944 F.3d 886 (11th Cir. 2019) ..........................................................18

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985)..............................................................................7

*United States v. Bobo*,
  586 F.2d 355 (5th Cir. 1978) .............................................................19

*United States v. Brendia*,
  234 F.3d 1274, 2000 WL 1716433 (7th Cir. 2000)............................22

*United States v. Ledford*,
  154 Fed. Appx. 692 (10th Cir. 2005)..................................................19

*United States v. Martin*,
  803 F.3d 581 (11th Cir. 2015) ..........................................................15

*United States v. McLeod*,
  385 F.2d 734 (5th Cir. 1967) ...........................................................................4, 14

*United States v. Murrell*,
  368 F.3d 1283 (11th Cir. 2004) ............................................................................7

*United States v. Parikh*,
  858 F.2d 688 (11th Cir. 1988) ............................................................................21

## INTRODUCTION

In the wake of the 2020 election, True the Vote and its president Catherine Engelbrecht (together, "TTV") issued a press release to announce their "landmark" mass challenges against more than 360,000 Georgia voters. TTV filed those challenges even though it was warned not to by the Secretary of State's Office and by its own volunteers, and it did so with devastating consequences for voters in violation of Section 11(b) of the VRA. *See*, *e.g*., Doc. 312 at 52 (Plaintiff Heredia testifying that the challenge made her fear she was "going to get in trouble for voting"); *id.* at 21 (Plaintiff Heredia testifying that, although she was previously a regular voter, she has not voted since that election given the fear and stress that experience caused her).

As Fair Fight explained in its opening brief, the district court found all of Plaintiffs' witnesses credible, and nearly all facts in Plaintiffs' favor; but the court applied the wrong legal standards in determining liability under Section 11(b). Although TTV defends the district court's opinion, it does so without any substantive analysis of the appropriate legal framework—the crux of this appeal. TTV takes no position, for instance, on whether Section 11(b) liability requires sole or proximate causation; identifies no standard at all for attempted intimidation; and does not dispute that the district court confused the facts when it stated that TTV's challenge against Plaintiff Heredia was reasonable. Instead, TTV focuses on the

1

technical legality of its actions under state law (which has no bearing under federal law), compares its actions to more egregious or violent examples from our nation's long history of voter intimidation (which has little bearing on whether it violated Section 11(b)), and grossly mischaracterizes the record developed at the district court.

As the district court agreed, TTV's conduct was unconscionable, even if it was technically permitted under Georgia law. The record shows that TTV submitted an enormous challenge file that it knew both (1) swept in legions of eligible voters and (2) did not contain the kind of individualized evidence sufficient to sustain a challenge. It then demanded that counties uphold its challenges by confronting voters and threatened to publicly release the list of voters if the counties did not do so. Through those actions, TTV intimidated many voters and attempted to intimidate, threaten, or coerce thousands more. Plaintiffs' robust evidentiary record mapped directly onto the statute's plain language and the governing legal standards—all of which confirm TTV's conduct violated Section 11(b).

## ARGUMENT

### I.    TTV is liable under Section 11(b) because its conduct caused voters to fear the consequences of voting.

As Fair Fight demonstrated in its opening brief, Section 11(b) prohibits conduct that causes individuals to fear harassment or negative legal consequences for voting. *See* Opening Br. of Appellant at 5, 31-32, ECF No. 21 ("Op. Br."). This

includes non-violent and non-physical forms of intimidating, threatening, or coercive conduct; indeed, Congress crafted Section 11(b) specifically to capture the more subtle forms of pressure on the right to vote that previous federal voter intimidation statutes had failed to fully prohibit. *See id.* at 5-6, 31. And a plaintiff need not prove a defendant's specific intent to intimidate, threaten, or coerce to establish a Section 11(b) violation if the "natural consequences" otherwise result in such an outcome. *See id.* at 6.

TTV does not directly contest this legal standard, but instead focuses on its lack of "direct voter contact" or "manipulat[ion]" of the county boards. Resp. Br. of Defs.-Appellees at 29-30, ECF No. 31 ("TTV Br."). That argument is wholly unmoored from the text of Section 11(b), and no case has adopted such a standard. In *National Coalition on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 92, 123-24 (S.D.N.Y. 2023), for example, the defendants were found liable under Section 11(b) where they enlisted third parties to send robocalls to thousands of voters before the 2020 election. *Id.* at 91-93, 112-13. Although TTV attempts to distinguish *Wohl* by arguing those defendants "directly contacted voters," TTV Br. at 34, the defendants in *Wohl*, like TTV, identified a group of voters to target and then used a third party to engage those voters. *See id.* at 91-93; Doc. 335 at 125 (finding "TTV directed the Section 230 challenges on behalf of volunteer challengers"). There, the third party was a robocall service; here, it was the county

challengers that TTV personally recruited and the county boards of elections that processed TTV's challenges.

Like *Wohl*, TTV's conduct also put voters in fear of "negative criminal and legal consequences" for voting, 661 F. Supp. 3d at 113-14. Those fears were a "natural consequence" of TTV's mass challenges in a highly-charged environment, in which TTV repeatedly fanned the flames by trumpeting false claims of voter fraud and imploring their supporters to keep all "[e]yes on Georgia" to "expose" voter fraud (while at the same time knowing they possessed no evidence whatsoever of such fraud). Op. Br. at 7-8; *see also United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (emphasizing that defendants' actions in a voter intimidation case "cannot be viewed in isolation" and "must be considered against the background of contemporaneous events . . . and the general climate prevailing there at the time").

At bottom, the inquiry does not turn on whether TTV's specific actions precisely matched those of defendants in other Section 11(b) cases, but rather the effect of TTV's actions on voters. Like the district court, TTV ignores the evidence that its mass challenges caused voters to fear the consequences of voting and focuses instead on the administrative burdens that these challenged voters faced to ensure their ballots were counted, arguing that administrative inconvenience does not rise to a Section 11(b) violation. *See* TTV Br. at 40-41. But Plaintiffs did not ask the district court to hold that administrative inconvenience alone would result in a

violation of the statute; they testified about the fear TTV's challenges caused and the ways in which they were intimidated by TTV's actions—so much so that one Plaintiff has not voted since the challenge because of the anxiety that the experience caused her. Doc. 312 at 21 (Plaintiff Heredia). As the trial testimony established, TTV's actions made voters believe that they were being accused of committing a crime, *id.* at 17 (Plaintiff Heredia); Doc. 310 at 97 (Plaintiff Berson). For other voters, the challenge caused "[a]nguish" and brought back "PTSD" from not being able to vote as an older Black Georgia citizen, Doc. 320 at 35 (Mr. Turner). Those are the natural consequences of TTV's actions that imposed liability under Section 11(b), not the inconvenience the challenges caused.

Finally, although TTV repeatedly attempts to exonerate itself based on its alleged "genuine" belief that individuals were breaking the law, TTV Br. at 40, that contention is legally irrelevant because the Section 11(b) standard does not turn on an actors' intent if the natural consequences of their actions cause voters to feel intimidated, threatened, or coerced—a standard that TTV does not actually contest. *See* Op. Br. at 6. In any event, as the district court concluded, TTV's challenges were frivolous, which TTV knew or should have known before filing the challenges, *see* Doc. 335 at 90-92. Indeed, TTV ignored warnings from the Secretary of State's Office and even its own volunteers that the mass challenge effort was legally flawed and was targeting lawful voters, *see id.* at 91-92 (recounting testimony from Mr.

Germany and Mr. Martin), negating any inference that TTV was acting out of a genuine desire to combat voter fraud.[1]

## II.    TTV is separately liable under Section 11(b) for attempted intimidation.

TTV's conclusory endorsement of the district court's findings about attempt liability both ignores the relevant law and misstates the facts.

### A.    The district court failed to identify or apply the elements of attempt.

In response to Fair Fight's explanation of the ways in which the district court misconstrued the legal elements of attempt, Op. Br. at 39-44, TTV responds that the district court could not have committed any error because the "trial court repeatedly acknowledged" that it "considered attempted intimidation," TTV Br. at 42-43. But the dispute is not whether the lower court *mentioned* attempted intimidation (it did), but whether it *applied* that theory of liability correctly (it did not). Like TTV's response brief, the district court never identified the elements of attempt, so it had no way to determine whether the offense had been committed.

TTV argues that the district court "did not confuse attempted intimidation with actual intimidation" because the court "methodically analyzed the elements of Section 11(b)," TTV Br. at 43, and found that "Defendants' Section 230 challenges

---

[1] As Fair Fight noted in its opening brief, at trial Defendants expressly waived any defense of their conduct under the First Amendment. *See* Op. Br. at 18. TTV does not contest this in its response brief.

could not have reasonably attempted to *compel* voter action, to *promise* any adverse effect, or to assert other means of *control* over a voter," Doc. 335 at 130-31. But these are not the elements of attempt liability—they are definitions of "intimidate," "threaten," and "coerce" in the context of Section 11(b). *See id.* at 113 (quoting *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020)). Attempt liability does not require compulsion, promises, or control; it requires the specific intent to engage in proscribed conduct and a substantial step toward commission of the offense. *See United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004). Thus, TTV's rebuttal to Fair Fight's criticism that the district court conflated attempted intimidation with actual intimidation was simply to highlight a glaring example of that exact conflation.

And although TTV objects to the familiar intent-plus-substantial step test for attempt liability because it is drawn from criminal law, s*ee* TTV Br. at 45, TTV fails to offer any alternative framework. It also ignores the elementary rule that where civil and criminal contexts differ, civil liability can be established by *lower* standards of proof. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 (1985). The district court could have applied the two-step test from criminal contexts, or it could have held Plaintiffs to a lesser burden. The approach it chose instead—simply declaring that TTV did not attempt to intimidate any voters based on a standardless recitation of its findings on *actual intimidation*—was error.

7

**B.    The district court failed to review the record for evidence of attempt.**

TTV's factual defense of the district court's analysis is equally mistaken. Like the district court, TTV ignores key evidence establishing TTV's attempt to intimidate voters. *See* Op. Br. at 44-54. And instead of challenging that evidence, TTV offers a concession: drawing from the district court's opinion, TTV suggests that it would be liable under Section 11(b) if it "took any action to affect the Board's decisions" about whether or how to process the voter challenges that TTV submitted. TTV Br. at 43-44 (quoting Doc. 335 at 130). Plaintiffs agree that action taken to persuade the Board to act on voter challenges may indicate the specific intent to intimidate or coerce challenged voters, and the actions taken to affect the county boards' decision could represent a substantial step towards completing the offense. Holding TTV to its own preferred test, which can be reasonably situated within the legal framework for attempt liability, the record is overflowing with evidence of TTV behavior intended to persuade county boards to take action against challenged voters.

For example, after TTV agent James Cooper complained to Ms. Engelbrecht that "[t]he fact that these counties are telling some [TTV challengers] they have to make their case, is running folks off!" PX 80 at 1, Ms. Engelbrecht responded, "We are putting together a one pager to support challengers who are being asked to appear" before county boards to help them advocate for investigations of challenged

8

voters. *Id.* Distributing talking points to support TTV volunteers' efforts to persuade county boards to accept the voter challenges is surely "action to affect the Boards' decisions." Doc. 335 at 130.

Similarly, TTV issued a press release highlighting that Ron Johnson, another TTV agent and challenger, participated in a Jackson County elections board meeting where Mr. Johnson "told the board that it was their responsibility to verify" the eligibility of voters named in TTV's challenge list, and his advocacy "got heated enough at one point that [the board chair] threatened to have Mr. Johnson removed from the meeting." PX 84 at 2. Heated advocacy urging the board to verify voters' eligibility is also "action to affect the Boards' decisions." Doc. 335 at 130.

As a third example, Mark Williams, another core member of TTV's voter challenge team, attended a Gwinnett County elections board meeting where he "asked the Gwinnett board to uphold the [TTV voter] challenge and to investigate all 32,000 voters on the list." Doc. 315 at 48. Mr. Williams was "upset that Gwinnett did not find probably cause for the challenge" because he "wanted . . . these names to be vetted and heard." *Id.* at 51. Again, demanding that a board investigate tens of thousands of voters is quintessential "action to affect the Boards' decisions." Doc. 335 at 130; *see also* PX 92 at 15-25 (Engelbrecht discussing plan to sue counties if they did not uphold TTV's challenges).

9

TTV's representation that "[t]here simply was no evidence" that TTV took action to affect the boards' decisions about voter challenges, TTV Br. at 44, is dishonest. There is no question that TTV urged counties to accept its massive lists of challenged voters, to notify these voters that they had been challenged, to hold hearings and interrogate these voters about their eligibility, and to disenfranchise any voters who failed to clear these hurdles in advance of the election. The district court admitted all of this evidence, recognized it would be sufficient for liability, and then simply ignored it. *See* Doc. 335 at 130.

TTV pivots to quoting the district court's statements that "Plaintiffs' evidence only connects Defendants' actions to *one voter* who testified at trial (Plaintiff Heredia)," and "the facts in this case show Defendants submitted a reasonable challenge to Heredia," TTV Br. at 44 (quoting Doc. 335 at 131, 134)—again confusing actual intimidation with attempted intimidation. Whether or not TTV's Banks County challenge intimidated Ms. Heredia (and it did), it is undisputed that TTV prepared challenges against "over 360,000" voters in Georgia, and that "TTV's list utterly lacked reliability." Doc. 335 at 43, 90. Thus, TTV is wrong to assert that "[t]here can be no attempted voter intimidation if the evidence presented did not even connect TTV's actions to the [witnesses] in the case." TTV Br. at 46. Even where TTV disputes its role in the challenges against witnesses who testified at trial, those witnesses' experiences reveal the reasonable, natural consequences that

10

eligible voters suffer when they are targeted by challenges like TTV's. Because defendants are "deemed to intend the natural consequences of their acts," Doc. 335 at 126 n.65 (quotation omitted), and because trial witnesses confirmed that the natural consequence of indiscriminate challenges against eligible voters on the eve of Georgia's 2021 Runoff elections was intimidation, *see* Op. Br. at 30-39, the district court should have held TTV liable.

As Fair Fight's opening brief showed, TTV (1) specifically intended to intimidate voters, *see id.* at 44-52, and (2) took a substantial step to achieve that goal by recklessly filing hundreds of thousands of unreliable challenges and by working to persuade county boards to act on those challenges, *see id.* at 52-54.[2] Plaintiffs identified the legal test, and the district court credited the relevant facts—to find liability for attempt, all it had to do was put the two together. Its failure to do so is reversible error.

### C.    The district court clearly erred in determining TTV's challenge to Heredia was "reasonable."

In determining that TTV was not liable for attempted intimidation, the district court also clearly erred in finding "there was a reasonable question about Heredia's proper residency for voting," Doc. 335 at 134. To support this conclusion, the district

---

[2] TTV recites the mantra that "attempted voter challenges" is different from "attempted voter intimidation," *see* TTV Br. at 47, ignoring the fact that attempted (and completed) voter challenges represented a substantial step in the overall scheme of voter intimidation. *See* Op. Br. at 52-54.

court stated that "Heredia had lived and worked in Atlanta for three-years at the time of the Senate runoff election and all public information indicated her residency [was] around Atlanta" at the time of the runoff election. Doc. 335 at 134. But that factual finding was demonstrably erroneous. *See* Op. Br. at 34.

The district court confused the public information surrounding Heredia's residency at the time of Defendants' challenge, in December 2020, with Heredia's circumstances three years later *at the time of trial*, in November 2023, by which point Heredia *had* "lived and worked" in the Atlanta area for approximately three years and candidly admitted that someone could "reasonably assume she lived in Atlanta" *at the time of trial*. *Id.* at 15. In contrast, at the time of the challenge, Heredia's permanent residence was in Banks County, where she had lived while attending the University of Georgia through 2019, Doc. 312 at 8-9, and Heredia's "car registration, her driver's license, [and] her voter registration" remained in Banks County, *see* Doc. 335 at 14-15. Tellingly, TTV does not dispute these facts. Its perfunctory statement that the district court did not commit clear error, TTV Br. at 47, is conclusory and wrong.

"A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quotation and citation

12

omitted). Here, TTV identified no evidence whatsoever that would have supported the trial court's factual finding on Heredia's residency at the time TTV submitted its challenge, and correspondingly, on the reasonableness of Defendants' challenge against her. Precisely because it is clear that "a mistake has been committed" (indeed, here we can even trace *how* the district court made such a mistake), the Court should recognize that the district court's finding on the "reasonableness" of Defendants' challenge to Heredia was clearly erroneous.

## III.    TTV's legal defenses are unmoored from Section 11(b)'s standard.

TTV's response brief repeatedly relies on novel rules and standards unmoored from any legal authority. Contrary to TTV's claims, Section 230 of the Georgia Election Code does not authorize indiscriminate, baseless voter challenges, and even if it did, Georgia's challenge law is no defense to a VRA violation.

### A.    TTV's alleged compliance with state law cannot absolve it from liability.

TTV's argument that it complied with Section 230 of Georgia law in filing the challenges—even if true—is not relevant to this Court's review. As Fair Fight demonstrated in its opening brief, defendants may violate federal voter intimidation statutes even when their actions comply with state law. *See* Op. Br. at 23-25 (citing cases). TTV does not meaningfully contest this.

To be sure, the district court purported to disclaim any suggestion "that Section 230 challenges can never be a violation of Section 11(b)." Doc. 335 at 137.

But that stray remark is impossible to square with the district court's analysis. *See id.* at 122 (remarking that "Plaintiffs' most evident problem in their Section 11(b) claim is Georgia law itself"); *id.* at 122-23 & n.59 (noting Defendants' alleged technical compliance with Section 230 and remarking that "Plaintiffs have not made any argument challenging Section 230 under the Supremacy Clause, or as unconstitutional"). It is similarly difficult to square with TTV's defense of the opinion, which relies primarily on its compliance with state law. *See, e.g.*, TTV Br. at 1-2 (arguing compliance with state law); *id.* at 27 (summarizing the district court's emphasis on state law); *id.* at 32 (similar). These arguments are wholly inconsistent with binding precedent, which hold that "[a]cts otherwise entirely within the law may violate [federal voter intimidation laws] if they have the proscribed effect" of intimidating voters. *McLeod*, 385 F.2d at 740; *see also* Op. Br. at 23-25 (citing cases).

Ultimately, Plaintiffs did not challenge Section 230 and have not argued that all Section 230 challenges impart liability under Section 11(b). Instead, TTV is liable because it launched mass challenges that it knew were riddled with blatant errors and inevitably swept in leagues of lawful voters, while (1) alleging mass voter fraud without evidence and (2) calling for "all eyes" on Georgia to expose voter fraud at a time when Georgia's Senate Runoff Election was in the national spotlight. *See* Op.

Br. at 30-39. This behavior predictably caused voters to fear the consequences of voting and was thus prohibited by Section 11(b).

### B.   TTV fails to apply any theory of causation.

As Fair Fight has shown, Section 11(b) is best read to require a proximate causation standard—one in which defendants are liable for "the natural and probable consequence[s]" of their actions. *See id.* at 27-30. Under a proximate cause standard, the intervening acts of third parties "break the chain of causation only where they are *unforeseeable*." *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (emphasis added) (citation omitted). Here, however, the counties' conduct in processing TTV's challenges was wholly foreseeable to TTV. Indeed, the very reason TTV filed challenges in the first place was to persuade county boards to investigate voters and prevent them from voting. *See* Op. Br. at 28-29. TTV never attempts to explain what standard of causation should have been applied here, and consequently its defense of the district court's causation theory merely repeats the district court's ruling while ignoring the relevant legal question.

Rather than engage with the proper causation standard, TTV claims Plaintiffs waived any objection to the standard announced in the district court's summary judgment ruling. But the district court's summary judgment order did not identify what causation standard it would apply. It acknowledged, however, the long-standing natural consequences standard of Section 11(b), emphasized that it "[did]

not believe that [any] causation requirement needs to be onerous," and that there need only be "some connection between Defendants' conduct and [voters'] intimidation." Doc. 222 at 24-25. If anything, that order suggested TTV *would be liable* if it directed county challengers to file challenges, as TTV unquestionably admitted it did at trial. *Id.* at 21 (recognizing that Plaintiffs could prove their claim if they "submitted evidence that voters felt or could have felt intimidated by being, or possibly being, challenged by Defendants via their county challengers"). It was only after trial that the district court abandoned that standard and held instead that the county boards' status as intermediaries broke the causal chain and absolved TTV of liability. *See* Doc. 335 at 125-26. Regardless, Fair Fight had no obligation to object to a legal standard announced in a summary judgment order to preserve arguments for appeal after a final order. Defendants cite no case law standing for this principle, and, of course, Fair Fight would not have been permitted to appeal a denial of a summary judgment order anyway. *See Coleman v. Hillsborough County*, 41 F.4th 1319, 1324 (11th Cir. 2022).

To the extent Fair Fight had any obligation to preserve its causation arguments below, it met that obligation. Plaintiffs have long argued that the foreseeability of Defendants' actions is what renders them liable. *See, e.g.*, Doc. 318 at 28 (Plaintiffs' post-trial brief arguing Defendants were liable because "[t]he natural consequence of Defendants' actions was to intimidate or coerce voters from exercising their

16

rights"); Doc. 156-1 at 15 (Plaintiffs arguing at summary judgment that "[i]t was thus entirely foreseeable that eligible voters would be included in the challenge lists, would feel intimidated upon receipt of formal notice, and would reluctantly decide in the future that the safer course may be not to vote at all"); *id.* at 9 (arguing for a natural-consequences standard).

Strikingly, TTV does not attempt to rebut Fair Fight's argument that the consequences of its actions were foreseeable, instead relying exclusively on its alleged inability to force the counties to accept all of its challenges. *See* TTV Br. at 36-37. Both TTV and the district court insist that TTV took no action to affect the boards' decision to reach out to individual voters, *id.* at 28, seemingly ignoring that its voter challenges did precisely that: they asked the county boards to confront hundreds of thousands of Georgians and raise questions about their eligibility to vote. *See, e.g.*, PX 4 at 2 (TTV challenge sent to counties representing that the identified voters "no longer reside where they are registered to vote" and seeking a challenge hearing under Section 230). And when a county board did not act as swiftly as TTV would have liked, TTV and its challengers exerted even more pressure to influence the boards' decisions. *See supra* at 8-10.

Like the district court, TTV fails to explain why its lack of control over the county boards is legally relevant. It is not. As Fair Fight explained in its opening brief, even when an intervening actor has unfettered discretion, liability still attaches

if the third parties' action is reasonably foreseeable. *See* Op. Br. at 29-30 (citing cases); *Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*, 944 F.3d 886, 892 (11th Cir. 2019) (holding an intervening cause will not excuse liability "if its probable or natural consequences could reasonably have been anticipated" (cleaned up)). TTV did not refute this, much less rebut it. Because the county boards' actions were entirely foreseeable—again, it was the stated *goal* of the challenge program for counties to process TTV's challenges and alert voters that a challenge had been made against them—TTV is liable under the applicable causation standard.

## IV.    The district court's erroneous exclusion of evidence prejudiced Plaintiffs.

Although Plaintiffs could have (and should have) prevailed with the evidentiary record below, Fair Fight raised two evidentiary errors that would provide additional bases to rule for Plaintiffs, and thus by definition were not harmless. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (holding an error is not harmless and affects a parties' substantial rights "if one cannot say, with fair assurance that the judgment was not substantially swayed by the error" (cleaned up)).

### A.    The district court erroneously excluded evidence of TTV's threats.

First, the district court misapplied the rule against hearsay and on that basis refused to consider damning social media posts that threatened to "release the entire list" of challenged voters if "Georgia counties refuse to handle the challenges" so

18

that "America [could] do the QC." *See* Op. Br. at 42-44; PX 45. Exclusion of that threat, which alone would provide a basis to find attempted intimidation or coercion in violation of Section 11(b), plainly prejudiced Plaintiffs.

Statements offered for purposes other than their truth are not hearsay. *United States v. Bobo*, 586 F.2d 355, 372 (5th Cir. 1978). As Fair Fight explained in its opening brief, the posts were not introduced to prove that Defendants *actually* planned to release the list, but rather to show that they publicly *declared* an intent to do so. When "the significance of an offered statement lies solely in the fact that it was made . . . the statement is not hearsay." *Id.* (quotation omitted); *see also Great S. Lumber Co. v. Williams*, 17 F.2d 468, 470 (5th Cir. 1927) (holding that where "[t]he making of the threatening statements, and not the truth of what had been said by the makers, was the inquiry," the statement was not hearsay), *aff'd*, 277 U.S. 19 (1928). For this precise reason, courts have held that a defendant's out-of-court statement in which he threatened, "I will kill you" was not hearsay because it was not "offered for the truth of the matter asserted, that he would indeed kill [a person] if she went to the police." *United States v. Ledford*, 154 Fed. Appx. 692, 697 (10th Cir. 2005). It was offered instead "only to prove that [the defendant] made the threat." *Id.* Much as it did not matter whether the defendant in *Ledford* actually intended to kill anyone, it does not matter whether Defendants actually intended to

publicize its list of challenged voters because in both instances the defendants sought to create the impression that they would act in the manner threatened.

The district court's conclusion that that "[t]here is no evidence that these posts were intended to reach any voter," Doc. 335 at 100, was similarly inexplicable because social media sites like Twitter (where the posts were made) are the "modern public square." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017); *see also Liverman v. City of Petersburg*, 844 F.3d 400, 410 (4th Cir. 2016) (explaining that, "[s]imilar to writing a letter to a local newspaper," "publicly posting on social media suggests and intent to communicate to the public" (cleaned up)). The court's conclusion that public social media posts addressed to Georgians, and amplified by the hashtags #eyesonGA and #validatethevoteGA, were not "intended to reach any voter" is irreconcilable with the most fundamental purpose of making a public post in a public forum.

Finally, the district court's observation that "there is no evidence that anyone saw or read these posts" is irrelevant if Section 11(b)'s prohibition on "attempt[s]" to intimidate has any meaning. Defendants do not contest that threatening to publicize voters' identities would be intimidating, and the district court similarly noted that publicizing such names would "ha[ve] enormous implications for potential voter intimidation[.]" Doc. 335 at 100 n.52. That alone confirms the district court's exclusion of this evidence was not harmless.

20

Defendants admit that when a court "applies the law in an unreasonable or incorrect manner" it constitutes an abuse of discretion. TTV Br. at 48. Here, the district court did both. It was *unreasonable* to conclude that a public statement on social media addressed to Georgians and amplified with hashtags was not "intended to reach any voter," particularly when there was no contrary testimony. And it was *incorrect* to conclude that a threatening statement could only be relevant if offered for the truth of the matter when the fact that it was uttered at all proved, or at least significantly weighs on, an *attempt* to intimidate to coerce voters.

### B.    The district court erroneously excluded evidence of Defendants' connection to Muscogee County voters.

Second, the district court also erroneously excluded testimony from Muscogee voter Gamaliel Turner that would have tied Defendants to the Muscogee County challenges. The court did so by adopting a novel "try before you buy" version of the rule against hearsay in which a party may deliberately invite hearsay and then, finding it unhelpful to their case, take back the very evidence they themselves had presented. Perhaps recognizing the fundamental unfairness of such a rule, this circuit has found that when a party has "invited" hearsay, it is proper for the trier of fact to consider that evidence. *See, e.g.*, *United States v. Parikh*, 858 F.2d 688, 695 (11th Cir. 1988) (upholding admission of hearsay statement by a government witness when the witness was responding to an inquiry by defense counsel, on the ground that defense counsel "invited" the error). In other words, a

21

"defendant cannot 'open the door' to a line of testimony and then object to its admissibility when the testimony elicited is damaging." *United States v. Brendia*, 234 F.3d 1274 (Table), 2000 WL 1716433, at *2 (7th Cir. 2000).

Defendants do not dispute that they invited the very testimony at issue here. Nor could they reasonably do so; defense counsel's questions to Mr. Turner could *only* have resulted in hearsay. Specifically, defense counsel asked Mr. Turner who challenged him (Alton Russell); whether Mr. Turner spoke to Mr. Russell about the challenges (he did); whether Mr. Turner would have a reason to know that Mr. Russell was acting on behalf of Defendants (he was, because Mr. Russell told him so). Then defense counsel asked Mr. Turner, "What did [Mr. Russell] say?" *See* Op. Br. at 36-37 n.12; Doc. 320 at 69-70. This testimony was not one that defense counsel stumbled into by accident. Whether or not Alton Rusell was an agent of True the Vote when he filed the Muscogee County challenges was highly contested between the parties.[3]

If Fair Fight is right that the Muscogee voter testimony presented (from voters Berson, Turner, or Stinetorf) otherwise established a Section 11(b) violation and that the district court's causation standard was wrong, the exclusion of this testimony

---

[3] For example, during trial, the district court refused to admit PX 86, a spreadsheet produced in discovery listing Alton Russell as TTV's Muscogee County challenger. *See, e.g*., Doc. 315 at 39-41. Plaintiffs do not separately contest the exclusion of that exhibit as error on appeal.

was not harmless. The district court accepted that Russell had challenged the impacted Muscogee County voters but found that "no evidence connects Russell to True the Vote's challenge list." Doc. 335 at 95. The evidence the district court erroneously excluded is precisely the link the court found missing.

## V.   TTV mischaracterizes the record, its conduct, and its impact on voters.

As Fair Fight explained in its opening brief, the vast majority of the district court's factual findings credited Plaintiffs' evidence, while finding TTV's founder and President, Catherine Engelbrecht, utterly *incredible* in her testimony describing TTV's challenge effort. *See* Op. Br. at 16, 45. TTV now repeatedly seeks to defend its conduct—and the distress it caused—by mischaracterizing both the factual record and the district courts findings.

For instance, TTV maintains it "performed a significant amount of diligence before undertaking the Section 230 challenges" and contends its challenges were accurate, *see* TTV Br. at 7-9; yet the district court found the opposite, concluding that: "TTV's list utterly lacked reliability. Indeed, it verges on recklessness. The Court has heard no testimony and seen no evidence of any significant quality control efforts, or any expertise guiding the data process." Doc. 335 at 90; *id*. at 91 (finding "[a] mere visual inspection of the list by a layperson would have returned an obvious concern for the datasets used. It is clear that TTV did not engage in a quality process to create the list, nor did they have proper review or controls in place.").

23

TTV also repeatedly suggests its challenges were brought in good faith, citing, for instance, how "Engelbrecht left the meeting [with Secretary of State General Counsel Ryan Germany] believing that TTV had done everything that is could and should do to support Georgia Citizens according to the law." Although an intent to intimidate is not required to prove liability under Section 11(b), *see* Op. Br. at 5-6, and TTV does not contend otherwise, TTV Br. at 38, these representations, too, are directly contradicted by the district court's findings. *See, e.g.*, Doc. 335 at 91 (finding "TTV was on notice [because of Engelbrecht's meeting with Mr. Germany] that asserting a mass challenge in [the] manner they chose would be outside the spirit of Section 230"); *id.* at 92 ("[T]he Court also finds, in weighing the evidence, that TTV acted having been warned that non-individualized Section 230 challenges based on NCOA data" would be insufficient to support a Section 230 challenge).

These warnings came not just from Mr. Germany, whose testimony the district court explicitly credited over Engelbrecht's "self-serving" testimony, *see id.* at 34, 92, but also from TTV's own allies as well. As the district court recounted, "[e]ven the sheer size of the [challenge] list spurred concerns by TTV's co-Defendants, who thought the mass list verged on being a systemic challenge" that would be barred by both the National Voter Registration Act and Section 230, *see id.* at 91. And the district court similarly found that even TTV's own volunteers warned TTV that its

lists were sweeping in eligible voters, demonstrating how "such errors [were] easily apparent to a lay person with a similar political interest as TTV." *Id.*

TTV's mischaracterizations of the record, and its attempt to shift responsibility for its conduct, ultimately pervade its discussion of nearly every witness. TTV, for example, insinuates that it was not responsible for Heredia's challenge, remarking that, "Heredia's eligibility was challenged by Banks County residents Jerry Boling and Dan Gasaway, neither of whom Heredia connected to TTV." TTV Br. at 14-15. Whether Ms. Heredia made the connection herself or not, at trial Plaintiffs proved that TTV recruited Boling to authorize a challenge in Banks County and submitted the Banks County challenge containing Heredia's name on his behalf. *See* PX 49 at 8; Doc. 311 at 43; Doc. 335 at 97 (district court confirming that Engelbrecht "admit[ed] that TTV and Boling worked together" on the Banks County challenge against Heredia).

Similarly, TTV attempts to cast doubt on Plaintiff Berson's testimony, noting that he "did not use the word 'intimidating' in his discovery responses and only used the word at trial." TTV Br. at 13. As Fair Fight has already noted, however, Defendants declined to depose Berson, and their interrogatories asked Berson about the administrative burdens he faced in proving his residency, Doc. 310 at 126, a much narrower question than whether Berson was intimidated by the challenge.

25

Finally, although TTV claims its actions did not harm anyone and implies that this case was manufactured by Fair Fight or its lawyers, *see* TTV Br. at 11, the record demonstrates that voters were so anxious and fearful about the challenges that they independently sought help after they were challenged. *See, e.g.*, Doc. 312 at 17 (Plaintiff Heredia testifying that after being challenged, she was "upset" and "angry," and "ended up calling a voters rights hotline" to "tell them [her] experience" and seek help); Doc. 320 at 94 (Mr. Turner testifying he sought help from his state representative and friends after being challenged to seek help in finding someone who could help him overcome the challenge).

Ultimately, none of these misrepresentations are dispositive to the merits of this appeal. But TTV's choice to dedicate its response brief to an imaginative rewriting of the record reveals a telling lack of confidence in the facts and the law as they exist.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

Allegra J. Lawrence-Hardy
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Michelle McClafferty
Georgia Bar No. 161970
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com

*/s/ Uzoma Nkwonta*
Uzoma N. Nkwonta
Jacob D. Shelly
Christina Ford
Tina Meng Morrison
Marcos Mocine-McQueen
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
cford@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law

**No. 24-10372**
**Fair Fight, Inc. v. True the Vote, Inc.,** *et al.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this brief contains 6,383 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in font size 14, Times New Roman.

*/s/ Uzoma Nkwonta*
Uzoma Nkwonta
*Attorney for Appellant Fair Fight, Inc.*